# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

DOCTORS HOSPITAL OF AUGUSTA, LLC )
As Authorized Representative and Assignee of )
MATTHEW D. STONE, )
)
Plaintiff, )
)
v. )
)
CAROLINA BEVERAGE CORPORATION )
EMPLOYEE BENEFIT PLAN, )
)
First Defendant )
)
and )
)
CAROLINA BEVERAGE CORPORATION, )
)
Second Defendant. )
)

Civil Action No.1:04-CV-_____

CV104-186

## NOTICE OF REMOVAL

Defendants Carolina Beverage Corporation Employee Benefit Plan and Carolina Beverage Corporation, by and through the undersigned counsel and pursuant to 28 U.S.C. §§ 1441 and 1446, give notice that they have removed from the Superior Court of Richmond County, Georgia, the action entitled *Doctors Hospital Of Augusta, LLC, as authorized representative and assignee of Matthew D. Stone v. Carolina Beverage Corporation Employee Benefit Plan, et al.*, Civil Action File No. 2004-RCCV-1013, to this Court, the United States District Court for the Northern District of Georgia, and state as follows:

1. On October 28, 2004, Plaintiff commenced this action against Defendants in the Superior Court of Richmond County, Georgia, Civil Action File No. 2004-RCCV-1013. Defendants were personally served with the Summons and Complaint by the Rowan County

(North Carolina) Sheriff's Department on November 3, 2004. This Notice of Removal has been filed within thirty (30) days after service. *See* 28 U.S.C. § 1446(b).

2.     The claims for relief in Plaintiff's Complaint allege that Defendants failed to reimburse Plaintiff for certain medical expenses pursuant to the terms of an employee benefit plan provided by Carolina Beverage Corporation to its employees and certain other beneficiaries. *See* Complaint ¶¶ 2 and 4 -18. The claims for relief in Plaintiff's Complaint also allege a breach of fiduciary duty owed under the Plan, failure to comply with claims processing procedures under the Plan, failure to establish a reasonable claims procedure under the Plan, and failure to timely respond to requests for production of documents pursuant to a written request for administrative review of the Plan's decision on payment of the claim. *See* Complaint ¶¶ 19-23.

3.     The claims that Plaintiff has attempted to assert against Defendants are governed by Section 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. Section 502 of ERISA provides the exclusive right of action for claims seeking benefits under an employee benefit plan. As such, this action is of a civil nature of which the District Courts of the United States have original federal jurisdiction under 28 U.S.C. § 1331. Accordingly, this case is removable to this Court pursuant to 28 U.S.C. § 1441.

4.     In accordance with 28 U.S.C. § 1446(a), attached hereto as Exhibit 1 are copies of all process, pleadings, papers and orders served upon Defendants in this action and/or filed in the Superior Court of Richmond County, Georgia, Civil Action File No. 2004-RCCV-1013.

5.     This Notice of Removal was served upon all parties and filed with the Clerk of the Superior Court of Richmond County, Georgia, contemporaneously with this filing. *See* 28 U.S.C. § 1446(d).

This the 3ᵈ day of December, 2004.

_Amy R. Snell_

J. Arthur Davison
Georgia State Bar No. 213385
Amy R. Snell
Georgia State Bar No. 665677
Attorney for Defendants
Carolina Beverage Corporation Employee Benefit Plan and
Carolina Beverage Corporation

OF COUNSEL:
FULCHER HAGLER LLP
Post Office Box 1477
Augusta, Georgia 30903-1477
Telephone: (706) 724 - 0171

IN THE SUPERIOR COURT OF RICHMOND COUNTY

STATE OF GEORGIA

CIVIL ACTION FILE NO. 2004 RCCV 1013

DOCTORS HOSPITAL OF AUGUSTA, LLC.,      )
As Authorized Representative and Assignee of )
MATTHEW D. STONE,                        )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )
                                         )
CAROLINA BEVERAGE CORPORATION            )
EMPLOYEE BENEFIT PLAN                    )
                                         )
        First Defendant                  )
                                         )
and                                      )
                                         )
CAROLINA BEVERAGE CORPORATION,           )
                                         )
        Second Defendant.                )

---

## COMPLAINT

NOW COMES the Plaintiff and files its Complaint against the Defendants by showing unto the Court the following:

### A. PARTIES

1.      Plaintiff, Doctors Hospital of Augusta, LLC ("Doctors Hospital"), is a corporation organized and existing under the laws of Delaware with its principal place of business in Augusta, Richmond County, Georgia, where it operates a hospital generally known as "Doctors Hospital". Plaintiff brings this action as assignee and authorized representative of Matthew D. Stone, a former patient of Doctors Hospital, for ERISA


EXHIBIT
1

violations and failure to pay benefits due as a result of medical care and treatment provided to Mr. Stone.

2.      First Defendant, Carolina Beverage Corporation Employee Benefit Plan ("the Plan"), is an employee benefit plan formed and established under the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §1001, et. seq.  Said Plan provides medical expense reimbursement coverage for specified beneficiaries of the Plan, Mr. Matthew D. Stone being one of said beneficiaries.

3.      Carolina Beverage Corporation is a corporation organized under the laws of a state other than Georgia, however said corporation is conducting business in Georgia and therefore is subject to the jurisdiction of this state by virtue of the Georgia Long Arm Statute (O.C.G.A. §9-10-91).  Carolina Beverage Corporation, who funds the Plan, is also the Plan Administrator and Plan Sponsor.

## B.  JURISDICTION AND VENUE

4.      This action is brought to recover medical benefits and penalties owed by the Defendants to Plaintiff as assignee and authorized representative of Matthew Stone. Jurisdiction and venue are proper under both state and federal law.

## C.  FACTUAL ALLEGATIONS

5.      The Plan provides medical expense reimbursement coverage to employees/beneficiaries of Carolina Beverage Corporation.  Said Plan is self-funded by Carolina Beverage Corporation and a copy of the Summary Plan Document is attached as Exhibit "A" and incorporated by reference.  At all times referenced herein, said Plan was in full force and effect.

6.      At all times referenced herein Matthew D. Stone was a beneficiary of said Plan and entitled to payment of medical benefits thereunder.

7.      Plaintiff is the authorized representative and assignee of all benefits for the Plan beneficiary, Matthew D. Stone. A copy of the Appointment of Authorized Representative executed by Mr. Stone is attached hereto and marked Exhibit "B" and incorporated by reference.

8.      Plaintiff operates one of the premiere burn facilities in the Southeast United States, and one of only two burn facilities in the state of Georgia.

9.      On or about August 7, 2003, Matthew Stone suffered severe burns requiring emergency admission to Plaintiff's facility where he stayed through September 12, 2003. During that time, Mr. Stone received specialized and intensive treatment for his severe burn wounds including, but not limited to, approximately nineteen separate and distinct surgical procedures. The total charges for this specialized treatment and care was $626,896.22.

10.     Mr. Stone required further medical treatment and hospitalization after his initial discharge. These admission dates and total charges for treatment were as follows:

(a)     Dates of Service – 9/15/03 – 10/6/03
        Total Charges - $73,688.69

(b)     Dates of Service – 10/17/03 – 11/02/03
        Total Charges - $117,174.99

(c)     Dates of Service – February 4, 2004
        Total Charges - $564.87

(d)     Dates of Service – March 8, 2004 – March 15, 2004
        Total Charges - $31,821.53

11.     Of the total charges of $850,146.30 submitted to the Plan for payment, only $564,700.96 has been paid, leaving a balance due and owing by the Plan to Plaintiff of $285,445.34.

12.     Request for payment, with supporting documentation of the initial hospitalization of August 7, 2003, was submitted to the Plan by Certified Mail dated September 17, 2003. Repeated calls were made on behalf of the hospital requesting the Plan to process and pay the initial billing which Defendants refused to do.

13.     On March 26, 2004, the attorney representing Plaintiff wrote both Defendants concerning the failure to timely pay benefits, providing the Defendants with a copy of Mr. Stone's Appointment of Authorized Representative, and further demanding production of a copy of the entire claims file of Defendant pursuant to 29 C.F.R. §2560.03-1(m)(8). A copy of said letter is attached hereto as Exhibit "C" and incorporated by reference.

14.     With the receipt of payment of $564,700.96 on April 27, 2004, Plaintiff also received a letter from HBA Hospital Bill Analysis allegedly offering explanation of benefit determination and amounts. A copy of said Explanation of Benefits is attached hereto and marked as Exhibit "D" and incorporated by reference. Several reasons were given for the Plan's failure to pay all billed charges including, but not limited to, some charges being undocumented or billed charges being reduced as being disallowed under the Plan or exceeding usual and customary charges.

15.     By letter dated June 4, 2004, the attorney for Plaintiff submitted a written request for administrative review of the Plan's failure or refusal to pay additional benefits. In addition, said letter pointed out, with specificity, the error of HBA and the

Plan in reducing most, if not all of the billed charges, as well as the reasons given for such reductions. A copy of said letter is attached hereto and marked as Exhibit "E" and incorporated by reference.

16.     On July 29, 2004, Plaintiff's attorney received the first response to his request for administrative review and payment of further benefits. This response, written by Brian B. Davenport, Esq., as attorney for Defendants, is attached hereto and marked as Exhibit "F" and incorporated by reference. Said response acknowledged Plaintiff's request for formal administrative review of the Plan's refusal to pay further benefits and Plaintiff's requests for additional information and documents. Said letter further indicated the Plan would reconsider its methodology of reducing Plaintiff's billings and a response to Plaintiff's request for additional benefits would be given within "the next two weeks."

17.     On August 24, 2004, counsel for Plaintiff again wrote Mr. Davenport requesting decision on Plaintiff's request for administrative review and payment of additional benefits. Said letter is attached hereto and marked as Exhibit "G" and incorporated by reference. This letter was sent two weeks after the promised deadline for obtaining information as set forth in Mr. Davenport's letter. No response from the Defendants or their representatives has been received since that time. No further benefits have been paid on Plaintiff's claim.

### D. CLAIMS FOR RELIEF

18.     Doctors Hospital, as Assignee and Authorized Representative of Matthew Stone, brings this claim against each Defendant, jointly and severally, for relief under 29 U.S.C. §1132. Doctors Hospital seeks a judgment against each Defendant, jointly and

severally, in the amount of all benefits due to Doctors Hospital as Assignee of Matthew Stone under the Employee Benefit Plan provided to Matthew Stone.

19.     The Defendants have jointly and severally breached their fiduciary duties by refusing and failing to pay all benefits due under the Plan with respect to the within referenced hospitalizations of Matthew Stone.  Specifically, the Defendants have attempted to reduce benefits owed under the Plan by arbitrary and capricious methods of calculation, unauthorized by the specific terms of the Plan documents.  Defendant's actions also violate the mandatory claims procedures under ERISA.

20.     Plaintiff is entitled to payment of the remaining unpaid balance of its bill for treatment rendered to Matthew Stone, said amount being $285,445.34.

21.     Defendants have utterly and completely failed and refused to comply with the claims processing procedures under the Plan and as required by 29 U.S.C. §1132(c)(1) and 29 C.F.R. §2560.503(1)(H)(2)(iii).  Specifically, all Defendants continue to refuse Plaintiff's request for payment of additional benefits or provide any written reason or response to Plaintiff's request for payment of all benefits.  Further, as shown above, the Defendants have continuously and repeatedly failed to timely respond to requests for production of documents.

22.     Based on the foregoing, Plaintiff is informed and believes that it is no longer required to exhaust administrative remedies as required under ERISA because of Defendants' failure to comply with the provisions of 29 C.F.R. §2560.503-1(f).

23.     Further, because of Defendants' refusal to establish a reasonable claims procedure or provide necessary documents, Plaintiff is informed and believes that all

Defendants should be fined in the appropriate amounts for their failure to comply with 29 U.S.C. §1132(c)(1) and 29 C.F.R. §2560.503-1(f).

24.     Plaintiff further requests that the Court award attorney's fees to Plaintiff as allowed under 29 U.S.C. §1132(g)(1).

### E. PRAYER

For reasons set out above, Plaintiff prays for judgment against the Defendants, jointly and severally as follows:

(a)     Actual damages in the amount of $285,445.34, said amount being benefits remaining due and payable to Plaintiff under the Plan;

(b)     For pre-judgment and post-judgment interest;

(c)     For costs of this suit, including attorney's fees;

(d)     For fines and penalties authorized under ERISA against all Defendants; and

(e)     For such other and further relief this Court deems just and proper.

This 26 day of ___October___, 2004

_____
ROBERT L. ALLGOOD
Attorney for Plaintiffs

2907 Professional Parkway
Augusta, GA 30907
(706) 860-3747
State Bar No. 012675

_____
N. KENNETH DANIEL
Attorney for Plaintiffs

2907 Professional Parkway
Augusta, GA 30907
(706) 860-3747
State Bar No. 204250

## IN THE SUPERIOR/STATE COURT OF RICHMOND COUNTY

## STATE OF GEORGIA

DOCTORS HOSPITAL OF AUGUSTA, LLC,
as Authorized Representative and
Assignee of MATTHEW D. STONE,

CIVIL ACTION,
NUMBER ___2004-RCV-1013___

**PLAINTIFF**

VS.

CAROLINA BEVERAGE CORPORATION
EMPLOYEE BENEFIT PLAN, 1st Def.
and

CAROLINA BEVERAGE CORPORATION, 2nd Def.

**DEFENDANT**

### SUMMONS

TO THE ABOVE NAMED DEFENDANT:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

Robert L. Allgood and N. Kenneth Daniel
2907 Professional Parkway
Augusta, Georgia 30907

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This ___28___ day of ___October___, ___2004___

Clerk of Superior/State Court

By ___Margo G. Bailey___
Deputy Clerk

Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

35 24

Case No. 2004-RCCV-013

Date Filed 10-28-04

Juvenile Court ☐
State Court ☐
Superior Court ☒
Georgia, Richmond County

Attorney's Address

Robert L. Allgood
N. Kenneth Daniel
2907 Professional Parkway
Augusta, Georgia 30907

Name and Address of Party to be Served

Mark Ritchie, President
CAROLINA BEVERAGE CORPORATION
EMPLOYEE BENEFIT PLAN
1413 Jake Alexander Blvd. S.
Salsbury, NC  28145-0697

DOCTORS HOSPITAL OF AUGUSTA, LLC,
as Authorized Representative and
Assignee of MATTHEW D. STONE,

Plaintiff

VS.

CAROLINA BEVERAGE CORPORATION
EMPLOYEE BENEFIT PLAN, 1st Def.
and
CAROLINA BEVERAGE CORPORATION,

2nd Defendant

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**

I have this day served the defendant CAROLINA Beverage CorPoration Employee Benefit Plan personally with a copy of the within action and summons. by Leaving copies with MARK Ritchie - President COMPLAINT 1413 Jake Alexander Blvd. S, Sal. N.C. 28145

**NOTORIOUS**

I have this day served the defendant _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

☐ Delivered same into hands of _____ described as follows age, about_____years; weight, about_____pounds; height, about_____feet and_____inches, domiciled at the residence of defendant.
COMPLAINT

**CORPORATION**

Served the defendant _____ a corporation
☐ by leaving a copy of the within action and summons with _____
in charge of the office and place of doing business of said Corporation in this County.
COMPLAINT

**TACK & MAIL**

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
☐ designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.
COMPLAINT

**NON EST**

☐ Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This 3 day of November, 2004
10:00 AM

Sgt. O. A. Childress

DEPUTY

SHERIFF DOCKET_____ PAGE_____

3° 04

Case No. _2004-RCCV-013_

Date Filed _10-28-04_

Juvenile Court ☐
State Court ☐
Superior Court ☒
Georgia, Richmond County

Attorney's Address

Robert L. Allgood
N. Kenneth Daniel
2907 Professional Parkway
Augusta, Georgia 30907

Name and Address of Party to be Served

Mark Ritchie, President
CAROLINA BEVERAGE CORPORATION
EMPLOYEE BENEFIT PLAN
1413 Jake Alexander Blvd. S.
Salsbury, NC 28145-0697

DOCTORS HOSPITAL OF AUGUSTA, LLC,
as Authorized Representative and
Assignee of MATTHEW D. STONE,

Plaintiff

VS.

CAROLINA BEVERAGE CORPORATION
EMPLOYEE BENEFIT PLAN, 1st Def.
and
CAROLINA BEVERAGE CORPORATION,

2nd Defendant

Garnishee

## SHERIFF'S ENTRY OF SERVICE

**PERSONAL**

I have this day served the defendant _CAROLINA Beverage Corporation_ Employee Benefit Plan _personally with a copy
of the within action and summons. _by leaving copies with MARK Ritchie - President_
COMPLAINT _1413 Jake Alexander Blvd. S. Sal. N.C. 28145_

**NOTORIOUS**

I have this day served the defendant _____ by leaving a
copy of the action and summons at his most notorious place of abode in this County.

☐ Delivered same into hands of _____ described as follows
age, about_____years; weight, about_____pounds; height, about_____feet and_____inches, domiciled at the residence of
defendant.
COMPLAINT

**CORPORATION**

Served the defendant _____ a corporation
☐ by leaving a copy of the within action and summons with _____
in charge of the office and place of doing business of said Corporation in this County.
COMPLAINT

**TACK & MAIL**

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in
☐ an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing
notice to the defendant(s) to answer said summons at the place stated in the summons.
COMPLAINT

**NON EST**

☐ Diligent search made and defendant _____
not to be found in the jurisdiction of this Court.

This _3_ day of _November_, _2004_
_10:00 AM_

_Sgt. O. A. Childress_

DEPUTY

SHERIFF DOCKET_____   PAGE_____

Reorder No. 95-00582                                    CLYDE CASTLEBERRY COMPANY, COVINGTON, GA. 30209

 

**Group :**   CAROLINA BEVERAGE CORPORATION

**Group # :**   CBC99

**Employee :**   MATTHEW STONE
**ID # :**   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

Eligibility/Benefits 1-800-241-1510
Precertification Required call 1-888-376-6544

CAREMARK   BIN # 610029 • Plan Code CRK
Issuer (80840) • Group Code KBADI
Rx Customer Service 800-824-6349



Providers: This plan requires pre-service review for some hospital outpatient procedures and pre-admission review for all hospital inpatient admissions. Report emergency admission within 24 hours. Call 888-376-0544
• For mental health pre-certification call Cigna Behavioral Alternatives at 800-446-1022

| | |
|---|---|
| Submit all Health Claims to | BC/BSSC - PPO Network |
| | Leased Network Claims |
| | PO Box 100000 |
| | Columbia, SC 29219-0001 |
| Submit all other claims to | Employee Benefit Services, Inc |
| | PO Box 1928 |
| | Fort Mill, SC 29716-1928 |
| | ** Yellow paper ID # 57216 ** |
| **Office Visit** | In-Network - $15 co-pay, Out-of-Network - 60% |
| **Coinsurance** | In-Network - 80%, Out-of-Network - 60% |
| **Deductible** | In-Network - $150 Individual, $500 Family |
| | Out-of-Network - $300 Individual, $1,000 Family |
| **Out of Pocket Max** | In-Network - $1,500 Individual, $3,000 Family |
| | Out-of-Network - $2,500 Individual, $5,000 Family |

# TABLE OF CONTENTS

Keeping Fit Can Be Your Biggest Benefit .................................. 3
Compliance with HIPAA of 1996 .......................................... 4
When Coverage is Effective ............................................... 5
Eligible Dependents ....................................................... 8
Major Medical Benefits .................................................. 10
Schedule of Medical Benefits ............................................ 11
Prescription Drug Programs .............................................. 14
Calendar Year Deductible ................................................ 16
Preferred Provider Benefits ............................................. 17
Calendar Year Out-Of-Pocket Maximum ................................. 18
Pre-Existing Conditions .................................................. 19
Special Provisions
• Utilization Review ..................................................... 21
• Wellness and Preventive Care ........................................ 25
• Mental, Nervous, Alcoholism &
   Chemical Dependency .................................................. 26
• Skilled Nursing Facility/Extended Care Facility ................. 26
• Home Health Care ..................................................... 27
• Hospice Benefits ...................................................... 28
• Second Surgical Opinion .............................................. 29
• Organ Transplant Benefits ........................................... 29
• Reconstruction after Mastectomies ................................ 30
• Subrogation ........................................................... 31
Covered Medical Expenses ............................................... 33
Excluded Medical Expenses .............................................. 37
Plan Definitions ......................................................... 40
Weekly Disability ........................................................ 51
Coordination of Benefits ................................................ 54
You and Medicare ....................................................... 56
Termination of Coverage ................................................ 57
Benefits After Termination of Coverage (COBRA) ............... 62
How To File A Claim .................................................... 67
Appealing a Denied Claim .............................................. 68
Allocation and Apportionment of Benefits ......................... 70
Amendment and Termination of the Plan .......................... 70
Employee Retirement Income Security Act Of 1974
   (ERISA) ............................................................... 71

**CAROLINA BEVERAGE**
**EMPLOYEE MEDICAL PLAN**

For Employees and their covered dependents located in North Carolina

**To All Our Employees:**

The Company's success has been made possible by the efforts and loyalty of our personnel. The Company, in turn, is anxious to provide the best working conditions and benefits possible. Your health, welfare and security are of vital concern to all of us.

While it is our sincere hope that we will all enjoy good health and long life, no one is immune to illness, accident or death. To protect you and your family's financial security from these possibilities, we are happy to be able to offer you this Employee Benefit Plan. This Plan provides financial assistance to enable you to better meet unforeseen bills arising from accident and illness.

Please review carefully the provisions of this program outlined in this booklet. You should be aware of the coverage and security it provides. However, note that this Plan is designed for protection and purposes of defining what expenses are examined to be reimbursable under the Plan. This, of course, does not take the place of you and your loved ones seeking the best treatment options after consulting with your Physician. Keep this booklet with your other valuable papers as it clearly indicates the benefits available during a time of emergency.

Thank you for your continuing loyalty and efforts on behalf of our Company. With your assistance, we can continue to be a better place to work.

Booklet Restated Effective:  September 1, 2001

**KEEPING FIT CAN BE YOUR BIGGEST BENEFIT**

Physical fitness doesn't just happen nor is it an accident of youth. We can all be physically fit. When you're in shape, you feel better, look better, enjoy life more fully and are likely to live longer.

Here are a few reminders that could lead you to a better quality lifestyle:

- **Proper nutrition** - Eat three (3) balanced meals each day. Be sure to eat breakfast. Try to eliminate junk food, excessive sugar and salt from your diet.

- **Watch your weight** - Obesity can lead to many serious health problems.

- **Exercise** - At least three (3) times a week. Exercise relieves tension, improves appearance, increases coordination and endurance, and improves respiration and circulation.

- **Avoid smoking and drugs** - Smoking is a leading cause of cancer, heart disease, high blood pressure and respiratory ailments.

- **Get enough sleep** - Seven (7) or eight (8) hours of sleep each night is recommended.

- **Keep immunizations up-to-date.**

- **Practice safety precautions on the road and at home** - Buckle up for safety and keep the phone number of your local Poison Control Center handy.

- **In the case of pregnancy** - Always seek prenatal care as early as possible.

## COMPLIANCE WITH HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996

All provisions of the Plan are hereby amended to bring the Plan into compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Any provisions of the Plan which differ with the requirements of HIPAA are hereby amended so that the Plan shall at all times be in compliance with HIPAA and the Plan Administrator shall administer the Plan accordingly.

Pursuant to HIPAA, the Plan will at no time take into consideration any health status-related factors, (including both physical and mental illnesses, prior receipt of health care, prior medical history, genetic information, evidence of insurability, conditions arising out of acts of domestic violence, or disability) which exist in relation to a person who is eligible for coverage under the Plan for purposes of determining the initial or continued eligibility of that person for coverage under the Plan, for determining the level of contribution of the person to Plan funding, or to determine the level of benefits which will be made available to a person.

All references to requirements of the Plan that a person who is otherwise eligible for coverage under the Plan must meet medical insurability guidelines are hereby deleted.

The Plan is a self-funded Welfare Benefit Plan which provides medical benefits to covered persons. No benefits are payable by any insurance company. The Company will provide all payments for the benefit Plan. Employees may be required to pay a contribution which will partially reimburse the employer for the cost of operating the Plan and for benefit payments.

All Plan Participants will be given written notice of any material reduction in benefits provided by the plan within sixty (60) days of the adoption of such material reduction.

## WHEN COVERAGE IS EFFECTIVE

 **Who Can Be Covered**

All full-time employees of the Company who have a normal work week of 30 hours or more per week can be covered under the Plan. If a husband and wife are both members of the eligible group, they may elect to be covered both as employees or one as the dependent of the other, but neither can be covered both as an employee and as a dependent.

**Effective Date of Coverage**

Coverage under the Plan shall become effective with respect to an eligible Employee and eligible Dependents at the end of any applicable waiting period or, if none, on the Enrollment Date, provided written application for such coverage is made on or before such date and the Employee is Actively at Work as of the effective date.

**All Full Time Employees – Coverage is effective upon the day of completion of three (3) months of continuous active employment.**

**All Seasonal Employees – Coverage is effective upon the day of status change to permanent full-time if they have completed three (3) months of continuous active employment.**

If the Employee is not Actively at Work as of the coverage date, coverage for the Employee and Dependent(s) shall become effective as of the date the Employee returns to work.

If the eligible employee is totally disabled on the date his coverage becomes effective, his coverage will not be delayed until he returns to active service. Benefits for the disabling condition will become available according to the rules of the Pre-existing Condition Limitations.

An eligible employee who is disabled due to an occupational injury or sickness for which he is eligible for benefits under any Workers' Compensation or Occupational Disease Law or similar

law shall be considered in active service for coverage under this Plan. Such coverage will be limited to conditions that are not related to the condition causing the disability.

### Initial Enrollment Period

You may elect single coverage for yourself or family coverage for yourself and your eligible dependents by completing an enrollment card immediately or no later than 30 days after completion of your qualifying period and agreeing to make any required contribution by payroll deduction.

### Late Enrollment as a Part of Open Enrollment

If application for coverage under the Plan by an Employee or Dependent is made after the initial period of eligibility, and the applicant is otherwise eligible for coverage under the Plan and is not eligible to be covered by the Plan as a Special Enrollee, the applicant shall be a Late Enrollee and coverage for the eligible applicant shall not become effective until the end of the next Open-Enrollment Period.

An "Open-Enrollment Period" is the period during which an individual may apply for or adjust coverage under the benefit plan(s) of the Company. The open-enrollment period for the Company takes place annually during the month of April for a May 1st effective date.

### Special Enrollment

The Health Insurance Portability and Accountability Act of 1996 requires that group health programs allow certain individuals to be covered by the Plan as Special Enrollees as follows:

A. If an otherwise eligible Employee or Dependent declined coverage under the Plan at the time of initial eligibility, and stated in writing at that time that coverage was declined because of other health coverage but that other health coverage is subsequently lost, and that person makes application for coverage hereunder within 30 days of the loss of other health coverage, such individual shall be a Special Enrollee provided such person: (a) lost the alternative health coverage as a result of

loss of eligibility for the coverage (including as a result of legal separation, divorce, death, termination of employment, or reduction in the number of hours of employment, but not including an increase in cost of the other coverage or reduction in benefits of the other coverage); or (b) employer contributions toward such other coverage were terminated; or (c) if the eligible Employee or Dependent was covered under a COBRA continuation provision and the COBRA continuation period has been exhausted. Individuals who lose other health coverage due to nonpayment of premium or for cause (e.g., filing fraudulent claims) shall not be a Special Enrollee hereunder.

B.  An otherwise eligible Employee who is not covered by the Plan, an otherwise eligible Employee and Dependent who are not covered by the Plan, or a Participant's Dependent who is not otherwise covered by the Plan may apply for coverage under the Plan as a result of the acquisition of a new Dependent by the Participant through marriage, birth, adoption or placement for adoption and shall be a Special Enrollee provided such person is properly enrolled as a Participant or Dependent of the Participant within thirty (30) days of the acquisition of the new Dependent.

C.  A newborn child, a child placed for adoption, or a newly adopted child of a covered Participant will be covered from the moment of birth, placement for adoption, or adoption, including coverage for the necessary care or treatment of medically diagnosed congenital defects, birth abnormalities or prematurity, provided the child is properly enrolled as a Dependent of the Participant within thirty (30) days of the child's date of birth, adoption, or placement for adoption.

D.  Coverage for a Special Enrollee, other than for a newborn, a child placed for adoption, or a newly adopted child, shall begin as of the first day of the calendar month following the enrollment request.

## ELIGIBLE DEPENDENTS

If you elect family coverage, your eligible dependents will be covered on the same date as your coverage. It is important that you remember to notify your Employee Benefits or Human Resources department when you acquire your first dependent, change from one dependent status to another dependent status or when you no longer require dependent coverage. Your eligible dependents are:

1.  Your spouse under a legally valid existing marriage with a person of the opposite sex, unless legally separated or divorced;

2.  Is a resident of the same country in which the employee resides;

3.  Your unmarried children under 19 years of age, except for a child who is eligible for employee coverage under another group plan;

4.  Your unmarried children who are covered by this Plan before age 19 but less than 24 years of age, who are enrolled as full-time students in an accredited college or university, or a vocational, technical, vocations-technical or trade school or institute or secondary school and who are dependent on you for support;

5.  A child required to be covered under the terms of a Qualified Medical Child Support Order (QMCSO). Determination of a Qualified Medical Child Support Order, as enacted by OBRA '93 will be made by the Plan Administrator;

6.  Benefits for a child who is mentally or physically handicapped may be continued beyond the maximum age provided the child is incapable of self-sustaining employment and is chiefly dependent upon you for support and maintenance. Proof of incapacity must be furnished to the Plan Supervisor within thirty-one (31) days after the date benefits would otherwise be canceled and additional proof may be required from time to time.

Children are defined as: a natural child, lawfully adopted child (including those children placed in the home pending adoption), step child, or legally placed foster child or a child for whom the employee has legal custody. Court documented legal custody papers are required of children

*Carolina Beverage Corporation*
*Page 8*

not born to the covered father and/or mother.  Children must depend upon the employee for at least 50% of their support.

However, the Plan excludes a child who is:  (1) Eligible for employee coverage under this Plan; or (2) Eligible for coverage as an employee under another group benefit plan.

No person may be the dependent of more than one employee under this Plan.

Maternity charges for a covered dependent daughter's pregnancy are not covered by the Plan.

## MAJOR MEDICAL BENEFITS

If you or a dependent, while covered under this Plan, incur covered charges as a result of a non-occupational injury or illness, the Plan will pay as specified in the *Benefit Percentage* section. Covered charges will include items payable at the applicable benefit percentage (as specified in the *Benefit Percentage* section) of reasonable and customary charges.

Benefits under this Plan will be paid only if the Plan Administrator decides in his discretion that the applicant is entitled to them.

The total benefits payable under this Plan for any and all of the illnesses or injuries shall not exceed the maximum specified in the *Schedule of Benefits*. If you or a dependent have been covered by this Plan on more than one occasion, payments on all occasions shall be counted toward the maximum benefit. Each covered person's major medical coverage lasts until his or her coverage ends or his or her maximum lifetime benefit is used, whichever comes first. The maximum lifetime benefit for each covered member of your family for all covered medical expenses combined is shown in the *Schedule of Medical Benefits*.

## SCHEDULE OF MEDICAL BENEFITS

**Maximum Benefits**

Lifetime Maximum Benefit ......................................$1,000,000
Lifetime Maximum Benefit for Alcoholism
  and Chemical Dependency.........................................$20,000
Lifetime Maximum Benefit for Hospice .......................6 Months
Lifetime Maximum Benefit for Smoking Cessation.............$500

Calendar Year Maximum for
  Alcoholism and Chemical Dependency ......................$10,000
Calendar Year Maximum for Inpatient Treatment
  Of Mental and Nervous Disorders...............................30 Days
Calendar Year Maximum for Outpatient Treatment
  Of Mental and Nervous Disorders.............................. 30 Visits

Calendar Year Maximum for Skilled Nursing /
  Extended Care Facility ...............................................60 Days
Calendar Year Maximum for Home Health Care
  (with Physician's Orders) ........................................ 120 Visits
Calendar Year Maximum for Chiropractic Care
  (Includes Lab & X-Ray Procedures) .................................$750
Calendar Year Maximum for Wellness ...............................$300

| Calendar Year Deductible | PPO | NON-PPO |
|---|---|---|
| Individual | $250 | $500 |
| Family | $500 | $1,000 |

**Out of Pocket Amount (PPO & Out of Area Providers):**
Individual ........................................................................$1,000
Family..............................................................................$2,000
  (Not Including the Calendar Year Deductible)

**Out of Pocket Amount (Non-PPO Providers):**
Individual ........................................................................$2,000
Family..............................................................................$4,000
  (Not Including the Calendar Year Deductible)

**PreCertification Penalty:**
Outpatient Procedures ......................................................$250
Inpatient Hospital Stay ....................................................$500

| Benefit Percentage | PPO | NON-PPO |
|---|---|---|
| Hospital Emergency Room  ................ | 80% | ....................80% |
| Inpatient Hospital Expense .................... | 80% | ....................60% |
| Pre-Admission Testing........................... | 80% | ....................60% |

Outpatient Hospital or Ambulatory
  Surgical Center Services
  (Including Surgery)................................ 80% .....................60%
Outpatient Diagnostic X-Ray and
  Laboratory Tests ............................... 100%* .................60%
Physician Services ............................... 100%* .................60%
                    (After $15 co-pay**)
All Other Inpatient/Outpatient
  Physician Charges
  (Including Surgery)................................ 80% .....................60%
Second Surgical Opinion (not
  required, except for transplants) ....... 100%* ................ 100%*

Skilled Nursing / Extended
  Care Facility .......................................... 80% .....................80%
Home Health Care (with
  Physician's Orders)............................... 80% .....................80%
Hospice Expense ...................................... 80% .....................60%
Maternity Expense ................................... 80% .....................60%
Routine Newborn (Nursery Care &
  Well Baby Physician Care***) .............80%* .....................60%
Wellness / Preventive Care................. 100%* .....................60%
                    (After $15 co-pay**)

Mental and Nervous Disorders
  Inpatient
    (Includes Hospital & Physicians)........ 50% .....................50%
    Outpatient (All Providers)..................... 50% .....................50%
Alcoholism and Chemical Dependency
  Inpatient
    (Includes Hospital & Physicians)........ 50% .....................50%
    Outpatient (All Providers)..................... 50% .....................50%

| Benefit Percentage | PPO | NON-PPO |
|---|---|---|

Chiropractic / Spinal Manipulation
(Includes all charges including Lab
& X-Ray performed in the office)......... 80% ....................60%
Physical Therapy
(With Physician's Orders) ................... 80% ....................80%
All Other Services such as Durable
Medical Equipment, Ambulance
Not offered by PPO .............................. 80% ....................80%

All Other Covered Expenses................. 80% ....................60%

*No calendar year deductible.

**Co-pay applies to all services rendered in the office except surgery and related charges.

***Routine Newborn: Nursery Care and Newborn Well Baby Physician Care while in hospital is payable under the baby's coverage with no deductible provided dependent coverage is in place (or added within 31 days of delivery). This waived deductible is for PPO services only.

**Maximum Hospital Daily Room and Board Covered Expenses** - Allowable Room charge is the most common semi-private rate; if private room, 85% of private rate. ICU, CCU and Burn Unit allowed as charged.

Note: Charges from the following health care provider will be considered for payment at the PPO level of benefits:

- Piedmont Radiological Associates located in Salisbury, North Carolina. The Federal Tax Identification Number: 56-0944714.

 **PRESCRIPTION DRUG PROGRAMS**

## Retail Drug Program

The prescription drug plan is separate and apart from the major medical plan.  The prescription drug co-pay is the amount of covered expenses the covered person must pay before the plan makes payment on a 34-day supply.

**Co-Pay Amounts**
Generic Drugs.............................................$10 per prescription
Brand Name Drugs ......................................$20 per prescription
Non-Preferred Brand
  Name Drugs........................ $30 or 20%, whichever is greater

## Mail Order Drug Benefits

This benefit provides payment and home delivery of prescription maintenance drugs for covered persons. Prescription maintenance drugs are drugs prescribed by a Physician for chronic health conditions (for example: high blood pressure, diabetes, asthma or arthritis, etc.).  The prescription drug co-pay is the amount of covered expenses the covered person must pay before the plan makes payment on a 90 day supply.

**Co-Pay Amounts**
Generic Drugs.............................................$20 per prescription
Brand Name Drugs ......................................$40 per prescription
Non-Preferred Brand
  Name Drugs........................ $60 or 20%, whichever is greater

The co-pay amount per prescription under the prescription drug benefit is not a covered expense under major medical benefits and will not count toward satisfaction of the calendar year deductible or the out-of-pocket.

**Limitations and Exclusions**

The following are not eligible Prescription Expenses:

Contraceptives **except** Oral Contraceptives, whether medication or device unless ordered by the physician for medical necessity of an illness;

Anorectics (any drug used for the purpose of weight loss);

Drugs with cosmetic indications;

Growth Hormones;

Levonorgestrel (Norplant);

Minoxidil (Rogaine) for the treatment of alopecia (baldness);

Prescription drugs such as, but not limited to, Viagra, which is prescribed to treat male or female sexual dysfunction;

Charges for the administration or injection of any drug;

Prescriptions which a Covered Person is entitled to receive without charge under any Workers' Compensation Laws;

Drugs labeled: "Caution – limited by federal law to investigation use," or experimental drugs even though a charge is made to the Covered Person;

Medication which is to be taken or administered to an individual, in whole or in part, while he or she is a patient in a licensed hospital, rest home, sanitarium, extended care facility, convalescent hospital, nursing home or similar institution which operates on its premises, or allows to be operated on its premises, a facility for dispensing pharmaceuticals;

Any prescription refilled in excess of the number specified by the Physician, or any refill dispensed after one year from the Physician's original order.

## CALENDAR YEAR DEDUCTIBLE

A deductible is the amount of covered medical expenses which must be paid by you before benefits are payable. The amount of the calendar year deductible is shown in the *Schedule of Medical Benefits*.

**(Satisfaction, in part or in whole, of the Individual PPO deductible may be used as satisfaction, in part or in whole, of the individual Non-PPO deductible, and vice versa.)**

The amount of any charges incurred and applied to the deductible in the last three (3) months of a calendar year can also be used to satisfy the deductible for the next year.

If, as a result of the same accident, covered expenses are incurred for two (2) or more covered persons in the same family, only one deductible amount will be applied against those expenses incurred for all such persons during the calendar year in which the accident occurs. All other non-related illness or accident charges will apply separately to the calendar year deductible.

## PREFERRED PROVIDER BENEFITS

This Plan includes Preferred Provider Organization (PPO) Benefits. The covered individual always has the freedom to choose either a Preferred Provider or a Non-Preferred Provider each time medical care is needed.

There will be a reduction in benefits as specified in the *Schedule of Medical Benefits*, each time a Non-Preferred Provider is used when an eligible Participant has the ability to utilize a network (PPO) provider.  This reduction in benefits does not apply to those eligible Participants who are not in the PPO Network service area, or, due to circumstances beyond their control, cannot utilize a PPO provider (i.e. emergency illness or accident, need for a specialized hospital that is not a network hospital, or when a service is not offered by a preferred provider).

Ancillary and Physician Services, (i.e., Anesthesiologists, Radiologists, Emergency Room Physicians, Pathologists, etc.,) rendered in a Preferred Provider (PPO) facility (whether as an inpatient or outpatient) will be considered under the Preferred Provider benefit levels.  Charges will be subject to the PPO Deductible and the PPO Out-of-Pocket amount, regardless of whether or not the provider performing the service is a Preferred Provider.

 **CALENDAR YEAR OUT-OF-POCKET MAXIMUM**

After the $1,000 PPO / $2,000 Non-PPO individual out-of-pocket amount has been met, all future covered expenses will be paid at 100% for the remainder of the calendar year. The family out-of-pocket maximum will be limited to $2,000 PPO / $4,000 Non-PPO.

Satisfaction, in part or in whole, of the individual PPO out-of-pocket amount may be used as satisfaction, in part or in whole, of the individual Non-PPO out-of-pocket amount, and vice versa.

**The Calendar Year Out of Pocket Maximum provision shall not apply to charges which are not a covered expense under the Plan; to the calendar year deductible; to any other deductibles or co-payment amounts; to the alcoholism and chemical dependency benefits; to any penalty deductibles.**

Any amount paid in excess of the maximum out-of-pocket will be recovered by the Plan to satisfy the intent of this provision.

## PRE-EXISTING CONDITIONS

The term "Pre-Existing Condition" means a physical or mental condition, regardless of the cause of the condition, for which medical advice, diagnosis, care, or treatment was recommended or received within the six-month period prior to the Enrollment Date. Genetic information shall not be treated as a Pre-Existing Condition in the absence of a diagnosis of the condition related to the genetic information. In order to be taken into account, the medical advice, diagnosis, care, or treatment must have been recommended or received from an individual licensed or similarly authorized to provide such services under State law and who operates within the scope of practice authorized by the State law. Pregnancy shall not be considered a Pre-Existing Condition hereunder.

A newborn child, a child placed for adoption, or a newly adopted child (under age 18) who begins Dependent Coverage hereunder within 30 days of birth, placement for adoption or adoption (or who has Creditable Coverage from birth, placement for adoption, or adoption without a Significant Break in Coverage) shall not be considered to have any Pre-Existing Conditions.

### Pre-existing Condition Exclusion

Claims resulting from Pre-Existing Conditions, as defined in the Plan, are excluded from coverage under the Plan for a period of twelve (12) months from the Enrollment Date of the Participant or Dependent where the Participant or Dependent enrolls for coverage under the Plan when first eligible or pursuant to the requirements of the Plan for Special Enrollees. The Plan shall reduce the period of exclusion by those periods of prior Creditable Coverage which the covered person served under prior qualifying medical benefit programs when evidence of the prior Creditable Coverage is submitted and the Plan shall notify the covered person as to the date that the Pre-Existing Condition exclusion period shall end.

Claims resulting from Pre-Existing Conditions, as defined in the Plan, are excluded from coverage under the Plan for a period of eighteen (18) months from the Enrollment Date of the Participant or Dependent where the Participant or Dependent enrolls for coverage under the Plan as a Late Enrollee or during a period of

Open Enrollment.  The Plan shall reduce the period of exclusion by those periods of prior Creditable Coverage which the covered person served under prior qualifying medical benefit programs when evidence of the prior Creditable Coverage is submitted and the Plan shall notify the covered person as to the date that the Pre-Existing Condition exclusion period shall end.

If a claim for benefits under the Plan is denied or reduced by operation of this provision, the covered person shall be entitled to appeal that decision and may provide additional evidence of prior Creditable Coverage pursuant to the normal procedure of the Plan for the appeal of any other coverage decision of the Plan.

## SPECIAL PROVISIONS

**Utilization Review**

The benefits provided by this Plan are limited to charges for services which are medically necessary for the care and treatment of an illness or injury. As such, charges for any hospital (including skilled nursing facility) confinement are covered only if the hospital confinement, or the length of hospital confinement, is medically necessary for the care and treatment of an illness or injury. The Company has hired a Hospital Utilization Review (UR) company which will furnish each Participant with a program of hospital utilization review so that he or she is made aware of the length of hospital confinement, if any, that is determined to be medically necessary for the care and treatment of his or her illness or injury. The "800" telephone number of the UR company is listed on your identification card. All benefits provided by this Plan for charges for hospital confinement will be subject to the following requirements:

1.  **For Non-Emergency (Elective) Hospital Admissions:**

    Before admission to a hospital as an inpatient, a pre-admission authorization is required. You or your doctor must call the UR company before admission to the hospital. The UR company will then talk with your doctor about: (a) the reason for admission to the hospital; (b) the proposed treatment; (c) any surgery to be done; and (d) the number of days of hospital confinement contemplated. The UR company will evaluate the information provided based upon professional standards of care and, when appropriate, authorize benefits for such confinement.

2.  **For Emergency Hospital Admissions:**

    In case of an emergency hospital admission as a bed patient, a Physician, the hospital, or a member of the Participant's immediate family must call and inform the UR company of the admission within 48 hours of, or by the end of the first business day following the rendering of the

emergency health care, whichever is later.   The UR company will contact your Physician for the required medical information.

The UR company will then authorize benefits for such confinement by telephone to the Physician or hospital.

If you go to the emergency room, but are not admitted to the hospital you do not have to call.

However, the Plan will at all times comply with the terms of the Newborns' and Mothers' Health Protection Act of 1996.  Under federal law, group health plans and health insurance issuers offering group health insurance coverage generally may not restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section.  However, the plan or issuer may pay for a shorter stay if the attending provider (e.g., your physician, or (if an allowable provider under the plan) a nurse midwife, or a physician assistant), after consultation with the mother, discharges the mother or newborn earlier.

Also under federal law, plans and issuers may not set the level of benefits or out-of-pocket costs so that any later portion of the 48-hour (or 96-hour) stay is treated in a manner less favorable to the mother or newborn than any earlier portion of the stay.

In addition, a plan or issuer may not, under federal law, require a physician or other health care provider obtain authorization for prescribing a length of stay of up to 48 hours (or 96 hours). However, to use certain providers or facilities, or to reduce your out-of-pocket costs, you may be required to obtain precertification.

*If Hospital Utilization Review Is Not Used By The Participant, The Following Applies:*

If hospital charges are incurred by a Participant for a period of hospital confinement as a bed patient for which days have **NOT** been authorized as set out under the hospital pre-admission review above, the penalty specified in the *Schedule of Medical Benefits* will apply.

### Concurrent Review

If the admitting Physician determines that a Participant needs to be hospitalized for a longer period than initially authorized, the Physician must call and request authorization for the additional period of confinement.

If hospital charges are incurred by a Participant for a period of hospital confinement as a bed patient for which days have **NOT** been authorized under concurrent review, the penalty specified in the *Schedule of Medical Benefits* will apply.

### Pre-Authorization Review

Utilization and Pre-Authorization Review is required for Outpatient Services and for the following procedures:  Breast Biopsy, Dilation and Curettage (D&C), Excision of Mass, Lipoma, Lesion or Cyst, Hemorrhoidectomy, Incision and Drainage, Bunionectomy, Nasal Surgery, Reconstruction of Nail Bed, Arthroscopy, Carpal Tunnel Release -- Surgery on nerve at wrist, Endoscopic procedures of the Digestive, Respiratory & Urinary Systems, Cardiac Catheterization, MRI, Nerve Repair, Laparoscopy, Lung Perfusion Studies.

### Case Management Process

Case management is the process of assessing major or catastrophic illnesses and injuries and developing and coordinating a cost-effective treatment plan. The process can be accomplished by utilizing current contract benefits or by proposing an exception to .benefits.    Additionally, case management monitors the quality of care in an appropriate place of service.

Clinical Case Managers, who are all registered nurses, are responsible for identifying and carefully examining as early as possible every reasonable option in the care and treatment of patients suffering from a serious illness or injury. The Clinical Case Managers then coordinate and facilitate a smooth transition to the alternate care setting. The case management component is designed to help control the cost of treating victims of serious illnesses and injuries while monitoring for the highest quality of care.

The UR company has the authority to modify the length of stay and to approve services which are not otherwise covered by the Plan if those services are as effective as a covered service but are less costly.

### Appeals Process

If the patient or provider disagrees with the days of care which are authorized, an appeal may be filed.

The appeal must be submitted in writing to the Plan Supervisor, who will need to obtain the complete medical record and forward it to the UR company.

The medical records will be reviewed by a Physician Consultant. If the Physician Consultant modifies or reverses the original decision, the appellant and the claims supervisor will be notified.

The process described herein will be completed no later than thirty (30) days following receipt of the written request for appeal and the complete medical record.

**Wellness and Preventive Care Benefits**

Charges for wellness and preventive care will be eligible for payment, for employees and their covered dependents, as described in the following paragraphs.

Listed below are the categories of the well and preventive care benefits and any limitations that apply:

Well Child Care
Charges for well child care up to two (2) years of age will be payable under the Plan.   Coverage includes office visits, laboratory tests, and immunizations as follows:

- Routine history and physical examinations;
- TB Tine Test and immunizations for:  DPT, Oral Polio, Measles, Mumps, Rubella, Hemophilia Influenza Type B, Hepatitis Type B.  This includes any necessary booster shots.

Physical Examinations
The Plan will provide payment for routine physical examinations for each employee and covered dependent over age two (2). The Plan will provide payment for charges made by a physician for (a) routine physical examinations (including but not limited to office visits, laboratory tests); (b) immunizations, and (c) routine eye examinations.

Routine Mammograms
Routine mammograms will be covered under the Plan.  This benefit will provide for the examination, radiology fee, and the charge for the physician's interpretation of the mammogram.

Routine Gynecological Examination
Benefits will be paid for eligible expenses incurred by a covered person for one Routine Gynecological Examination per calendar year. Payment for routine gynecological examinations are limited to: Physician examination, pap smear, hemoglobin, and urinalysis.

<u>Prostate Exams</u>
Prostate exams will also be covered under this Plan.  This benefit will provide for the examination, laboratory fee, and the charge for the physician's interpretation of the laboratory results.

## Mental and Nervous Disorders, Alcoholism and Chemical Dependency

The benefits payable for the treatment of neurosis, psychosis, personality or any other mental or emotional disorder of any kind and for treatment of alcoholism and chemical dependency will be payable as specified in the *Schedule of Medical Benefits*. The Plan will at all times comply with the provisions of the Mental Health Parity Act of 1996.

## Skilled Nursing Facility/Extended Care Facility

Benefits shall be payable for charges for a skilled nursing facility or extended care facility.  The charges for room and board (the facility's regular daily charges for semi-private room), skilled nursing care and other per day charges are covered.

The charges will be considered covered expenses only if:

1.  The patient is confined within fourteen (14) days after his or her discharge from a hospital where he or she was confined for at least three (3) successive days; the patient was entitled to hospital benefits under the Plan; and the term of confinement in the extended care facility is continuous;
2.  A doctor certifies that confinement is required due to a need for skilled nursing care;
3.  The confinement is not for custodial or domiciliary care.

All admissions to a Skilled Nursing Facility/Extended Care Facility are subject to certification and concurrent review regarding the length of stay, as outlined under *Utilization Review.*

The charges shown above are the only charges that are covered expenses.

## Home Health Care

Benefits shall be payable for charges by a home health care agency for visits furnished to a covered person in such person's home.

Benefits are payable for covered expenses you or your covered dependent incur due to an illness or injury that results in home health care. These benefits are subject to all Plan provisions. You or your covered dependent must be under the care of a Physician for any benefits to be payable.

Covered expenses are charges, not to exceed the reasonable and customary charges, that are made for (1) part-time or intermittent care or services by a licensed nurse, licensed midwife, or home health aide; (2) physical, occupational, speech therapy and nutrition services; or (3) medical supplies, drugs, medication or special meals prescribed by a Physician, and laboratory services to the extent that such services would have been covered under this Plan if the claimant had been in a hospital.

No benefits are payable for:

1. Any expense excluded by the Plan;
2. Services by a close relative or a person who normally lives in your home;
3. Transportation services;
4. More home health visits than specified in the *Schedule of Medical Benefits*. (Each visit by an employee of a Home Health Care Agency will be considered one visit and each 4 hours of Home Health Aide services will be considered one visit);
5. More than two hours of nursing care in any twenty-four hour period; and
6. Custodial care.

## Hospice Benefits

Charges for Hospice Benefits are payable for a terminally ill covered individual whose life expectancy is 6 months or less as certified in writing by the attending Physician before the date the initial Hospice Care begins. Covered expenses include those normally provided by a Hospice program. Services must be rendered by or under the supervision of a licensed Physician or a registered nurse (R. N.), and services include, but are not limited to:

1. Nutritional guidance;
2. Home health aides;
3. Room and board for confinement in a Hospice Facility;
4. Services and supplies furnished by Hospice while the patient is confined in a licensed and qualified hospice care facility, but not if the patient is confined in a hospital;
5. Counseling services by a licensed social worker or a licensed pastoral counselor for the terminally ill patient only;
6. Bereavement counseling for the patient's immediate family given by a licensed social worker or a licensed pastoral counselor. Any counseling services given in connection with a terminal illness will not be considered as treatment for a Mental or Nervous Disorder.

Hospice Care does not include charges:

1. For services provided by volunteers or persons who regularly do not charge for their services;
2. For pre-death counseling which is not provided by or through the Hospice program of care for the sole purpose of adjustment to the terminally ill Covered Person's death;
3. For services provided by homemakers, caretakers and the like;
4. For funeral services and arrangements;
5. For legal or financial services or counseling;
6. For curative treatment or services; or
7. For Hospice Care services not made or recommended by the Covered Person's attending Physician or a Hospice program Physician.

**Second Surgical Opinion**

When a Physician suggests surgery for a covered person, the Plan will pay for the expense incurred for a second opinion consultation by another Physician. Covered expenses will be considered for the following:

1. Consultation with a specialist physician or specialist surgeon. This surgeon cannot be the one originally scheduled to perform the surgery. The specialist surgeon must be board certified;

2. X-rays, laboratory tests and other diagnostic procedures needed for the consultation.

If the second surgical opinion does not confirm the need for surgery, payment will be made for another surgical opinion in the same manner as the second opinion.

*A Second Surgical Opinion is required for Organ Transplantation.*

**Organ Transplant Benefits**

Benefits will be provided to an organ transplant recipient and the organ donor if the recipient is covered under this Plan for medically necessary, non-experimental human organ transplants. However, covered expenses for the donor will only include the inpatient hospital expenses and the surgical expenses for removing the organ if the cost of removing the organ is not covered under another medical plan.

Covered organ transplants include, but are not limited to, the following when medically necessary and when not experimental:

1. Cornea transplants
2. Artery or vein transplants
3. Kidney transplants
4. Joint replacements
5. Heart valve replacements
6. Implantable prosthetic lenses in connection with cataracts

7.  Prosthetic by-pass or replacement vessels
8.  Heart transplants
9.  Heart and lung transplants
10. Liver transplants
11. Bone marrow transplants
12. Lung transplants

## Reconstruction After Mastectomies

With respect to benefits payable under the Plan due to a mastectomy, the following benefits will be provided to a Plan Participant who elects breast reconstruction in connection with such mastectomy:

1.  Reconstruction of the breast on which the mastectomy has been performed;
2.  Surgery and reconstruction of the other breast to produce symmetrical appearance; and
3.  Coverage for prostheses and physical complications of all stages of mastectomy, including lymphedemas, in a manner determined appropriate in consultation with the attending physician and the patient.

## Subrogation

When the Plan provides benefits for accidental injury or illness or other loss (hereinafter "injury") to or for the benefit of a covered person, the Plan shall be subrogated to all rights of recovery that the person, his heirs, guardians, executors, agents or other representatives (hereafter individually and collectively "injured person") may have as a result of the loss. The rights of recovery to which the Plan shall be subrogated include, without limitation, the injured person's rights to recovery:

- Against any person or entity that caused, contributed to or is in any way responsible for the injury;

- Against any person, insurance company, health care provider or other entity that is in any way responsible for providing indemnification, coverage, compensation or other payment as a result of the injury;

- Under no fault, personal injury protection, financial responsibility, uninsured motorist and underinsured motorist insurance;

- Under motor vehicle and wage loss reimbursement insurance;

- Under homeowners, renters, premises and owners, landlords and tenants insurance including medical reimbursement coverages; and

- Under group accident and health insurance, and athletic team, sporting event, school, club and other specific risk insurance coverages or accident benefit plans.

The injured person and persons acting on his behalf shall do nothing to prejudice the Plan's subrogation rights and shall, when requested, provide the Plan with accident-related information and cooperate with the Plan in the enforcement of its subrogation rights. If the Plan receives notice that it has or may be required to provide injury-related benefits to any person, it shall be entitled to assert a subrogation lien against responsible entities, persons, insurers and attorneys when and

*Carolina Beverage Corporation*
*Page 31*

as necessary to protect the rights of the Plan and its members and beneficiaries. Even though the Plan may request that a subrogation form be signed by the injured person, the subrogation right of the Plan shall not be dependent upon the receipt by the Plan of such a form. However, the Plan has the right to hold all benefit payments until a signed subrogation form is received by the Plan.

The amount of the Plan's subrogation interest shall be deducted first from any recovery received by or on behalf of the injured person without regard to whether the recovery has been apportioned between medical or other damages and without regard to whether full and complete recovery of damages has occurred. The Plan reserves the right to reduce the amount of its recoverable interest where, in the discretion of the Plan Administrator, a reduction is in the best interest of the Plan and its Participants and warranted by the circumstances. The Plan is entitled to recover any attorney's fees incurred in enforcing its subrogation rights. The Plan shall not be responsible for expenses or attorney fees incurred by an injured person in connection with any recovery unless the Plan agrees in writing to pay those expenses or fees. The Plan also reserves the right to initiate an action in the name of the Plan or in the name of the injured person to recover its subrogation interest.

If an individual has received compensation through settlement or lawsuit for an injury, any services which are linked to that injury will not be covered by the benefit plan.

## COVERED MEDICAL EXPENSES

The Plan will provide benefits as set out in the *Schedule of Medical Benefits* for non-experimental, Medically Necessary medical services which are not otherwise excluded or limited by the Plan.  Covered medical expenses include the following:

1. Hospital room and board charges, up to a daily maximum of the prevailing semi-private room rate;
2. Hospital charges for intensive care, cardiac care or other similar necessary accommodations;
3. Miscellaneous hospital charges (charges billed by the hospital other than room and board); other hospital services required for medical, surgical care or treatment;
4. Charges for an ambulatory surgical center;
5. Pregnancy Benefit: Benefits are payable for covered expenses incurred by a covered female employee or covered dependent wife due to pregnancy, childbirth and related conditions on the same basis as for illness;
6. Charges for sterilization procedures, but not for the reversal of sterilization procedures;
7. Charges for medical care or treatment for mental and emotional disorders, alcoholism and chemical dependency (see *Special Provisions*);
8. Charges from a hospital for routine newborn nursery care and for the initial examination by a pediatrician at birth to determine the health of the infant;
9. Charges for Hospice benefits (see *Special Provisions*);
10. Charges by a Physician or professional anesthetist for anesthesia and its administration;
11. Charges for diagnostic x-ray or laboratory examinations and their interpretation, excluding dental x-ray unless rendered for treatment of a fractured jaw or injury to sound natural teeth incurred as a result of an accident sustained;
12. Charges for chemotherapy and radiation therapy;
13. Charges by a Physician for medical care and treatment;
14. Charges made by a Physician for surgical procedures performed on an inpatient or outpatient basis.  In the case of multiple surgical procedures performed through the same incision during the same operative session, the eligible expense for the surgeon will be the reasonable and customary charge for the primary procedure and 50% of the reasonable and customary charge for the secondary

procedure(s). For procedures performed through separate incisions, the eligible expense will be the reasonable and customary charge for each primary procedure;

15. When an assistant surgeon is required to render technical assistance at an operation, the eligible expense for such services shall be limited to 20% of the reasonable and customary charge for the surgical procedure;

16. Charges for physical therapy and occupational therapy, when services are provided by licensed therapists and ordered by a physician to restore prior function;

17. Charges for speech therapy by a qualified speech therapist required because of an injury or illness other than a functional disorder. If therapy is required because of a congenital abnormality, the person must have had corrective surgery before therapy;

18. Charges for the circumcision of a newborn male infant and medically necessary circumcisions for adult males;

19. Charges for chiropractic medical care or treatment as outlined under the *Schedule of Medical Benefits*;

20. Charges for medically necessary nursing care rendered by a registered nurse (R.N.) or, if none is available as certified by the attending Physician, for services of a Licensed Practical Nurse (L.P.N.), but only for nursing duties excluding custodial care and care by members of immediate family;

21. Charges for rehabilitative care, but only for necessary medical care (as prescribed by a Physician) which is rendered in a rehabilitation hospital, to exclude custodial care or occupational training;

22. Benefits will be provided to an organ transplant recipient and the organ donor if the recipient is covered under this Plan (see *Special Provisions*);

23. Charges for medically necessary abortions where the life of the mother is endangered if the pregnancy were to be carried to term. Complications arising out of an abortion are covered as any other illness.

24. Charges for dental care or treatment performed by a Dentist or Physician for the following:
    (a) Oral surgery to remove an impacted tooth;
    (b) Treatment of injury to sound natural teeth incurred as a result of an accident, including fixed bridgework and full or partial dentures and crowns;

25. Charges for medically necessary professional ambulance service to a hospital or charges by regularly scheduled airline or air ambulance to the nearest hospital qualified to give the required treatment. These services must be given within the U.S., Puerto Rico, or Canada;

26. Charges for the following supplies:

   (a) Prescription drugs (including insulin) that are (i) ordered for the patient in writing by a doctor; and (ii) dispensed by a licensed pharmacist or a doctor;

   (b) Blood or blood plasma and its administration, excluding any charges for blood or blood plasma which has been replaced by a donor;

   (c) Medically necessary supplies such as casts, splints or surgical dressings, trusses, braces (except dental), or crutches. Orthotics are limited to the initial pair;

   (d) The initial placement of artificial limbs or eyes (replacements will be covered only when medically necessary or due to growth);

   (e) Oxygen and rental of equipment for its administration;

   (f) Rental of durable medical equipment at home, including but not limited to mechanical equipment for treatment of respiratory paralysis, wheelchairs and hospital beds; however if the purchase price would be less than the rental cost for long-term usage, the Plan will pay for the purchase of such equipment upon approval from the Plan Supervisor, but not for the repair of such purchased equipment.

27. Charges for the initial purchase of an external breast prosthesis, prescribed in connection with a mastectomy (replacement of such item is covered only when medically necessary) see *Special Provisions;*

28. Charges for treatment received in a skilled nursing facility or extended care facility (see *Special Provisions*);

29. Charges by a home health care agency (see *Special Provisions*);

30. Charges for the initial pair of contact lenses when necessitated as a result of cataract surgery (only one pair of lenses as a result of any one surgery will be eligible charges);

31. Charges for orthoptic training (eye muscle exercises). Training by an optometrist does not have to be

recommended by a Physician.  Training by an orthoptic technician must be prescribed by a Physician;

32.  Charges for routine eye examination;

33.  Charges for treatment, services or supplies related to tobacco dependency and smoking cessation (includes nicotine patches (see *Schedule of Medical Benefits).*

## EXCLUDED MEDICAL EXPENSES

The following will **not** be payable under the Plan:

1. Services and supplies in a hospital owned or operated by the United States government or any government outside the United States in which the covered person is entitled to receive benefits, except for the reasonable cost of services and supplies which are billed, pursuant to Federal law, by the Veterans Administration or the Department of Defense of the United States, for services and supplies which are covered herein and which are not incurred during or from service in the Armed Forces of the United States;

2. Charges for a dependent daughter's pregnancy, unless there are non-maternity complications which make treatment medically necessary;

3. Charges for, or in connection with, education, training and bed and board while confined to an institution which is primarily a school or other institution for training, a place of rest, a place for the aged, a nursing home, or a custodial care facility;

4. Charges for educational testing or training because of nervous, mental or emotional disorders, including occupational training;

5. Charges for in-patient admissions which are primarily for diagnostic studies;

6. Charges made in excess of a reasonable and customary charge;

7. Charges that are not medically necessary for the treatment of an illness or injury or which are incurred either before coverage begins or after coverage ends;

8. Charges for dental expenses, except as specified in the *Covered Medical Expenses* section;

9. Charges for surgery for the correction of myopia including radial keratotomy or keratoplasty;

10. Charges resulting from illness covered by a Workers' Compensation Act or similar law; and charges resulting from accidental injury or illness arising out of or in the course of employment for wages or profit (past or present);

11. Charges for acupuncture or hypnosis;

12. Charges resulting from attempted suicide or intentionally self-inflicted injury while sane or insane unless charges result from a medical condition such as depression;

13. Charges for injuries or illness resulting from the covered employee's or dependent's commission of a felony, aggravated assault, illegal act or illegal occupation;

14. Charges for experimental procedures;

15. Charges for cosmetic or reconstructive surgery **except** for repair due to an illness, accident or birth defect (see *Special Provisions*);

16. Charges for any treatment of obesity including diet control, diet supplements, enrollment in a health, athletic or similar club. Charges for work hardening therapy. Charges for exercise programs or maintenance programs designed to maintain a healthy individual;

17. Charges in connection with temporomandibular joint dysfunction (TMJ);

18. Charges for contraceptives, infertility testing and treatment, invitro fertilization, artificial insemination, G.I.F.T. (Gamete Intrafallopian Transfer), services of a surrogate mother, sex transformations;

19. Charges for custodial care;

20. Charges for fitting of glasses or contact lenses, furnishing or replacing glasses or contact lenses, **except** for routine eye examination (see *Special Provisions*);

21. Charges for hearing aids or exams, **except** for the initial purchase of a hearing aid when necessitated by hearing loss resulting from surgery;

22. Charges for transportation (except as specified under *Covered Medical Expenses*);

23. For treatment received or expenses incurred by you or your family members which are reimbursed, entitled to reimbursement, or are in any way indemnified by or through any public program;

24. Charges for services or supplies for which no charge is made or for which you are not responsible, and therefore, you are not required to pay;

25. Charges for exercise equipment, air conditioners, humidifiers, dehumidifiers, purifiers, or tanning booths;

26. Charges for personal convenience items including, but not limited to: TV and telephone, guest trays, guest beds and reading material;

27. Charges for orthopedic or corrective shoes;

28. Charges for the prescription drug, Retin-A, unless medically necessary;

---

29. Charges, under any circumstance, for prescription drugs such as, but not limited to, Viagra which is prescribed to treat male or female sexual dysfunction;

30. Charges for treatment which has not been approved, prescribed or rendered by a Physician or other approved provider of services;

31. Charges in connection with services rendered by a person who ordinarily resides in the home of the covered person or who is a member of the immediate family;

32. Charges for failure to keep an appointment, telephone consultations or for the completion of forms;

33. Charges for services or treatment rendered outside the United States if the purpose of such travel is to receive such treatment;

34. Charges resulting from and arising out of or caused by or contributed to or in consequence of war, hostilities (whether war be declared or not), invasion, insurrection or riot;

35. Charges for services related to obtaining or implanting a non-human, artificial, or mechanical organ;

36. Charges for special education and/or learning disorders;

37. Charges for osteotomy, orthognathic surgery, or maxilla-facial or dental facial orthopedic

38. Charges for hospital confinement (as an in or outpatient) for dental surgery unless, (a) the dental services rendered are covered under this plan, and (b) the covered person has a medical condition, other than the proposed dental procedure, which exists prior to surgery, and makes it medically necessary for the dental procedure to be performed in the hospital.

## PLAN DEFINITIONS

**Actively at Work** - Means that, on the day that coverage under the Plan would begin, an Employee is not absent from work due to an unapproved absence which is not related to the health of the employee.

**Alcoholism/Chemical Dependency** - The use or abuse of alcohol or other drugs which produces a state of psychological and/or physical dependence in a manner that impairs personal, social or occupational functioning.  This may include a pattern of tolerance and withdrawal.

**Ambulatory Surgical Center** - Any licensed public or private establishment with an organized medical staff of Physicians with permanent facilities that is equipped and operated primarily for the purpose of performing surgical procedures and which provides continuous service of Physicians and registered professional nurses whenever a patient is in the facility and which does not provide services or other accommodations for patients to stay overnight.

**Assistant Surgeon** - Consists of the medically necessary service of one Physician who actively assists the operating surgeon when such surgical assistant service is not available by an intern, resident, or house Physician.

**Calendar Year** - A period of twelve (12) consecutive months beginning on any January first (1st) and ending on the following December thirty-first (31st).

**Company** - The term "Company" means **Carolina Beverage Corporation.**

**Cosmetic Surgery** - Any surgical procedure which results primarily in improving the appearance of a part of the body.

**Covered Expenses** - Reasonable and customary expenses incurred including hospital, surgical, medical and dental care expenses required for diagnosis and treatment of injury or illness.

**Covered Person** - A Plan Participant and eligible dependents.

**Creditable Coverage** - The term "Creditable Coverage" includes only those coverages required to be included as such under Section 701(c) of ERISA, and shall exclude those coverages that are permitted to be excluded under Section 701(c) of ERISA. Solely for purposes of illustration and not in limitation of the foregoing, Creditable Coverage generally includes periods of coverage under an individual or group health plan (including Medicare, Medicaid, governmental and church plans) that are not followed by a Significant Break in Coverage and excludes coverage for liability, limited scope dental or vision benefits, specified disease and/or other supplemental-type benefits.

**Custodial Care** - Care which is designed to help a person in the activities of daily living and which does not require the attention of trained medical or paramedical personnel. Such care may involve preparation of special diets, supervision over medication that can be self-administered and assistance in getting into or out of bed, walking, bathing, dressing, eating and using the toilet.

**Deductible** - Out-of-pocket amount, before coinsurance, you pay prior to becoming entitled to payment by this Plan for covered expenses.    The dollar amount is shown in the *Schedule of Medical Benefits*.

**Dentist** - A person acting within the scope of applicable state licensure/certification requirements and holding the degree of Doctor of Dental Surgery (D.D.S.) or Doctor of Dental Medicine (D.M.D.)

**Disability, Disabled** - The total inability, as a result of injury or illness of the employee, to perform the work customarily assigned to him/her or any other work the employer is willing to assign to him/her. The determination of the existence or non-existence of disability shall be made by the Plan Administrator pursuant to a medical examination by a Physician selected and approved by the Plan Administrator. (This term is applicable to those plan provisions regarding weekly disability benefits and/or extension of benefits due to disability.)

**Effective Date** - The date on which an employee or dependent is covered by the Plan.

**Elective Surgery** - Non-emergency procedures where a reasonable delay would not affect the results.

**Employee** - Any individual who is regularly in the active employment of the employer on a regular full-time basis.

**Enrollment Date** - The term is defined as the first day of coverage or, if there is a Waiting Period for coverage to begin under the Plan, the first day of any applicable Waiting Period. For a person who is a Late Enrollee or who enrolls on a Special Enrollment date, the "Enrollment Date" will be the first date of actual coverage.

**ERISA** - The Employee Retirement Income Security Act of 1974, as from time to time amended.

**Experimental** - The use of any treatment, procedure, facility, equipment, drug, device, or supply not accepted as standard medical treatment of the condition being treated or any of such items requiring federal or other government agency approval not granted at the time services were provided. The final determination as to whether one of the above items is experimental will be based upon professional medical opinions as determined by the Plan Administrator.

**Generic Drugs** - Drugs or medicines that are sold under their technical or chemical name; are not protected by a trademark or trade name; and are FDA approved as equivalent to drugs that are protected by a trademark or trade name.

**Home Health Care** - A formal program of care and treatment that is performed in the home of a person, is prescribed by a Physician as being medically necessary, is prescribed in place of a hospital or skilled nursing facility or results in a shorter hospital or nursing facility stay; and is organized, administered, and supervised by a hospital or qualified licensed personnel under the medical direction of a Physician.

**Home Health Care Agency** - An agency or organization whose primary purpose is to provide skilled nursing and other therapy for, and in the private homes of, persons recovering from an injury or illness. It must be certified as a home health care agency and be licensed or approved under state or local standards that apply. Its professional service policies must be established by a professional group including at least one qualified Physician and at least one Registered Nurse (R.N.) who provides full-time supervision, and must maintain a complete medical record on each patient.

**Hospice** - An agency that provides counseling and medical services and may provide room and board to a terminally ill individual. A Hospice must meet all of the following tests:

1. It is licensed and has obtained any required state or governmental Certificate of Need Approval;
2. It is under the direct supervision of a Physician, has a nurse coordinator who is a registered nurse (R.N.) and provides service 24 hours a day, 7 days a week;
3. It is an agency that has as its primary purpose the provision of hospice services;
4. It has a full-time administrator and maintains written records of services provided to the patient.

**Hospital -**
1. An institution licensed as a hospital, which: (a) maintains, on the premises, all facilities necessary for medical and surgical treatment; (b) provides such treatment on an inpatient basis, for compensation, under the supervision of Physicians; and (c) provides 24 hour service by Registered Nurses;
2. An institution which qualifies as a hospital, a psychiatric hospital or a tuberculosis hospital, and a provider of services under Medicare, if such institution is accredited as a hospital by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO);
3. An institution which: (a) specializes in treatment of mental illness, alcohol or drug abuse or other related illness; (b) provides residential treatment programs; and (c) is licensed or certified in accordance with the laws of the appropriate legally authorized agency;
4. A free-standing surgical facility;

5.   A psychiatric day treatment facility; or
6.   An alcoholism or chemical dependency treatment facility.

The term hospital will not include an institution which is primarily a place for rest, a place for the aged, or a nursing home.

**Hospital Miscellaneous Services and Supplies** - Charges by a hospital for its medical services and supplies. They do not include charges for a room or for professional services of a doctor or private nurse.

**Illness** - Sickness or disease which requires treatment by a Physician. For purposes of determining benefits payable, "Illness" includes pregnancy, childbirth, miscarriage, and complications of pregnancy.

**Injury** - Bodily injury of a covered person which was caused by an external force and which is unrelated either directly or indirectly to other causes and which requires treatment by a Physician.

**Inpatient** - A person who is confined in a hospital as a resident patient and who is charged at least one day's room and board by the hospital.

**Intensive Care Unit** - An accommodation or part of a hospital, other than a post-operative room, which, in addition to providing room and board:

1.   is established by the hospital for a formal intensive care program;
2.   is exclusively reserved for critically ill patients requiring constant audio-visual observation prescribed by a Physician and performed by a Physician or a specially trained registered graduate nurse (R. N.); and
3.   Provides all necessary life-saving equipment, drugs and supplies in the immediate vicinity on a stand-by basis.

**Late Enrollee** - Means an Employee or Dependent who requests enrollment for coverage under the Plan other than during the period of initial eligibility.

**Life Threatening** - A medical condition that is brought on by an accidental bodily injury or by illness that requires immediate medical attention because of severe symptoms occurring suddenly and unexpectedly. Examples include (but are not limited to): coma, convulsions and/or seizures, poisoning, persistent high fever that cannot be controlled, animal/insect bites, stroke, heart attack, severe and uncontrolled bleeding, gun shot or stab wound, fractures, sunstrokes, etc. These conditions, if not treated immediately, would lead to serious impairment or death.

**Lifetime** - The term "Lifetime" as reflected in this booklet only applies to the benefit maximums and limitations while an active employee covered under this Plan or while covered under any continuation of coverage provision of this Plan. In no event shall the term "Lifetime" mean "during the lifetime of you or your dependents."

**Medical Emergency** - The sudden and unexpected onset of a condition with severe symptoms requiring immediate medical care such as: heart attack, stroke, poisoning, loss of consciousness, convulsions or other acute conditions.

**Medically Necessary** - Medical services and/or supplies which are absolutely necessary and essential, as determined by the Plan, to treat an illness or injury of a covered Participant or dependent while covered by this Plan. Such services and/or supplies must be: a) consistent with the patient's diagnosis or symptoms; and b) appropriate treatment according to generally accepted standards of medical practice; and c) not provided only as a convenience to the patient or provider; and d) not experimental or unproven; and e) not excessive in scope, duration, or intensity to provide safe, adequate and appropriate treatment to the covered person.  Any service or supply provided at a provider facility will not be considered medically necessary if the covered person's symptoms or condition indicate that it would be safe to provide the service or supply in a less comprehensive setting; and f) not educational, vocational, or provided primarily for medical or other research.

**Medicare** - The program of medical care benefits provided under Title XVIII of the Social Security Act of 1965 as amended.

**Mental and Nervous Disorders** - A neurosis, psycho neurosis, psychopathy, psychosis, or mental or emotional disease or disorder.

**Non-Emergency Illness** - Colds, headaches, earaches, routine immunizations, stomach cramps, sore throats and other non-acute conditions that are not life threatening as determined by the Plan Administrator.

**Operation** - All surgery performed during one operating period and one continuous period of anesthesia.

**Out-Of-Pocket Expenses** - Covered charges you must pay before the Plan pays 100%.

**Outpatient** - A patient who is not confined in a hospital as a resident patient or treatment in a hospital requiring confinement of less than eighteen (18) consecutive hours.

**Outpatient Surgery Charges** - Charges made by a Physician for surgery and administration of anesthetics while: (1) An outpatient in a hospital; or (2) In the Physician's office or clinic; or (3) In an ambulatory surgical center.

**Physician** - A doctor of medicine; a doctor of osteopathy licensed to practice medicine or surgery by the Board of Medical Examiners of the state in which he practices; a doctor of dentistry; a doctor of podiatry or surgical chiropody; a doctor of optometry; a doctor of chiropractic or a doctor of psychology who is licensed or certified in the State and has a doctorate practice degree in psychology and at least two years' clinical experience in a recognized health setting or has met the standards of the national Register of Health Services provided in psychology; or such other person who: a) is licensed to practice by the state in which he performs services; b) performs within the scope of his license a medical service for which a benefit is provided by this Plan; and c) regularly charges and collects fees for those services.

**Plan** - This Employee Benefit Plan.

**Plan Participant** - An employee (or covered dependent) of the Company who is covered under the Plan.

**Plan Supervisor** - The person or firm employed by the Company to provide consulting services to the Company in connection with the operation of the Plan and any other functions, including the processing and payment of claims.

**PPO Hospital** - An institution which meets the definition of a hospital in this Plan that has an in force a PPO contract with the company at the time services are rendered to provide Hospital services to covered persons.

**PPO Provider** - Means medical service providers that have contracted to provide medical care, treatment and services.

**Pre-Admission Tests** - Charges made by a hospital for x-ray and laboratory examinations made within seven (7) days before admission as an inpatient or outpatient to that hospital for the same surgery or condition for which the tests were made.

**Prenatal Services** - All covered expenses for office visits; x-ray and lab expenses and delivery fee as it relates to pregnancy.

**Primary Care Physician** - Means Family Practitioner, Internist, Obstetrician, Gynecologists, and Pediatrician.   All other physicians will be deemed specialists for purposes of this plan.

**Qualified Medical Child Support Order (QMCSO)** - The enacted Omnibus Budget Reconciliation Act of 1993 (OBRA '93) that provides for the recognition of qualified medical child support orders (QMCSO) by group health plans. This allows children who might otherwise not have rights to benefits under a group health plan or entitlement to enrollment in a parent's group health plan as alternate recipients. OBRA '93 allows a court to issue a medical child support order requiring coverage even in situations where, under terms of the group health plan, a child would not be eligible for coverage.

**Reasonable and Customary** - The usual charge made by a Physician or supplier of services, medicines, or supplies which does not exceed the general level of charges made by others rendering or furnishing such services, medicines, or supplies within the area in which the charge is incurred for illness or injury comparable in severity and nature to the illness or injury being treated. The term "area" as it would apply to any particular service, medicine, or supply means a county or such greater area as is necessary to obtain a representative cross section of level of charges.

**Registered Nurse** - A professional nurse who has the right to use the title "Registered Nurse" and the abbreviation "R.N."

**Rehabilitation Hospital** - A facility which meets all the requirements of a hospital (as defined herein) other than the "surgical facilities" requirement and, in addition, meets the following criteria:

1.  It must be accepted by the Joint Commission of Accreditation of Healthcare Organizations (JCAHO) and be approved for federal Medicare benefits as a qualified hospital;
2.  It must maintain transfer agreements with acute care facilities to handle surgical and/or medical emergencies;
3.  It must maintain a utilization review committee.

**Semi-Private Room Rate** - The hospital's charge for a semi-private room, even if the Participant occupies a private room.

**Significant Break in Coverage** - Means a period of 63 days or more during which an employee or dependent is not covered by any Creditable Coverage. Waiting periods are not included in the calculation of the break in coverage period.

**Skilled Nursing Facility or Extended Care Facility** - Means a lawfully operated institution, or its distinct part, that meets all these tests:

1.  Its primary purpose is providing lodging and skilled nursing care, day and night, for persons recovering from an injury or illness;

2.  It is supervised on a full-time basis by a doctor or registered nurse (RN);
3.  It admits patients only upon the advice of a doctor; it keeps clinical records on all patients; it has the services of a doctor available at all times under an established agreement;
4.  It has established methods and procedures to dispense and administer drugs and biologicals;
5.  It has a written transfer agreement with one or more hospitals; and
6.  It is not, except incidentally, a place for rest, a place for the aged, a place for drug addicts, a place for alcoholics, or a place for the mentally ill.

**Special Enrollee** - Means an Employee or Dependent who is entitled to, is qualified for, and who requests Special Enrollment under the Plan within 30 days of losing other health coverage or who is added to the Plan as a result of marriage, birth, placement for adoption or newly adopted child under the age of 18.

**Surgical Procedure** - A surgical procedure includes but is not limited to: cutting, treating burns, correcting a fracture, reducing a dislocation, manipulating a joint under general anesthesia, electrocauterizing, paracentesis, applying plaster casts, administering pneumothorax, endoscopy, injecting sclerosing solution, arthroscopic procedures, lithotripsy or urethral dilation.

**Total Disability** - The covered employee is prevented solely because of a non-occupational injury or non-occupational disease, from engaging in his regular or customary occupation, and is performing no work of any kind for compensation or profit. (This term is applicable to those plan provisions regarding weekly disability benefits and/or extension of benefits due to disability.)

**Treatment Center** - An institution which does not qualify as a hospital, but which does provide a program of effective medical and therapeutic treatment for alcoholism, chemical dependency or drug abuse and:

1.  Where coverage of such treatment is mandated by law; has been licensed and approved by the regulatory

authority having responsibility for such licensing and approval under the law; or

2.  Where coverage of such treatment is not mandated by law, meets all the following requirements:

   a.  It is established and operated in accordance with the applicable laws of the jurisdiction in which it is located;
   b.  It provides a program of treatment approved by the Physician;
   c.  It has or maintains a written, specific detailed regimen requiring full-time residence and full-time participation by the patient;
   d.  It provides at least the following basic services:

      1.  Room and board;
      2.  Evaluation and diagnosis;
      3.  Counseling;
      4.  Referral and orientation to specialized community resources.

**Waiting Period** - Means the term that must pass under this Plan (or for purposes of determining Creditable Coverage, under any other health plan) before an Employee or Dependent is eligible to be actually covered by the Plan. Notwithstanding the foregoing, the time between the date a Late Enrollee or Special Enrollee first becomes eligible for enrollment under the Plan and the first day of coverage shall not be treated as a Waiting Period.

## WEEKLY DISABILITY BENEFITS

### Schedule Of Benefits

Amount of Benefit:           66.7% of Weekly Earnings
                             (Maximum $300 per Week)

The Benefit Period starts on the:
  1st day if disability is due to a non-work related
  accident, or on the 8th day if disability is due to an
  illness

Maximum Benefit Period:      26 weeks

If you, the employee, while covered under this Plan for weekly
disability benefits, become wholly and continuously disabled so
as to be actually prevented from the performances of every
duty of your occupation or employment for the Company for
salary and wages due to bodily injury or illness, the Company
will pay benefits to you according to the *Schedule of Benefits*
during the period of such disability beginning with the stated
day of disability due to illness or the stated day of disability due
to an accident but not longer than the maximum period stated
in the *Schedule of Benefits*.

Successive periods of disability shall be considered as one
continuous period of disability unless: 1) the subsequent
disability is due to a cause(s) entirely unrelated to the cause(s)
of the previous disability; or 2) they are separated by a
continuous period of at least two weeks during which you are
not absent from active work on a full-time basis.

**Limitations:**

1.  For any period of disability which the employee is not
    under the direct care of a legally qualified physician or
    surgeon; or
2.  For disability caused by participating in a riot, the
    commission of a felony or any illegal act, or disability
    resulting from a military duty;
3.  For disability due to bodily injury or sickness for which
    benefits are required under any applicable Workers'

Compensation Act or similar law, or injury arising from the course of any employment, or from any accidental injury or illness arising out of or in the course of employment for wage or profit (past or present); or

4.   For disability due to intentionally self-inflicted bodily injuries while sane or insane.

## Partial Disability:

The Company hereby amends the Plan to add benefits for Partial Disability. This benefit will allow employees to be out for a period of partial disability or if they have been out for a period of total disability to have the opportunity to return to work on a part-time basis. This benefit will apply to the following:

1.   The Employee is still prevented by the same disabling condition from performing the essential duties of his/her occupation.

2.   The Employee has recovered to the extent that he/she is:

     a.   Able to perform some, but not all, of the essential duties of his/her job, and
     b.   As a result, he/she is earning no more than 80% of his/her pre-disability earnings.

The addition of partial disability benefits is not designed to compensate the employee for full pre-disability wages. It does, however, increase compensation from what was received on total disability.

*Partial Disability Maximum:  Benefit is not to exceed 80% of earnings.

The formula used is:

Weekly Benefit = [(A-B)/A] x C

                    A = Your Pre-Disability Weekly Earnings
                    B = Your Current Weekly Earnings
                    C = The Weekly Benefit Payable If You Were Totally Disabled

For example:  An Employee earning $1,000 per week becomes totally disabled.  Weekly income benefits are 66.7% of salary or $667.  The Employee returns to work on a part-time basis and earns $700 per week.  Using the above formula, the part-time salary would be supplemented by $180.

## COORDINATION OF BENEFITS

This Plan has been designed to help the Participant meet the cost of illness or injury. Since it is intended to prevent payment of benefits which exceed actual expenses, the amount of benefits payable under this Plan will take into account any coverage a Participant has under other "plans." The benefits paid under this Plan will be coordinated with the benefits payable by the other "plans." Other "plans" include Medicare and/or any other group benefit coverage in which you or your dependents are covered Participants. Other "plans" also include no fault motor vehicle insurance, blanket or franchise insurance.

The order of benefit determination designating the Plan which has the responsibility for paying first (primary plan) will be:

1. If the "Other Plan" does not incorporate a coordination of benefits provision as a part of its regular benefits, it is the primary plan and will pay without regard to this coverage;
2. The Plan covering the patient as an employee is the primary plan;
3. The Plan covering the patient as a dependent child of a covered parent whose birthday is the earliest in the year is the primary plan, except as follows:
    a) When the parents are legally separated or divorced and the parent with custody of the child has not remarried, the benefits of a plan which covers the child as a dependent of the parent with custody of the child will be determined before the benefits of a plan which covers the child as a dependent of the parent without custody;
    b) When the parents are divorced and the parent with custody of the child has remarried, the benefits of a plan which covers the child as a dependent of the parent with custody shall be determined before the benefits of a plan which covers that child as a dependent of the stepparent; the benefits of a plan which covers that child as a dependent of the parent without custody will be considered last;
    c) Notwithstanding (a) and (b) above, if there is a court decree which would otherwise establish financial responsibility for the medical and dental care

*Carolina Beverage Corporation*
**Page 54**

expenses with respect to the child, the benefits of a plan which covers the child as a dependent of the parent with such financial responsibility shall be determined before the benefits of any other plan which covers the child as a dependent child;

4. If the primary plan is not determined by 1, 2, or 3, the plan which has covered the employee for the longer period of time is the primary plan;

5. If a plan does not follow the birthday rule, but instead has a rule based on the gender of the parent and if as a result the plans do not agree on the order of benefits, the gender rule determines the order of benefits.

This Plan will always pay either its regular benefits in full, or a reduced amount, which when added to the benefits payable by the other plan or plans, will equal 100% of allowable expenses. "Allowable Expenses" means any necessary, reasonable and customary expense incurred while the Participant is eligible for benefits under the "Plan," part or all of which would be covered under any of the Plans, but not for any expenses contained in the list of exclusions.  "Plans" means any plan providing benefits or services for, or by reason of, medical, dental or vision treatment, which benefits or services are provided by group insurance, self-insurance, or any similar plan or program.

With regard to CHAMPUS, the Plan will be the primary carrier and CHAMPUS will be the secondary carrier.

## YOU AND MEDICARE

Current laws and regulations require that in most situations the Company's medical plan provide primary coverage for active employees and for dependents of active employees who are eligible for Medicare due to age or, except in certain cases covering End Stage Renal Disease, disability, with Medicare providing supplemental coverage. This will not apply if you or your dependent elect, in writing, to terminate participation in the Company's medical plan and have Medicare provide primary coverage.

If Medicare is elected as primary coverage, the law does not permit the Company's Medical Plan to provide benefits supplementing Medicare. You and your dependent must terminate participation in the Company's medical plan and have **only** Medicare.

You should contact the Company if you wish to terminate your participation in the Plan and have Medicare provide your medical benefits. Otherwise, participation in the Company's medical plan will continue to provide you primary medical benefits, with Medicare providing supplemental coverage.

For more information, contact your Personnel Representative or your local Social Security office.

## TERMINATION OF COVERAGE

Your coverage under the Plan will end on the earliest of the following dates:

1. The date the Plan ends;
2. The date the Plan is changed to end the coverage for the class of employees to which you belong;
3. The date you cease to be a member of the class for whom that coverage is provided;
4. The date ending the period for which you last made any required contribution to the cost of your coverage; or
5. The last day you are no longer considered an active employee.

### Termination of Coverage for Dependents

Coverage for your dependents under this Plan will terminate on the earliest of the following dates:

1. With respect to each of your dependents, on the date such individual ceases to be a dependent as defined in the Plan;
2. With respect to all of your dependents, on the date ending the period for which your last contribution is made if you fail to make any required contributions to the cost of the coverage for your dependents when due;
3. With respect to all of your dependents, on the date your coverage under this Plan terminates;
4. The date the Plan is terminated.

### Continuation During Disability, Approved Leave of Absence or Layoff

A person may remain eligible for a limited time (90 days from the last full day worked) if active, full-time work ceases due to disability, leave of absence or layoff. At the end conclusion of this ninety (90) day period, the employee will be considered as terminated from employment for the purposes of this plan.

A person may remain eligible for coverage for 180 days if active, full-time work ceases due to occupational disability (workers compensation).

While continued, coverage will be that which was in force on the last day worked as an Active Employee. However, if benefits reduce for others in the class, they will also reduce for the continued person.

## Continuation During Family and Medical Leave

All Employees and their dependents covered under the Plan who are eligible for a leave of absence under the Family and Medical Leave Act of 1993 ("FMLA") shall have the right to continue coverage under the Plan for the term of the leave of absence under the same terms, conditions and coverage as enjoyed by all other employees.

If the Plan requires a contribution from the employee for normal coverage, those contributions must be paid by the employee during the term of the leave of absence in order for coverage under the Plan to continue.

If the leave of absence is a paid leave, normal contributions will be deducted from those payments. If the leave of absence is not a paid leave, the employee must pay the contribution to the Plan, through the Company as the Plan Administrator, at the same time that contributions are normally taken from the Company payroll. If a contribution is not made within 15 days of such date, a 15 day notice of Termination of Coverage will be given and coverage under the Plan will end for the employee and all covered dependents at the end of the 15 day notice period. All eligible claims which are incurred during the unpaid period will still be considered as eligible by the Plan. The Company may withhold a delinquent contribution from any amount due the employee or may bring a legal action to recover the contribution if not paid by the employee.

If an employee returns to employment during or at the end of the FMLA leave of absence and during the leave the employee's coverage under the Plan has ended for any reason, the employee will be allowed to re-enter the Plan as of the date that the employee returns to work. The employee and those

dependents who were previously covered by the Plan will not be subject to a pre-existing condition waiting period. Coverage for new entrants at the time that the employee returns to work will be governed by the terms of the Plan.

The Company may recover its contribution to the Plan for an employee who is on an unpaid FMLA leave of absence if the employee fails to return to work for at least 30 days after the FMLA leave has been exhausted or expires, unless the reason the employee does not return to work is due to:

1.  The continuation, recurrence, or onset of a serious health condition which would entitle the employee to leave under the FMLA; or
2.  Other circumstances beyond the employee's control.

The Company may recover its contribution from any sums due the employee provided such deductions do not violate applicable Federal or State wage payment or other laws. The Company may also bring legal action against the employee to recover its share of the contribution.

If the employee elects or is required to substitute normal Company paid leave (vacation, sick days, personal days, etc.) for part or all of a FMLA leave the Company may not recover its contribution for the period of the leave that is covered by the normal Company paid leave.

**Continuation of Coverage Under the Uniformed Services Employment and Re-employment Rights Act (USERRA)**

1.  In any case in which an employee or any dependents has coverage under the Plan, and such employee is absent from such position of employment by reason of service in the uniformed services, the employee may elect to continue coverage under the Plan as provided in this section. The maximum period of coverage of the employee and the employee's dependents under such an election shall be the lesser of:

    (a) The 18 month period beginning on the date on which the employee's absence begins; or

*Carolina Beverage Corporation*
*Page 59*

(b) The day after the date on which the employee fails to apply for or return to a position of employment, as determined under USERRA.

2.  An employee who elects to continue Plan coverage under this section must pay 102 percent of his or her normal premium under the Plan.  Except that, in the case of an employee who performs service in the uniformed services for less than 31 days, such employee will pay his or her normal contribution for the 31 days.

3.  An employee who is qualified for re-employment under the provisions of USERRA will be eligible for reinstatement of coverage under the Plan upon re-employment.  Except as provided in paragraph #4 below, upon re-employment and reinstatement of coverage no new exclusion or waiting period will be imposed in connection with the reinstatement of such coverage if an exclusion or waiting period would normally have been imposed.  This paragraph applies to the employee who is re-employed and to an individual who is covered by the Plan by reason of the reinstatement of the coverage of such employee.

4.  Paragraph #3 shall not apply to the coverage of any illness or injury determined by the Secretary of Veteran's Affairs to have been incurred in, or aggravated during, performance of service in the uniformed services.

**Certificates of Prior Coverage Under the Plan**

In 1996 the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") was passed by Congress.  Under HIPAA, all employees and their dependents who are actually covered by the Plan will automatically receive a Certificate of Group Health Plan Coverage ("Certificate") when they lose coverage under the Plan and upon the loss of coverage should continuation of coverage under COBRA be elected.  Additionally, all employees and their dependents who lose coverage under the Plan may submit a request for a new Certificate at any time during the 24 months which follow loss of coverage.  The Certificate(s) will include information for both the covered employee and his dependents.

The Certificate will be issued free of charge to the employee or dependent and will show a new employer or group health plan the period that the employee or dependent was covered by the Plan, including the waiting period served prior to the effective date of coverage. A person who receives a Certificate must provide the Certificate to his new group health plan in order for the new group health plan to credit the period that the person was covered by the Plan against the pre-existing condition exclusion waiting period of the new group health coverage, if any.

**Re-enrollment** – A previously eligible employee whose coverage for himself and his dependents, if any, has terminated, may again become covered under the Plan by enrolling on the same basis and according to the same rules as a new eligible employee. In addition, if an employee is rehired or returns to an eligible status within three (3) months after Termination of Coverage under this Plan (or after an absence due to a work related injury) and completed the necessary enrollment form, such rehire (and any of his eligible dependents) will have coverage effective the day of Employee's rehire on an active basis. All plan provisions, including pre-existing condition limitation, will apply.

## BENEFITS AFTER TERMINATION OF COVERAGE
## (COBRA)

All eligible Participants and dependents covered under the Plan on the date before a qualifying event who would otherwise have lost coverage herein as a result of any of the events listed below shall have the right to elect continuation coverage. Newborns, adopted children, and children placed for adoption with a person covered by COBRA continuation coverage may be added to their parent's coverage while the parent has coverage under COBRA if the plan would otherwise allow such a child to be covered by the plan. If a newborn child, adopted child, or child placed for adoption is added to COBRA continuation coverage such child shall be considered a qualified beneficiary under the plan.

The Company will notify the Plan Administrator of the Participant's death, termination of employment, lay off or reduction of working hours or when he/she becomes entitled to benefits under Title XVIII of the Social Security Act, within 30 days of the occurrence of any of these events. The Participant or covered dependent must notify the Plan Administrator within 60 days of his/her divorce or legal separation or when a dependent child is no longer eligible for coverage as defined in the Plan.

The Plan Administrator will notify the Participant or covered dependent of his/her right to elect to continue coverage within 14 days from the date the Plan Administrator is first notified of any of the events described above.

The election period shall begin not later than the date on which coverage terminates under the Plan due to any of the events listed below, shall be of at least 60 days' duration, and shall end no earlier than 60 days after the later of:

a)   The date coverage terminates under the Plan due to any qualifying event listed below, or

b)   The date the Plan Administrator notifies the Participant or covered dependent of his/her rights under this provision as described above.

Benefits will be identical to those available under the Plan to all active Participants and covered dependents who are similarly situated beneficiaries.

The Company may require the Participant and/or covered dependent to pay for all or part of the cost for continuing his/her coverage, up to 102% of the cost of the coverage.   If the Participant or covered dependent is required by the Company to pay the cost of continuing coverage, payment for the initial premium must be made within 45 days from the date of election. Payments must thereafter be made in monthly installments. Payments are due by the first day of the month for which coverage is being provided.

Covered dependent spouses and children are eligible for continuation of coverage for up to 36 months upon the occurrence of any of the following qualifying events which results in the loss of coverage under the Plan:

    a)    The death of the Participant;

    b)    The divorce or legal separation of the Participant from the covered dependent spouse;

    c)    The Participant becoming entitled to Medicare benefits under Title XVIII of the Social Security Act;

    d)    With respect to a dependent child, the dependent child is no longer eligible for coverage as a dependent child as defined in the Plan.

The Participant and covered dependents shall be eligible for continuation of coverage for up to 18 months upon the occurrence of any of the following qualifying events which results in the loss of coverage under the Plan:

    a)    The Participant's employment with the Company terminates (except if due to the Participant's gross misconduct);

    b)    The Participant is laid off or his/her working hours are reduced so as to render him/her ineligible for coverage as defined in the Plan.

If the Participant or covered dependent is disabled prior to or within 60 days of the initial qualifying event for continuation coverage due to termination of employment or reduction in hours, continuation coverage may be extended for all qualified beneficiaries within that family for up to 29 months from the qualifying event date rather than for only 18 months.   The disabled person is subject to all of the following:

a)   The Social Security Administration must make a determination that the person was disabled under Title II or XVI of the Social Security Act and that the disability began before or within 60 days after the qualifying event date;

b)   The disability determination must be made by the Social Security Administration before the end of the original 18 month continuation of coverage period;

c)   The person must notify the Plan Administrator within 60 days after the disability determination has been made;

d)   The person must notify the Plan Administrator within 30 days after the final determination is made that the person is no longer totally disabled;

e)   The cost for coverage for months 1 through 18 will be at the rate of up to 102% of the cost of the coverage and the cost for months 19 through 29 will be at the rate of up to 150% of the cost of the coverage.

The continuation period will end when any of the following occur:

a)   When the Participant or dependent fails to make the required contribution (if any) to the Plan before the due date or within a grace period of 30 days;

b)   When the Participant or covered dependent becomes covered by any other group health plan, except as described below, or becomes entitled to Medicare benefits under Title XVIII of the Social Security Act;

c) When the dependent spouse remarries and becomes covered by a group health plan, except as described below;

d) When the Company ceases to maintain any group health plan;

e) In the case of a disabled person who has been on continuation coverage for more than 18 months, the month that begins more than 30 days after the date of the final determination under Title II or XVI of the Social Security Act that the person is no longer disabled.

A retired Participant and his/her spouse who would otherwise lose health coverage under the Plan after the Employer files a Chapter 11 Bankruptcy proceeding may continue coverage under the Plan until the death of the Participant. Upon the death of the retired covered Participant, his/her covered dependents shall be entitled to continuation coverage for a period of 36 months from the retiree's death.

If the Participant or dependent becomes covered under another group health plan while covered hereunder, continuation coverage may continue only during the time that the new group health plan contains any exclusion or limitation which relates to a pre-existing condition of the Participant or dependent. Normal payments for this coverage must be made in order for continuation coverage to remain in effect. Additionally, the other group health plan will be considered the primary coverage and must always pay benefits before this Plan will consider a claim for benefits.

In no event shall coverage as provided in this provision be continued for more than 36 months. For example, if a dependent is receiving continuation of coverage benefits due to an 18 month qualifying event and during the 18 month period another qualifying event occurs which would entitle the person to 36 months of continuation coverage, that dependent shall be eligible for continuation of coverage for not more than a total of 36 months.

During the final 180 days of the continuation period, the Company will provide the Participant and covered dependents the opportunity to convert medical coverage to an individual health

*Carolina Beverage Corporation*
*Page 65*

plan but only if such a conversion privilege is provided for in the Plan.

**Return To Active Employment**

A former covered employee or dependent who continues coverage under this provision and who returns to active employment with the Company, or if a dependent, resumes dependent eligibility, while covered hereunder may return to regular coverage without having to meet a new coverage waiting period or meet the pre-existing condition waiting period.

## CLAIM INFORMATION

### How To File A Claim

Forms for filing claims may be obtained from the Company. Claims should always be filed as soon as possible but **must be filed within 12 months from when the services were rendered or expenses incurred** to:

> Employee Benefit Services, Inc.
> 10 Woodlawn Green
> 4801 Chastain Avenue
> Charlotte, NC 28217

When filing your claim, you must submit proof of each charge, so it is extremely important that you secure copies of bills for all charges.

### Medical Care Benefits

It is the responsibility of the Participant to see that all doctor bills, medical bills, and hospital bills get to the Plan Supervisor for payment. Proper payment cannot be made without these bills. A charge will be deemed incurred on the date the services or supplies are actually rendered or received. Intentional failure to do so can result in the claim being disallowed.

Claim forms must be submitted to the Plan Supervisor when completed. All questions must be answered. Usually, the form provided by the hospital will be acceptable if all charges are itemized.

### Assignment of Benefits

If you sign the claim form where it states "You authorize the Plan Supervisor to issue payment directly to the Physician, Dentist, hospital, etc.," payment will be made to that designated person even if you have previously paid this bill. In order to prevent any confusion, please read carefully before signing this specific block.

**Appealing a Claim If Denied**

If a claim should be denied in whole or in part, written notification will be delivered in the same fashion as reimbursement for a claim. A claim work sheet will be provided by the Plan Supervisor showing the calculation of the total amount payable, charges not payable, and the reason. If additional information is needed for payment of a claim, the Participant may request a review by filing a written application with the personnel office, Plan Administrator or Plan Supervisor. On receipt of written request, the Plan Supervisor and Plan Administrator will review the claim and all facts and reasons relating to the decision. The Participant or his authorized representative may examine pertinent documents (except as information may be contained therein which the Physician does not wish to be made known to the claimant) which the Plan has, and may submit his opinion of what the issues are and his comments in writing. Request for review must be filed promptly wherever possible. Decision by the Plan Administrator will be made promptly (within sixty (60) days), unless special circumstances require extension. The decision will also be delivered to the Participant in writing setting forth specific references to the pertinent Plan provision upon which the decision is based. The decision of the Plan Administrator will be final.

**Facility of Payment**

In the event of the Participant's death or mental incompetence at a time when benefits remain unpaid, the Plan will pay such benefits to the person or institution with whom the covered charges were incurred if the charges have not otherwise been paid.

Any payment so made will constitute a complete discharge of the Company's obligation to the extent of such payment and the Company will not be required to see the application of the money so paid.

**Fraudulent Claims**

Any misrepresentation by a claimant in an application for enrollment or benefits, or in the course of a review under the Plan claims procedures, shall constitute grounds for adjustment of any claims and of the requested benefits in whole or in part, for recovery by the Plan of any benefits paid in reliance upon said misrepresentation, and for any other available equitable or legal remedies. At the discretion of the Plan, the participation of a Plan Participant and/or dependent who is determined to have submitted fraudulent enrollment forms or claims may be terminated from the Plan notwithstanding any other provision of this Plan.

**Right to Recovery**

If the Plan Administrator pays benefits in good faith, it is not required to pay the same benefits again.   The Plan Administrator also has the right to recover any overpayments made under another Plan or whenever benefit payments exceed the amount allowable under the provisions of the Plan, whether due to mistake or to the negligent or intentional conduct of a provider, claimant or any other party.

The Plan shall also have the right to recover the excess payments against any benefits payable in the future.

## ALLOCATION AND APPORTIONMENT OF BENEFITS

The Company reserves the right to allocate the deductible amount to any eligible charges and to apportion the benefits to the covered person and any assignees. Such allocation and apportionment shall be conclusive and shall be binding upon the covered person and all assignees.

## AMENDMENT AND TERMINATION OF THE PLAN

The Company has the right to amend or modify the Plan or terminate or partially terminate the Plan at any time. All previous contributions by the Company shall continue to be used for the purpose of paying benefits under the provisions of this Plan with respect to claims arising before such amendment or termination, or shall be used for the purpose of providing similar health benefits to covered Participants until all contributions are exhausted.

Any change to the Plan must be in writing and will not require the consent of any Participant or beneficiary. Changes so made shall be binding on each covered Participant and on any other covered persons referred to in the Plan. Only the Company can change the provisions of the Plan. The Company will not be bound by any promise or representation made by the Plan Supervisor or any other person. No clerical error will invalidate coverages described herein if they are otherwise validly in force.

## EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974
## (ERISA)

The following information comprises the Summary Plan Description under the Employee Retirement Income Security Act of 1974.

1.  The name of the Plan is the **Carolina Beverage Employee Medical Plan.**

2.  The name, address and telephone number of the Plan Administrator, who is the agent of service process for the Plan is **Carolina Beverage Corporation, PO Box 697, 1413 Jake Alexander Blvd. South, Salisbury NC 28145-0697. Telephone (704) 637-5881.**

3.  The Employer Identification Number is **56-0163135** and the Plan's records are maintained on a plan year basis commencing on **May 1st** and ending on **April 30th.** The Plan Number is **501**; the Group Number is **CBC99.**

4.  The Plan is a self-funded Welfare Benefit Plan providing health benefits.

5.  The cost of employee coverage and dependent coverage is shared by the Company and you.

6.  The Plan is administered by the Plan Supervisor, **Employee Benefit Services, Inc., 10 Woodlawn Green, 4801 Chastain Avenue, Charlotte, NC 28217, (704) 522-1855,** with benefits provided in accordance with the provisions of the Plan Document.

7.  Claim Procedures: Claims for benefits under the Plan are to be submitted to the Plan Supervisor. Payment of claims under the Plan will be made by the Plan Supervisor. If an employee's claim for benefits under the Plan is denied, the Plan Supervisor will provide notice to the employee in writing of the denial within a reasonable time setting forth the specific reasons for such denial. The

employee may then request a review of the decision denying the claim.

8.  As a Participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA).  ERISA provides that all Plan Participants shall be entitled to:

 a.  Examine, without charge, at the Plan Administrator's office and at other specified locations, such as work sites and union halls, all Plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the Plan with the US. Department of Labor, such as detailed reports and plan description;

 b.  Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator.  The administrator may make a reasonable charge for the copies; and

 c.  Receive a summary of the Plan's annual financial report.  The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan.  The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries.  No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial.  You have the right to have the Plan review and reconsider your claim.  Under ERISA, there are steps you can take to enforce the above rights.

For instance, if you request materials from the Plan and do not receive them within thirty (30) days, you may file

suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until you receive the material, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court.

If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator.

If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the Pension Welfare Benefits Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Pension and Welfare Benefits Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C. 20210.

9.   The right is reserved in the Plan for the Company to terminate, suspend, withdraw, amend or modify the Plan, in whole or in part, at any time.

10.  In the event of a conflict between the summary plan description and the Plan Document, the terms of the Plan Document will govern.

11.  The named fiduciary has the authority to control and manage the operation and administration of the Plan. The named fiduciary is the Plan Administrator who has the discretion to determine issues of eligibility and benefits.

12. The Plan is a legal entity. Legal notices must be filed with and legal process served upon the Plan Administrator.

13. The Plan Administrator maintains fiscal records for a plan year ending the last day of the plan year.

14. Your benefits or a covered dependent's benefits under this Plan may not be assigned except by consent of the Plan Administrator, other than to suppliers of medical or dental services.

15. The Plan shall not constitute a contract between you and the Plan Administrator; nor will it be a consideration for, or a condition of, your employment.

16. The requirements for being covered under this Plan, the provisions concerning termination of coverage, and a description of the Plan benefits (including any limitations and exclusions which may result in the reduction or loss of benefits) are indicated in this booklet.

## APPOINTMENT OF AUTHORIZED REPRESENTATIVE
### AND ASSIGNMENT OF BENEFITS

The undersigned, MATTHEW D. STONE, does hereby transfer, convey and assign unto DOCTORS HOSPITAL OF AUGUSTA, LLC, its successors and assigns, all claims which the undersigned may have for payment of benefits under an employee benefit plan with Carolina Beverage Corporation or any other employee benefit plan with respect to the in-patient hospitalization and treatment provided to Matthew D. Stone at Doctors Hospital of Augusta on various dates on and after August 7, 2003, including, but not limited to, August 7, 2003 until September 12, 2003, October 17,2003 until November 2,2003 and various other inpatient and outpatient hospitalizations.. The rights and benefits assigned herein include, but are not limited to, the right to seek and receive payment for all hospital charges incurred by Matthew D. Stone during his hospitalizations and treatment at Doctors Hospital of Augusta (specifically including those referenced above and any and all other inpatient and outpatient treatment provided to Matthew D. Stone at any time in the past and at any time into the future until this appointment and assignment may be revoked), all under the terms and conditions of the Employee Benefit Plan covering Matthew D. Stone and issued by Carolina Beverage Corporation or any other entity or organization. This assignment further authorizes Doctors Hospital of Augusta, its successors, assigns and representatives, to pursue all rights and remedies which said Matthew D. Stone has or may have as a result of the in-patient or out-patient hospital treatment referenced above and as a result of any and all denials or refusals by the above-referenced Plan, its Administrator or any other entity to pay in full all benefits which are or may be due under the terms of the Employee Benefit Plan and any other insurance policies.



EXHIBIT

B

In accordance with the terms of the plan and provisions of law, the undersigned further specifically appoints DOCTORS HOSPITAL OF AUGUSTA and/or its attorney, N. KENNETH DANIEL, as the authorized representative of the undersigned for purposes of acting on behalf of the undersigned in pursuing all claims, administrative appeals and other inquiries against the Carolina Beverage Corporation Employee Medical Plan, its Trustees, Administrators, Plan Sponsors and Plan Administrators, including any reinsurer or excess insurer, all regarding payment of all hospital charges due to Doctors Hospital of Augusta for all treatment of Matthew D. Stone as above referenced. The undersigned further agrees to cooperate in providing any and all other and further authorizations to Doctors Hospital of Augusta which may be necessary or convenient in enabling them to receive any information required in the pursuit of the above-referenced claim.

This authorization to represent is intended to specifically allow Doctors Hospital of Augusta, its attorneys, agents and assigns, to receive all information regarding the processing of any claim for payment of benefits owed, or claimed to be owed, to Doctors Hospital of Augusta, including obtaining copies of claims files and any protected health information contained therein as defined under the Health Insurance Portability and Accountability Act of 1996 (HIPAA). Incident to the Appointment and Assignment, the undersigned hereby consents to allow the Carolina Beverage Corporation Employee Medical Plan, its Trustees, Administrators, Plan Sponsors and Plan Administrators to provide to Doctors Hospital of Augusta with any HIPPA protected materials.

The undersigned further authorizes and directs that any payments made by or pursuant to the Plan issued by the Carolina Beverage Corporation Employee Medical Plan for services rendered by Doctors Hospital of Augusta to Matthew D. Stone be paid

directly to said hospital and the undersigned waives any right for direct payment of the same.

This __5__ day of __March__ , 2004.

_Matthew Stone_
MATTHEW D. STONE

SSN:  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
GROUP NO.: CBC99

# DANIEL & LOWE

### ATTORNEYS AT LAW

2907 PROFESSIONAL PARKWAY
AUGUSTA, GEORGIA 30907

N. KENNETH DANIEL, P.C.
ROBERT J. LOWE, JR.*

March 26, 2004

P.O. BOX 211790
AUGUSTA, GEORGIA 30917
(706) 860-3747
FAX 860-4757

*ALSO ADMITTED IN TN AND FL

CERTIFIED - RETURN RECEIPT

The Carolina Beverage Corporation,
   Plan Administrator/Carolina Beverage
      Employee Medical Plan
P.O. Box 697
Salisbury, NC 28145-0697

CERTIFIED - RETURN RECEIPT

Employee Benefit Services, Inc.
Plan Supervisor/Carolina Beverage Employee
   Medical Plan
10 Woodlawn Green
4801 Chastain Avenue
Charlotte, NC 28217

|  |  |
|---|---|
| Re: Plan Participant/Employee: | Matthew D. Stone |
| Date of Incident: | August 9, 2003 |
| Group: | CBC99 |
| Provider: | Doctors Hospital of Augusta |
| Account: | 539586846 |
| Dates of Service: | 08/07/03 - 09/12/03 |
| Billed Charges: | $626,896.22 |

Dear Sir or Madam:

     I represent Doctors Hospital of Augusta, the hospital housing the burn facility in Augusta, Georgia that provided care and treatment to Matthew D. Stone, as referenced above and also as shown on the attached exhibit. Mr. Stone was initially treated at our hospital from August 7, 2003 through September 12, 2003 during which stay he incurred total billed charges of $626,896.22. Following his discharge, his account was billed to your Plan by certified mail on September 17, 2003, almost seven months ago. Our hospital has been repeatedly assured by claims processing agents that the claim was being processed and was expected to be paid. Hospital employees were informed as long ago as October 30, 2003, that this initial claim had been sent to repricing and the hospital would be paid once the claim had been repriced.



The Carolina Beveral Corporation, Plan
 Administrator/Carolina Beveral Employee
  Medical Plan

Employee Benefit Services, Inc.
Page Two
March 26, 2004

     Mr. Stone has recently appointed Doctors Hospital of Augusta as his authorized representative to pursue his claim for benefits due from the Plan. A copy of the Appointment of Authorized Representative and Assignment of Benefits is enclosed for your records. It is difficult to understand why it has taken more than six months to process his initial claim that apparently is clearly compensable under the terms of your Plan. It is also difficult to understand why none of the accounts referenced on the attached exhibit has been even partially paid. Your failure to timely deny the claims in accordance with the requirements of ERISA, allows us, as Assignee of Mr. Stone, to forego any further administrative remedies and proceed directly to litigation in Federal Court if these claims are not immediately paid.

     Pursuant to the applicable provisions of ERISA, I am requesting immediate production of a copy of the entire claims file, including, but not limited to, all documents which you have or will rely upon in accepting, rejecting, paying, or not processing this claim, as well as any and all other documents received or submitted by anyone with respect to this claim whether or not you have relied on those documents in making your determination and decision. Doctors Hospital, as Assignee of Matt Stone, is specifically authorized to receive this information pursuant to the provisions of 29 C.F.R. Sec. 2560.503-1(m)(8). In addition, if such material is not time produced, pursuant to the provisions of ERISA, Doctors Hospital fully intends to seek payment of the applicable penalties authorized by law. Finally, to the extent it is your contention that you do not have all of the materials which are necessary to process any of the referenced claims, please contact me on an immediate basis notifying me of exactly what additional materials are needed to process any of the claims.

     With kindest regards, I am

          Yours very truly,

          DANIEL & LOWE

          N. Kenneth Daniel

NKD;dl
cc: Josephine H. Hicks, Esq.

ATTACHMENT "A"

Inpatient Hospital Stays of Matt D. Stone:

| Account No. | Dates of Service | Total Billed Charges |
|-------------|------------------|----------------------|
| 539586846 | 08/07/03 - 09/12/03 | 626,896.22 |
| 539747658 | 09/15/03 - 10/06/03 | 73,688.69 |
| 539856279 | 10/10/03 | 502.55 |
| 539876409 | 10/17/03 - 11/02/03 | 117,174.99 |
| 539983040 | 11/07/03 | 436.21 |
| 540005041 | 11/14/03 | 485.60 |
| 540036248 | 12/01/03 | 272.87 |
| 540101057 | 12/15/03 | 355.11 |
| 540378177 | 02/17/04 | 3,271.80 |
| 540464586 | 03/08/04 - 03/15/04 | 31,821.53 |



SENDER: *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

*COMPLETE THIS SECTION ON DELIVERY*

A. Received by (Please Print Clearly)   B. Date of Delivery
   B. Kilby                              3/30/04

C. Signature
X  B. Kilby           ☐ Agent
                      ☐ Addressee

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

1. Article Addressed to:

The Carolina Beverage Corp
Plan Administrator/Carolina Bev
Employee Medical Plan
P.O. Box 697
Salisbury, NC  28145

3. Service Type
   ☐ Certified Mail    ☐ Express Mail
   ☐ Registered       ☐ Return Receipt for Merchandise
   ☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
   7002 2410 0004 4688 8501

PS Form 3811, July 1999        Domestic Return Receipt        102595-99-M-1789



U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

Postage         $   .60
Certified Fee       2.30
Return Receipt Fee  1.25
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)
Total Postage & Fees  $  4.65

Sent To   Employee Benefit
Street, Apt. No.;   4201 Chastain Avenue
or PO Box No.
City, State, ZIP+4   Charlotte, NC  28217

PS Form 3800, June 2002        See Reverse for Instructions

7002 2410 0004 4688 8501

04/29/2004  14:19    67842175                    PASA                              PAGE  02

# HBA Hospital Bill Analysis

April 27, 2004

Doctor's Hospital Augusta
P.O. Box 402949
Atlanta GA 30384-2949

| | |
|---|---|
| Health Plan Name: | Carolina Beverage |
| Dates Of Service: | 8/07/2003 to 3/15/2004 |
| Patient Control #: | 539747658 |
| Patient Name: | Matt D. Stone |
| Total Billed: | $848,892.58 |
| Amount Disallowed: | $284,191.62 |
| Revised Total: | $564,700.96 |

Dear Hospital Administrator,
We have conducted an independent review of the billed charges as referenced above. Please note the following regarding our findings:

It appears that certain charges exceed reasonable and customary. Additional documentation is required in order to support the charges billed. We have recommended that the health plan make their payment based upon the revised total as indicated above and reflected in our report.

You may appeal the Plan's decision. All appeals must be submitted in writing and must be made within 60 days. If an appeal is not received within this time period, the plan assumes you have accepted these findings and the file will be closed.

Should you decide to appeal, the following items will be helpful in the appeal process:

1.      Any documentation of historical financial data and/or other sources that would support the amount billed

2.      Invoices from suppliers for implants, medical supplies or devices disallowed. Please submit the Physicians orders and the invoices for the pharmacy charges.



EXHIBIT
D
ALL-STATE LEGAL®

Page 2
Stone, Matt

3.    Medical records to support amounts billed which have been disallowed

If an appeal is received, an acknowledgment letter (detailing the information received) will be sent to your attention.  Any information deficiencies will be noted as well.  If there are documentation deficiencies, an additional 30 days will be provided to submit the missing data.

The hospital has accepted an assignment of benefits. The plan member should not be balance billed.

Please do not hesitate to contact us. Thank you for your cooperation in our review of this claim.

Sincerely,
Paula Mullinax RN, BSN
Nurse Reviewer
Phone 800-890-2843
Fax 407-562-0044

NOTE: This is a self funded health plan and is subjected to ERISA guidelines. ERISA permits plans to establish administrative procedures for appeals. Such procedures address the time frames in which a denial may be appealed.  A provider who accepts an assignment of benefits must comply with these guidelines and exhaust the administrative remedies in the Plan before taking further action. Attempts to collect unpaid balances without exhausting the appeals process violate ERISA provisions.

CC:   Tommy Page \ Carolina Beverage Corporation
        Cheryl Harden \ EBS \ Director of Claims and Customer Service
        Josephine Hicks Esq \ Carolina Beverage Corporation
        Bryan Davenport Esq \ HBA, LLC
        File

# DETERMINATION CODE EXPLANATIONS

Doctors Hospital of Augusta
Stone, Matt D. [3]
10/17/03 – 11/02/03
539878409

**The Health Insurance Portability and Accountability Act of 1996 (HR 3103) or HIPAA** "With the passage of HR 3103 on August 21, 1996, Congress declared war on all health care fraud and abuse and applied these provisions to all payers. For purposes of this law, a health care benefit program is defined as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual and includes any individual or entity who is providing a medical benefit, item or service for which payment is made under the plan or contract."

## NON-BILLABLE SERVICES

CMS prohibits "charging for non-billable services for both inpatients and outpatients. These are charges that Medicare considers as part of the cost of doing business as a hospital and, therefore, should be included in the room or procedure charge. They are also not billable to the beneficiary. Non-billable services would include such things as billing for nursing time, gowns, call-back, or equipment."

## 2.  SPECIAL CARE UNITS / INTENSIVE CARE UNITS (SCU, ICU, CCU)

**B.**  ROUTINE SUPPLIES - Routine supplies are defined as supplies found in the "floor stock" and are available to all patients receiving supplies in that location. The supply items are included in the general cost of the room in which the services are delivered and are not separately billable. Miscellaneous, general or unnamed supply items are considered routine and also are not billable.

## 4.  OPERATING ROOM

**B.**  ROUTINE SUPPLIES

1. O/R supplies or routine stock items, such as gowns, drapes, gloves, towels and prep-solutions used in the operating room are considered cost items for the facility and are not separately billable. They are included in the charge associated with the room charge.

2. Pre-packaged trays, kits, and surgical packages must list the components contained in each kit/tray. These kits are usually more expensive than the individual components and incorporate non-billable routine supply items. Charges are ineligible for reimbursement without a list of kit/tray components.

**C.**  ROUTINE EQUIPMENT - Equipment commonly available to patients in a particular setting or ordinarily furnished to patients during the course of procedure, e.g., surgical equipment, even though the equipment is rented by the hospital, is considered routine and not separately billable.  In addition, supplies used in conjunction with rental equipment would also be considered routine.

Equipment, instruments, apparatuses, implements or such items for which depreciation and financing expenses are recovered as depreciable assets do not meet eligibility requirements for pass-through/outlier payments and are therefore considered routine and not billable.

1

**5.  RECOVERY ROOM**

   **B.**  <u>ROUTINE SUPPLIES</u> - Items that are routinely available for patients and routinely stocked in the department are incorporated into the cost of the room or procedure charge and therefore not separately billable. Miscellaneous, general or unnamed supply items are considered routine and are not billable.

## 16. PHARMACY

   **E.**  <u>NON-LEGEND DRUGS</u> - Items stocked at nursing stations or on the floor in gross supply and distributed or utilized individually in small quantities, e.g., antacid, aspirin (and other non-legend drugs ordinarily kept on hand), suppositories, vitamins, nicotine patches, laxatives and enemas are considered as routine supply items and not separately billable.

## 18. INCORRECT PROFESSIONAL VS. TECHNICAL CHARGE

Components (Professional/Technical/Comprehensive): Professional component is usually 40% of the cost and includes physician review and analyzation with a report of the findings. This is normally billed by the physician. Technical component is usually 60% of the cost for the use of the equipment utilized for the test. This is normally billed by the facility. Comprehensive component is inclusive of both Technical and Professional portions, totaling 100% of the charge.

   **A.**  Incorrect charge for the technical component incorporating the comprehensive component fee.

## 19. INFUSION / INJECTIONS / IV SOLUTIONS - In order to qualify for reimbursement, IV solutions must serve a therapeutic or diagnostic purpose. Admixtures are neither therapeutic nor diagnostic. KVO and E/D protocol are neither therapeutic nor diagnostic. Therefore, these charges are denied.

   **A.**  <u>THERAPEUTIC / DIAGNOSTIC</u> -IV solution administration for patency is neither therapeutic nor diagnostic. <u>Admixtures</u> used for reconstitution or administrative facilitation, being neither therapeutic nor diagnostic, are not billable. Examples: sterile water or saline (NACL, NSS, NS, D5W) up to 250 ML.

   **B.**  <u>PATENCY</u> - 0 – 200 ml of saline, D5W, sodium chloride, NACL (NS, NSS), (or 250 ml with surgical procedures), constitute patency.

   **C.**  <u>FLUSHES</u> – Saline and heparin flushes constitute patency maintenance, which is neither diagnostic nor therapeutic.

   **D.**  <u>IRRIGATION</u> - Saline or IV solutions used for irrigation is deemed a generic service integral to procedure performance. (Lactated Ringers over 1000 ML included).

   **E.**  <u>A.W.P.</u> - IV solutions are reimbursed using the AWP plus 30% mark up.

## 24. UCR RANGE - Non-Uniformity – Charges to be related consistently to the cost of the services and uniformly applied to all patients. Charges are defined as "the regular rates established by the provider for services rendered to both Medicare beneficiaries and Other Paying Patients.

2

**C.** <u>ALLOWED AMOUNTS</u> - Allowed amounts are based upon percentiles from national databases. The percentiles used are the 75th and 85th. This data is used in place of geographical conversion factors. The 75th percentile indicates that 25% of the charges are at that charge or higher, and 75% are at that point or lower. Billing at the 85th percentile means that your fees are equal to or higher than 85% of the charges submitted for these supplies and services.

## 25. INCORRECT APPLICATION OF CPT/HCPCS OR ICD-9-CM CODES

Written policies and procedures on proper coding should reflect current regulations and should be developed in tandem with private payer and organizational standards. The charge(s) do not reflect the correct coding guidelines published CMS, The National Center for Health Statistics, American Medical Association, and American Health Information Management Association (AHIMA).

**C.** <u>CODE SUBSTANTIATION</u> - ICD-9-CM diagnoses codes (Vol. 1) and procedure codes (Vol. 3) reported on the UB-92 must substantiate the reported procedures, treatments, items and services referenced and billed on the itemized statement.

## 30. UNBUNDLING - This is billing piecemeal or in a fragmented manner to yield
greater reimbursement for tests or procedures that should be billed together or under one comprehensive code at a lower cost. The services are not separately billable. Examples include:

**B.** Reporting separate codes for related services when one comprehensive code includes all of the related services.

## 99. FAIR AND REASONABLE CHARGES – Billed charges are comprised of Drugs
and Services (Pathology and Radiology). The sources used for establishing the "Fair and Reasonable" are: "The Red Book" 2003 Drug Topics, and the National Fee Analyzer, 2003, and 2004 published by Ingenix. Both resource books have national recognition throughout the health care industry. Additionally, Ingenix, Inc. maintains the largest database of charge data, clinical measurements, and audited health care financial records in the health care industry. Note: 2004 Red Book is not published till May of the current year.

Drugs: CMS reimburses 85% to 95% of the AWP listed in the Red Book. For purposes of non-CMS reimbursement, "Fair and Reasonable" is calculated using the AWP multiplied by 1.30, thus securing a 30% margin of profit for drugs supplied by the hospital.

Pathology/Radiology: The National Fee Analyzer incorporates various percentiles of pricing, in addition to CMS standard reimbursement. The 75th percentile, the highest, is the elected percentile, and is then adjusted by the geographical conversion factor for Atlanta, GA which is 1.126.

IV Solutions: IV solutions are normally purchased in bulk quantities, thereby reducing actual cost to $.10 to $.75 cents per bag. The Allowed Amount column figures are calculated from the purchase price of a <u>single bag, with no bulk discount, and includes a 30% mark up from that retail, list price.</u>

Ancillary Supply Prices: The Allowed Amount column figures are calculated from the purchase price of a <u>single item, with no bulk discount, and includes a 30% mark up from that retail price.</u>

3

**Attachment A**

## CATEGORIES

Equipment (see Attachment B)

Equipment items are reusable items which are owned, leased or rented by the facility and are not directly identifiable to an individual patient. Examples include: cardiac monitors, lasers, fetal monitors, arthroscopes and laproscopes.

You should consider the use of the equipment when establishing the room and board charge or the procedure charge for which the equipment is utilized. You should evaluate these charges to verify that the use of the equipment is accurately reflected in the costs incurred for the services rendered. It would not be appropriate to establish a separate charge for a piece of equipment such as an arthroscopic shaver because the use of the equipment is considered to be part of the procedure charge.

**Major Moveable Equipment:**
Major Moveable Equipment has the following general characteristics:
➢ The item is in a relatively fixed location in the building.
➢ The item is capable of being moved as distinguished from building equipment.
➢ The item has a unit cost sufficient to justify ledger control.
➢ The item is of sufficient size and identity to make control feasible by means of identification tags.
➢ The item has a minimum useful life of approximately three years.

**Minor Equipment:**
➢ Minor Equipment has the following general characteristics:
➢ The item does not have a fixed location.
➢ The item is subject to use by various departments of the facility.
➢ The item is comparatively small in size and unit cost.
➢ The item is subject to inventory control.
➢ There is a fairly large quantity of the items in use.
➢ The item has a useful life of approximately three years or less.

**Rented or Leased Equipment:**
Equipment acquired through a lease-purchase or sale-lease back agreement (virtual purchase) is subject to the same rules as facility-owned equipment. If the agreement does not meet the requirements of a virtual purchase, but lease or rent payments are for equipment that would be depreciable if owned, the payments are still allowable capital-related costs. Since costs are allocated in this manner, no separate charge is allowed for rented equipment.

Supplies

Routine supplies: (See attachment B)
These items are also referred to as floor stock items or minor medical and surgical supplies. These items are generally available to all patients, reusable, and are not separately identifiable as provided to an individual patient. Examples include gowns, drapes, and non-specialty needles. These items are not separately billable and should not be separately identified in the chargemaster.

Non-routine supplies: (See attachment C)
These items are not normally furnished to all patients. These items are single use and directly identifiable as rendered to an individual patient. Examples include oxygen, IV supplies, and ace bandages. Non-routine supplies may be reported separately as billable items.

Please note, under Medicare OPPS, most non-routine supplies are considered packaged items. Packaged services are items and services that are considered to be an integral part of another service that is paid under the OPPS. No separate payment is made for packaged services, because the cost of these items is included in the APC payment for the service of which they are an integral part. From a reimbursement and cost reporting standpoint, you should report packaged services as separate line items even though you will not receive a separate payment since they will be used to calculate outlier payments, Transitional Corridor Payments (TOPs), and to determine future payment rates.

1

**Attachment B**

## Examples of Routine Items and Services

The following list includes items that may not be separately billable in a hospital setting:

| | |
|---|---|
| Adhesive/paper tape | Kinetic machines |
| Alcohol preps/wipes | Laproscopes |
| Alternating pressure pads and mattresses and misc support surfaces* | Lasers |
| Apnea monitors | Lymphedema pumps* |
| Aprons | Manual wheelchair base* |
| Arthroscopes | Microscopes |
| Bedpans | Motorized wheelchair/power wheelchair base* |
| Bilirubin lights | Nebulizers* |
| Blankets | Non-specialty Needles |
| Blood drawing supplies | Non-sterile applicators |
| Blood glucose monitors* | Respiratory therapy equipment* |
| Breast pumps* | Patient lifts* |
| Canes* | Perfusion pumps* |
| Cardiac monitors | Pillows |
| Cold packs | Pneumatic compressor and appliances* |
| Commodes* | Portable sitz baths |
| Continuous passive motion machines* | Power operated vehicles* |
| Continuous positive airway pressure* | Pulse oximeters |
| Cotton balls | Restraints* |
| Crutches* | Roll about chairs* |
| Cushion lift power seat* | Self-contained Pacemaker monitor* |
| Decubitus care equipment* | Shampoo |
| Diathermy units | Sheets |
| Drapes | Slippers |
| Drills | Soap |
| Dynamap monitors | Specimen containers |
| Ensure | Suction machines |
| Equipment covers | Support surfaces* |
| Fetal monitors | Surgical masks |
| Film copies | Syringes |
| Gel Flotation pads and mattresses* | TENS units* |
| Gloves** | Thermometers |
| Gowns | Tongue depressors |
| Heat lamps* | Traction equipment* |
| Heating pads* | Transfer belts |
| Hospital beds and accessories * | Trapeze devices* |
| Hot packs | Urinals |
| Humidifiers | Video cameras |
| Ice bags | Walkers* |
| Incontinence supplies | Wheelchair options/accessories* |
| Incubators | Wheelchairs* |
| Infusion pumps | Yag lasers |
| Intermittent positive pressure breathing equipment* | |

* These items are Durable Medical Equipment (DME) and are not billable by the hospital in an inpatient or outpatient hospital setting

** Generally gloves used during a procedure are routine and not separately billable. However, gloves such as isotoner gloves, used during therapeutic rehabilitation may be considered orthotic devices and are separately billable.

**Attachment C**

## Examples of Non-routine items and services

The following non-routine items are separately billable in a hospital setting:

| | |
|---|---|
| Ace bandages | Irrigation trays |
| Braces | IV supplies |
| Brachytherapy needles | Knee prosthesis |
| Breast prosthesis | Lumbrosacral supports |
| Cervical collars | Ostomy supplies |
| Disposable speculums | Oxygen |
| Douches | Oxygen cannulas |
| Drainage bags | Pacemaker leads |
| ECG electrodes | Screws, nuts and bolts used in conjunction with prosthetic devices |
| Enemas | Splints |
| Foley catheters | Staples |
| Harnesses | Sutures |
| Hip prosthesis | Ureteral stent |

Please note that there may be some variance by Fiscal Intermediary (FI). You may want to contact your FI to determine if they will provide a listing of specific supplies determined to be routine or non-routine.

540464586

PAGE  23

PASA

6784217522

04/29/2004  14:19

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747658 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 03/08/2004 to 03/15/2004 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 207 | ICU/Burn Care | 6,510.00 | 0.00 | 0.00 | 0.00 | 6,510.00 |
| 10 | 207 | ICU/Burn Care | 1,085.00 | 0.00 | 0.00 | 0.00 | 1,085.00 |
| 11 | 250 | Pharmacy | 5,240.06 | 475.20 | 2,663.64 | 3,138.84 | 2,101.22 |
| 12 | 258 | IV Solutions | 286.33 | 60.35 | 0.00 | 60.35 | 225.98 |
| 13 | 259 | Drugs/Other | 1,963.99 | 0.00 | 589.20 | 589.20 | 1,374.79 |
| 14 | 270 | Med-Sur Supplies | 2,190.00 | 1,912.20 | 0.00 | 1,912.20 | 277.80 |
| 15 | 278 | Supply/Implants | 1,542.40 | 0.00 | 0.00 | 0.00 | 1,542.40 |
| 16 | 301 | Lab/Chemistry | 1,780.40 | 1,537.92 | 0.00 | 1,537.92 | 242.48 |
| 17 | 302 | Lab/Immunology | 132.15 | 0.00 | 0.00 | 0.00 | 132.15 |
| 18 | 305 | Lab/Hematology | 508.11 | 0.00 | 0.00 | 0.00 | 508.11 |
| 19 | 324 | DX X-Ray/Chest | 245.47 | 189.68 | 0.00 | 189.68 | 55.79 |
| 20 | 360 | OR Services | 9,074.00 | 0.00 | 2,722.20 | 2,722.20 | 6,351.80 |
| 21 | 430 | Occupation Therapy | 52.67 | 0.00 | 0.00 | 0.00 | 52.67 |
| 22 | 710 | Recovery Room | 1,206.65 | 0.00 | 361.96 | 361.96 | 844.69 |
| 23 | 991 | Cafeteria | 4.30 | 4.30 | 0.00 | 4.30 | 0.00 |
| 24 | | | 31,821.53 | 4,179.65 | 6,337.00 | 10,516.65 | 21,304.88 |

540378177

PAGE 22

PASA

6784217522

04/29/2004  14:19

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 538747658 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 02/17/2004 to 02/17/2004 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 270 | Med-Sur Supplies | 467.79 | 76.30 | 0.00 | 76.30 | 391.49 |
| 10 | 420 | Man Ther Tech-1/> Re | 52.67 | 0.00 | 0.00 | 0.00 | 52.67 |
| 11 | 424 | Physical Therapy | 111.83 | 111.83 | 0.00 | 111.83 | 0.00 |
| 12 | 510 | Office/Outpatient VI | 64.75 | 64.75 | 0.00 | 64.75 | 0.00 |
| 13 | 623 | Med-Surg Supplies | 2,574.76 | 0.00 | 772.43 | 772.43 | 1,802.33 |
| 14 | | | 3,271.80 | 252.88 | 772.43 | 1,025.31 | 2,246.49 |

540163689

PAGE 21

PASA

6784217522

04/29/2004   14:19

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747668 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 02/04/2004 to 02/04/2004 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 270 | Med-Sur Supplies | 381.50 | 267.05 | 114.45 | 381.50 | 0.00 |
| 10 | 434 | Occupational Therapy | 111.83 | 0.00 | 0.00 | 0.00 | 111.83 |
| 11 | 510 | Office/Outpatient VI | 71.54 | 71.54 | 0.00 | 71.54 | 0.00 |
| 12 | | | 564.87 | 338.59 | 114.45 | 453.04 | 111.83 |

540101057

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747658 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 12/15/2003 to 12/15/2003 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inaproriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 259 | Drugs/Other | 122.08 | 0.00 | 36.62 | 36.62 | 85.46 |
| 10 | 300 | Drawing Blood | 16.35 | 16.35 | 0.00 | 16.35 | 0.00 |
| 11 | 305 | Thromboplastin Time, PAR | 20.78 | 0.00 | 0.00 | 0.00 | 20.78 |
| 12 | 305 | Prothrombin Time | 12.95 | 0.00 | 0.00 | 0.00 | 12.95 |
| 13 | 761 | Treatment of Burn | 182.95 | 0.00 | 0.00 | 0.00 | 182.95 |
| 14 | | | 355.11 | 16.35 | 36.62 | 52.97 | 302.14 |

PASA

6784217522

14:19

04/29/2004

540036248

PAGE 19

PASA

6784217522

04/29/2004   14:19

|   | A. | B. | C. | D. | E. | F. | G. |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747658 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 12/01/2003 to 12/01/2003 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Unappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 259 | Drugs/Other | 19.66 | 0.00 | 0.00 | 0.00 | 19.66 |
| 10 | 270 | Med-Sur Supplies | 20.18 | 20.18 | 0.00 | 20.18 | 0.00 |
| 11 | 300 | Drawing Blood | 16.35 | 16.35 | 0.00 | 16.35 | 0.00 |
| 12 | 305 | Thromboplastin Time, PAR | 20.78 | 0.00 | 0.00 | 0.00 | 20.78 |
| 13 | 305 | Prothrombin Time | 12.95 | 0.00 | 0.00 | 0.00 | 12.95 |
| 14 | 761 | Treatment of Burn | 182.95 | 0.00 | 0.00 | 0.00 | 182.95 |
| 15 | | | 272.87 | 36.53 | 0.00 | 36.53 | 236.34 |

540 005 041

PAGE 18

6784217522

04/29/2004 14:19

PASA

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747659 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 11/14/2003 to 11/14/2003 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 250 | Pharmacy | 14.07 | 0.00 | 0.00 | 0.00 | 14.07 |
| 10 | 259 | Drugs/Other | 244.16 | 0.00 | 73.25 | 73.25 | 170.91 |
| 11 | 270 | Med-Sur Supplies | 78.85 | 78.85 | 0.00 | 78.85 | 0.00 |
| 12 | 300 | Drawing Blood | 16.35 | 16.35 | 0.00 | 16.35 | 0.00 |
| 13 | 305 | Prothrombin Time | 12.95 | 0.00 | 0.00 | 0.00 | 12.95 |
| 14 | 510 | Office/Outpatient Visit | 119.22 | 0.00 | 0.00 | 0.00 | 119.22 |
| 15 | | | 485.60 | 95.20 | 73.25 | 168.45 | 317.16 |

539983040

PAGE 17

PASA

6784217522

04/29/2004 14:19

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 538747668 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 11/07/2003 to 11/07/2003 | | | | | |
| 7 | TPA;: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 270 | Med-Sur Supplies | 94.00 | 94.00 | 0.00 | 94.00 | 0.00 |
| 10 | 305 | Prothrombin Time | 12.95 | 0.00 | 0.00 | 0.00 | 12.95 |
| 11 | 430 | Man Ther Tech-1> RE | 146.31 | 0.00 | 0.00 | 0.00 | 146.31 |
| 12 | 761 | Treatment of Burn(s) | 182.95 | 0.00 | 0.00 | 0.00 | 182.95 |
| 13 | | | 436.21 | 94.00 | 0.00 | 94.00 | 342.21 |

539876409

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 539747658 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 10/17/2003 to 11/02/2003 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inapprorlate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 207 | ICU/Burn Care | 36,795.00 | 0.00 | 0.00 | 0.00 | 36,795.00 |
| 10 | 207 | ICU/Burn Care | 16,725.00 | 0.00 | 0.00 | 0.00 | 16,725.00 |
| 11 | 250 | Pharmacy | 14,132.46 | 1,242.00 | 4,932.52 | 6,174.52 | 7,957.94 |
| 12 | 258 | IV Solutions | 1,421.95 | 1,245.48 | 0.00 | 1,245.48 | 176.47 |
| 13 | 259 | Drugs/Other | 4,728.21 | 2.12 | 0.00 | 2.12 | 4,726.09 |
| 14 | 270 | Med-Sur Supplies | 10,743.81 | 4,770.10 | 3,223.14 | 7,993.24 | 2,750.57 |
| 15 | 272 | Sterile Supplies | 454.47 | 41.95 | 0.00 | 41.95 | 412.52 |
| 16 | 274 | Prosth/Orth Dev | 182.83 | 0.00 | 0.00 | 0.00 | 182.83 |
| 17 | 301 | Lab/Chemistry | 8,497.88 | 3,932.15 | 0.00 | 3,932.15 | 4,565.73 |
| 18 | 302 | Lab/Immunology | 505.80 | 138.72 | 0.00 | 138.72 | 367.08 |
| 19 | 305 | Lab/Hemotology | 2,043.88 | 613.16 | 0.00 | 613.16 | 1,430.72 |
| 20 | 306 | lab/Bact-Micro | 195.92 | 0.00 | 0.00 | 0.00 | 195.92 |
| 21 | 324 | DX X-ray/Chest | 454.58 | 0.00 | 0.00 | 0.00 | 454.58 |
| 22 | 360 | OR Svc. | 10,002.12 | 4,000.85 | 0.00 | 4,000.85 | 6,001.27 |
| 23 | 420 | Physical Therp | 389.17 | 0.00 | 0.00 | 0.00 | 389.17 |
| 24 | 430 | Occup Therp | 594.13 | 209.40 | 0.00 | 209.40 | 384.73 |
| 25 | 434 | Occup Therp/Eval | 103.55 | 103.55 | 0.00 | 103.55 | 0.00 |
| 26 | 623 | Med-Sur Supplies | 174.77 | 0.00 | 0.00 | 0.00 | 174.77 |
| 27 | 710 | Recovery Room | 1,799.81 | 539.94 | 0.00 | 539.94 | 1,259.87 |
| 28 | 761 | Treatment Rm | 182.95 | 0.00 | 0.00 | 0.00 | 182.95 |
| 29 | 921 | Perl Vascul Lab | 305.24 | 116.26 | 0.00 | 116.26 | 188.98 |
| 30 | 991 | Cafeteria | 11.94 | 11.94 | 0.00 | 11.94 | 0.00 |
| 31 | | | 110,445.47 | 16,967.62 | 8,155.66 | 25,123.28 | 85,322.19 |

539 856 279

PAGE 15

PASA

6784217522

04/29/2004   14:19

|   | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | |
| 3 | Control #: | 530747655 | | | | | |
| 4 | SS#: | 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 | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | |
| 6 | Dates of Service: | 10/10/2003 to 10/10/2003 | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | |
| 8 | Rev Code | Description | Total Billed | Inapproriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration |
| 9 | 259 | Drugs/Other | 110.77 | 0.00 | 33.23 | 33.23 | 77.54 |
| 10 | 270 | Med-Sur Supplies | 107.89 | 107.89 | 0.00 | 107.89 | 0.00 |
| 11 | 306 | Culture Specimen, Bacteria | 51.83 | 0.00 | 0.00 | 0.00 | 51.83 |
| 12 | 306 | Antibiotic sensitivity | 28.33 | 0.00 | 0.00 | 0.00 | 28.33 |
| 13 | 306 | Smear, Stain & Interpret | 20.78 | 0.00 | 0.00 | 0.00 | 20.78 |
| 14 | 761 | Treatment of Burn(s) | 182.95 | 0.00 | 54.89 | 54.89 | 128.06 |
| 15 | | | 502.55 | 107.89 | 88.12 | 196.01 | 306.54 |

539747658

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | DETERMINATIONS | | | 1 | | | | | |
| 2 | HOSPITAL: | | | Doctors Hospital Augusta | | | | | |
| 3 | PATIENT: | | | Stone, Matt D[2] | | | | | |
| 4 | SSN: | | | 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 | | | | | |
| 5 | DOS: | | | 091503 - 100603 | | | | | |
| 6 | PT.CONTROL #: | | | 539747658 | | | | | |
| 7 | DATE: | | | 4/3/04 | | | | | |
| 8 | | | | | | | | | |
| 9 | DATE OF | CPT | QTY | SERVICE / ITEM | DET | BILLED | ALLOWED | ADJUSTED | |
| 10 | SERVICE | HCPCS | | DESCRIPTION | CODE | AMOUNT | AMOUNT | AMOUNT | |
| 11 | | | | 250   PHARMACY | | | | | |
| 12 | 9/16-10/6/03 | | 47 | NA CHL 0.9% 10ML VIAL @ 27.50 ea. | 19A | 1292.50 | 0.00 | 1292.50 | |
| 13 | 091703 | | 2 | SOD CHL 0.9% IRR 1000M | 19D | 123.64 | 0.00 | 123.64 | |
| 14 | | | | | | | | 1416.14 | |
| 15 | | | | | | | | | |
| 16 | | | | 258   IV SOLUTIONS | | | | | |
| 17 | 9/16-9/29/03 | | 4 | SOD CHL 0.9 100ML BAG @ 55.88 ea. | 19A | 223.52 | 0.00 | 223.52 | |
| 18 | 091603 | | 1 | SOD CHL 0.9%  50ML BAG | 19A | 71.85 | 0.00 | 71.85 | |
| 19 | 091503 | | 1 | SOD CHL 0.9% 250ML BAG | 19B | 63.88 | 0.00 | 63.88 | |
| 20 | 092903 | | 1 | SOD CHL IRR POUR 250 M | 19D | 4.85 | 0.00 | 4.85 | |
| 21 | | | | | | | | 364.10 | |
| 22 | | | | | | | | | |
| 23 | | | | 270   MED-SUR SUPPLIES | | | | | |
| 24 | 9/17-9/29/03 | | 2 | ADAPTER FEM LUER LOK @ 4.41 ea. | 4B1 | 8.82 | 0.00 | 8.82 | |
| 25 | 9/17-9/29/03 | | 2 | CAUTERY VALLEY @ 119.86 ea. | 4C | 237.72 | 0.00 | 237.72 | |
| 26 | 8/17-9/29/03 | | 2 | CIRCUIT ANESTH 60" @ 18.92 ea. | 4B1 | 37.84 | 0.00 | 37.84 | |
| 27 | 092903 | | 1 | CONNECTING TUBE | 4B1 | 46.05 | 0.00 | 46.05 | |
| 28 | 092903 | | 1 | CUFF BLD PSSR ADULT | 4B1 | 51.73 | 0.00 | 51.73 | |
| 29 | 9/17-9/29/03 | | 2 | ELCTRD MEGADYNE D014 @ 55.51 ea. | 4B1 | 111.02 | 0.00 | 111.02 | |
| 30 | 9/17-9/29/03 | | 2 | FILTER HEAT & MOISTURE @ 22.72 ea. | 4C | 45.44 | 0.00 | 45.44 | |
| 31 | 091703 | | 1 | H2O DISTILLED GALLON | 4B1 | 13.93 | 0.00 | 13.93 | |
| 32 | 9/17-9/29/03 | | 10 | KERLIX ROLL @ 7.56 ea. | 4B1 | 75.60 | 0.00 | 75.60 | |
| 33 | 9/15-10/6/03 | 27 | 27 | KLING FLUFF 6X6 @ 20.19 ea. | 1B | 545.13 | 0.00 | 545.13 | |
| 34 | 9/17-9/29/03 | | 3 | KLING FLUFF 6X6 @ 20.19 ea. | 4B1 | 60.57 | 0.00 | 60.57 | |
| 35 | 8/15-10/6/03 | | 52 | KLING ROLL 4.5 @ 12.62 ea. | 1B | 656.24 | 0.00 | 656.24 | |
| 36 | 9/17-9/29/03 | | 4 | KLING ROLL 4.5 @ 12.62 ea. | 4B1 | 50.48 | 0.00 | 50.48 | |
| 37 | 092903 | | 1 | LMA SZ 4.0 | 4B1 | 54.90 | 0.00 | 54.90 | |
| 38 | 091603 | | 1 | MASK AEROSOL | 1B | 2.52 | 0.00 | 2.52 | |
| 39 | 9/17-9/29/03 | | 2 | OXYGEN R.R. CHARGE @ 123.94 ea. | 5B | 247.88 | 0.00 | 247.88 | |
| 40 | 9/17-9/29/03 | | 2 | PLATE BOVIE DISP @ 95.89 ea. | 4C | 191.78 | 0.00 | 191.78 | |

04/29/2004  14:19   6784217S

PASA

PAGE  04

539747658

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 41 | 091703 | | 1 | SET BLOOD GRAVITY FLOW | 4B1 | 49.54 | 0.00 | 49.54 | |
| 42 | 092903 | | 6 | SPONGE LAP 18 X 18 @ 126.81 ea. | 4B1 | 760.86 | 0.00 | 760.86 | |
| 43 | 092903 | | 1 | TIP YANKAUER | 4B1 | 26.50 | 0.00 | 26.50 | |
| 44 | 9/17-9/29/03 | | 2 | TISSEEL DUAL SPRAY TIP @ 89.58 ea. | 4B2 | 179.16 | 0.00 | 179.16 | |
| 45 | 9/17-9/29/03 | | 2 | TISSEEL MIST APPLICATO @ 168.44 ea. | 4B2 | 336.88 | 0.00 | 336.88 | |
| 46 | 091703 | | 1 | TUBE ENDO MURPHY 7.0 | 4B1 | 106.61 | 0.00 | 106.61 | |
| 47 | 091703 | | 1 | TUBNG PRSR ML/ML 6" | 4B1 | 39.74 | 0.00 | 39.74 | |
| 48 | 9/16-9/28/03 | | 3 | WHIRLPOOL LINER @ 34.44 ea. | 1C | 103.32 | 0.00 | 103.32 | |
| 49 | | | | | | | | 4040.26 | |
| 50 | | | | | | | | | |
| 51 | | | | 272   STERILE SUPPLY | | | | | |
| 52 | 100403 | | 1 | WATER IRRIG 1000 BOTTL | 19D | 68.56 | 0.00 | 68.56 | |
| 53 | | | | | | | | 68.56 | |
| 54 | | | | | | | | | |
| 55 | | | | 430   OCCCUPATION THERAPY | | | | | |
| 56 | 092903 | 29515 | 1 | APP SHORT LEG SPLINT   (unbundled from 97504) | 30B | 139.61 | 0.00 | 139.61 | |
| 57 | | | | | | | | 139.61 | |
| 58 | | | | | | | | | |
| 59 | | | | 434   OCCUP THERP / EVAL | | | | | |
| 60 | 091603 | 97004GO | 1 | OT RE-EVALUATION   (unbundled from 97001GP) | 30B | 103.55 | 0.00 | 103.55 | |
| 61 | | | | | | | | 103.55 | |
| 62 | | | | | | | | | |
| 63 | | | | 510   CLINIC | | | | | |
| 64 | 091503 | 99214 | 1 | WND CTR VST LEVEL 4 ES | 25B* | 228.44 | 0.00 | 228.44 | |
| 65 | | | | | | | | 1416.14 | |
| 66 | | | | | | | | 1644.58 | |
| 67 | | | | SUB TOTAL OF NON-BILLABLE ITEMS / SERVICES | | | | 12492.88 | |
| 68 | | | | | | | | | |
| 69 | | | | | | | | | COST TO |
| 70 | | | | UCR / Fair and Reasonable Charges | | Charge Per | Cost + 30 | | CHARGE RATIO |
| 71 | 9/16-10/3/03 | 84075 | 12 | ALK PHOS (ALP) | 99 | 85.03 | 28.97 | | 2.94 |
| 72 | 9/16-10/3/03 | 84450 | 12 | AST (SGOT) | 99 | 108.85 | 31.96 | | 3.40 |
| 73 | 9/16-10/3/03 | 82247 | 12 | BILIRUBIN TOT | 99 | 63.06 | 25.06 | | 2.52 |
| 74 | 9/16-10/3/03 | 84520 | 12 | BUN | 99 | 54.86 | 31.96 | | 1.72 |
| 75 | 9/16-10/3/03 | 82550 | 12 | CREATINE KINASE (CK) | 99 | 93.35 | 31.13 | | 3.00 |
| 76 | 9/16-10/3/03 | 82565 | 12 | CREATININE BLD | 99 | 58.55 | 31.13 | | 1.88 |
| 77 | 9/16-10/3/03 | 80051 | 12 | ELECTROLYTE PANEL | 99 | 131.67 | 41.23 | | 3.19 |
| 78 | 9/16-10/3/03 | 82947 | 12 | GLUCOSE BLD QN | 99 | 44.84 | 29.72 | | 1.51 |
| 79 | 9/16-10/3/03 | 83735 | 12 | MAGNESIUM BLD | 99 | 103.27 | 31.20 | | 3.31 |
| 80 | 9/16-10/3/03 | 84100 | 12 | PHOSPHORUS BLD | 99 | 81.05 | 28.97 | | 2.80 |

539747658

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 81 | 091603 | | 1 | FLUTIC/SALME 50/500 IN | 99 | 365.89 | 254.26 | | 1.44 |
| 82 | 9/15-10/6/03 | | 36 | OXANDROLONE TAB 10 MG | 99 | 57.12 | 22.71 | | 2.52 |
| 83 | 093003 | 85025 | 1 | CBC PLATELET AUTO DIFF | 99 | 105.98 | 40.01 | | 2.65 |
| 84 | 9/16-10/3/03 | 85027 | 11 | HEMOGRAM W PLT NO DIFF | 99 | 99.80 | 37.85 | | 2.63 |
| 85 | 9/17-9/29/03 | 85610 | 2 | PROTIME | 99 | 63.80 | 33.25 | | 1.92 |
| 86 | 9/17-9/29/03 | 85730 | 2 | PTT | 99 | 85.73 | 40.36 | | 2.12 |
| 87 | 0916-0926 | 71010 | 3 | XR CHEST 1V | 99 | 681.87 | 180.05 | | 3.79 |
| 88 | 091603 | 94664 | 1 | DEM AER GEN/NEB/MDI/IP | 99 | 179.08 | 53.54 | | 3.34 |
| 89 | 091703 | | 4 | SPONGE LAP 18 X 18 | 99 | 507.24 | 17.44 | | 29.08 |
| 90 | 9/16-9/28/03 | 97036GO | 10 | HUBBARD TANK/15MIN | 99 | 124.96 | 63.65 | | 1.96 |
| 91 | | | | | | 3095.59 | 1054.46 | | |

04/29/2004  14:19   678421751

PASA

539747658

PAGE 14

PASA

6784217522

04/29/2004   14:19

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | | |
| 3 | Control #: | 539747658 | | | | | | |
| 4 | SS#: | 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 | | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | | |
| 6 | Dates of Service: | 09/15/2003-10/08/2003 | | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration | |
| 9 | 207 | ICU/Burn Care | 21,105.00 | 0.00 | 0.00 | 0.00 | 21,105.00 | |
| 10 | 250 | Pharmacy | 3,931.43 | 1,416.14 | 1,179.43 | 2,595.57 | 1,335.86 | |
| 11 | 258 | IV Solutions | 449.53 | 364.10 | 0.00 | 364.10 | 85.43 | |
| 12 | 259 | Drugs/Other | 8,336.28 | 0.00 | 2,500.88 | 2,500.88 | 5,835.40 | |
| 13 | 270 | Med-Sur Supplies | 8,756.74 | 4,040.26 | 0.00 | 4,040.26 | 4,716.48 | |
| 14 | 272 | Sterile Supplie | 551.36 | 68.56 | 0.00 | 68.56 | 482.80 | |
| 15 | 274 | Prosth/Orth Dev | 182.83 | 0.00 | 0.00 | 0.00 | 182.83 | |
| 16 | 301 | Lab/Chemistry | 9,982.28 | 1,054.46 | 2,994.68 | 4,049.14 | 5,933.14 | |
| 17 | 305 | Lab/Hemotology | 1,745.61 | 0.00 | 523.68 | 523.68 | 1,221.93 | |
| 18 | 324 | DX X-ray/Chest | 681.87 | 0.00 | 0.00 | 0.00 | 681.87 | |
| 19 | 360 | OR Services | 10,929.48 | 0.00 | 3,278.84 | 3,278.84 | 7,650.64 | |
| 20 | 410 | Respiratory Svc | 1,123.30 | 0.00 | 0.00 | 0.00 | 1,123.30 | |
| 21 | 420 | Physical Therapy | 242.14 | 0.00 | 0.00 | 0.00 | 242.14 | |
| 22 | 424 | Phys Therp/Eval | 103.55 | 0.00 | 0.00 | 0.00 | 103.55 | |
| 23 | 430 | Occupation Ther | 1,798.68 | 139.61 | 0.00 | 139.61 | 1,659.07 | |
| 24 | 434 | Occup Therp/Eval | 103.55 | 103.55 | 0.00 | 103.55 | 0.00 | |
| 25 | 510 | Clinic | 228.44 | 228.44 | 0.00 | 228.44 | 0.00 | |
| 26 | 636 | Drugs/Detail Code | 363.36 | 0.00 | 0.00 | 0.00 | 363.36 | |
| 27 | 710 | Recovery Room | 2,234.54 | 0.00 | 670.36 | 670.36 | 1,564.18 | |
| 28 | 761 | Treatment Rm | 838.72 | 0.00 | 251.62 | 251.62 | 587.10 | |
| 29 | | | 73,688.69 | 7,415.12 | 11,399.49 | 18,814.61 | 54,874.08 | 54,874.08 |

539586846

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 1 | DETERMINATIONS | | | 1 | | | | | |
| 2 | HOSPITAL: | | | Doctors Hospital Augusta | | | | | |
| 3 | PATIENT: | | | Stone, Matt O. | | | | | |
| 4 | SSN: | | | 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 | | | | | |
| 5 | DOS: | | | 08/07/03 - 09/12/03 | | | | | |
| 6 | PT.CONTROL #: | | | 639586846 | | | | | |
| 7 | DATE: | | | 04/15/2004 | | | | | |
| 8 | | | | | | | | | |
| 9 | DATE OF | CPT | QTY | SERVICE / ITEM | DET | BILLED | ALLOWED | ADJUSTED | |
| 10 | SERVICE | HCPCS | | DESCRIPTION | CODE | AMOUNT | AMOUNT | AMOUNT | |
| 11 | | | | 250 · PHARMACY | | | | | |
| 12 | 8/28-9/6/03 | | 3 | H2O DISTILLED GALLON @ 13.93 ea. | 19D | 41.79 | 0.00 | 41.79 | |
| 13 | 8/13-8/17/03 | | 2 | HEPARIN 100U/ML 10ML I @ 22.93 ea. | 19C | 45.86 | 0.00 | 45.86 | |
| 14 | 8/8-9/9/03 | | 169 | NA CHL 0.9% 10ML VIAL @ 27.50 ea. | 19A | 4647.50 | 0.00 | 4647.50 | |
| 15 | 08/29/03 | | 2 | SOD CHL 0.9% 2ML FLUSH | 19C | 55.00 | 0.00 | 55.00 | |
| 16 | 8/8-9/5/03 | | 4 | SOD CHL 0.9% IRR 1000M @ 61.82 ea. | 19D | 247.28 | 0.00 | 247.28 | |
| 17 | 8/9-8/10/03 | | 23 | WATER FOR INJ 10ML @ 9.38 ea. | 19A | 215.74 | 0.00 | 215.74 | |
| 18 | | | | | | | | 5253.17 | |
| 19 | | | | | | | | | |
| 20 | | | | 258 · IV SOLUTIONS | | | | | |
| 21 | 8/11-8/30/03 | | 10 | D5W 100ML BAG @ 65.69 ea. | 19A | 656.90 | 0.00 | 656.90 | |
| 22 | 8/11-8/18/03 | | 3 | DEXTR 5%-W 150ML INJ @ 36.78 ea. | 19A | 110.34 | 0.00 | 110.34 | |
| 23 | 8/11/03 | | 1 | DEXTROSE-5%W 50ML BAG | 19A | 71.19 | 0.00 | 71.19 | |
| 24 | 8/7-9/10/03 | | 90 | SOD CHL 0.9% 100ML BAG @ 55.88 ea. | 19A | 5029.20 | 0.00 | 5029.20 | |
| 25 | 8/7-9/9/03 | | 81 | SOD CHL 0.9% 250 ML BAG @ 63.88 ea. | 18B | 5174.28 | 0.00 | 5174.28 | |
| 26 | 8/13-8/26/03 | | 13 | SOD CHL IRR POUR 250 M @ 4.85 ea. | 19D | 63.05 | 0.00 | 63.05 | |
| 27 | 081603 | | 1 | SOD CHLOR 0.9% 150ML BAG I | 19A | 36.78 | 0.00 | 36.78 | |
| 28 | 8/30-8/31/03 | | 2 | SOD CHLOR 0.9% 500ML BAG B @ 71.85 ea. | 19B | 143.70 | 0.00 | 143.70 | |
| 29 | | | | | | | | 11285.44 | |
| 30 | | | | | | | | | |
| 31 | | | | 270 · MED-SUR SUPPLIES | | | | | |
| 32 | 082203 | | 1 | CAUTERY VALLEY | 2C | 239.72 | 0.00 | 239.72 | |
| 33 | 8/8-8/23/03 | | 6 | ADAPTER FEM LUER LOK @ 4.41 ea. | 2B | 26.46 | 0.00 | 26.46 | |
| 34 | 8/18-9/5/03 | | 2 | ADAPTER FEM LUER LOK @ 4.41 ea. | 4B1 | 8.82 | 0.00 | 8.82 | |
| 35 | 090103 | | 1 | BAG AEROSOL TRACH | 2B | 7.56 | 0.00 | 7.56 | |
| 36 | 090503 | | 1 | BURR STRYK 1808-5-139 | 4C | 141.94 | 0.00 | 141.94 | |
| 37 | 8/12-8/25/03 | | 2 | CANNULA NASAL DIS 7" @ 10.09 ea. | 2B | 20.18 | 0.00 | 20.18 | |
| 38 | 090803 | | 1 | CANNULA NASAL DIS 7" | 4B1 | 10.09 | 0.00 | 10.09 | |
| 39 | 8/19-8/11/03 | | 5 | CANNULA NASAL HUDSON @ 3.15 ea. | 2B | 15.75 | 0.00 | 15.75 | |
| 40 | 8/15-9/8/03 | | 2 | CAUTERY VALLEY @ 119.86 ea. | 4C | 239.72 | 0.00 | 239.72 | |
| 41 | 8/26-8/28/03 | | 2 | CAUTERY VALLEY @ 119.86 ea. | 2C | 239.72 | 0.00 | 239.72 | |
| 42 | 8/7-8/28/03 | | 5 | CONNECTING TUBE @ 46.05 ea. | 2B | 230.25 | 0.00 | 230.25 | |
| 43 | 090503 | | 1 | CONNECTING TUBE | 4B1 | 46.05 | 0.00 | 46.05 | |
| 44 | 081303 | | 1 | CONNECTOR T | 2B | 1.90 | 0.00 | 1.90 | |
| 45 | 8/7-9/5/03 | | 7 | CUFF BLD PRSSR ADULT @ 51.73 ea. | 2B | 362.11 | 0.00 | 362.11 | |

04/29/2004  14:19  67842175

PASA

PAGE  07

539586846

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 46 | 081503 | | 1 | CUFF BLD PRSSR ADULT | 2B/28 | 186.74 | 0.00 | 186.74 | |
| 47 | 8/15-9/5/03 | | 2 | ELCTRD MEGADYNE 0014 @ 55.51 ea. | 4B1 | 111.02 | 0.00 | 111.02 | |
| 48 | 8/19-8/28/03 | | 5 | ELCTRD MEGADYNE 0014 @ 55.51 ea. | 12B | 277.55 | 0.00 | 277.55 | |
| 49 | 8/7-8/19/03 | | 4 | HOLDER TUBE ENDO DSP @ 56.15 ea. | 2B | 244.60 | 0.00 | 244.60 | |
| 50 | 8/7-8/28/03 | | 4 | INFUSER DISP BAG @ 69.39 ea. | 2B | 277.56 | 0.00 | 277.56 | |
| 51 | 082503 | | 1 | KERLIX FLUFFS BOX | 2B | 2.52 | 0.00 | 2.52 | |
| 52 | 8/8-8/28/03 | | 88 | KERLIX ROLL @ 7.56 ea. | 2B | 665.28 | 0.00 | 665.28 | |
| 53 | 090503 | | 4 | KERLIX ROLL | 4B1 | 30.24 | 0.00 | 30.24 | |
| 54 | 8/7-8/25/03 | | 2 | KIT CATH IN CTRL VEN @ 162.76 ea. | 2B3 | 325.52 | 0.00 | 325.52 | |
| 55 | 8/7-9/10/03 | | 63 | KLING FLUFF 6X8 @ 20.19 ea. | 2B | 1271.97 | 0.00 | 1271.97 | |
| 56 | 8/7-9/12/03 | | 125 | KLING ROLL 4 5 @ 12.62 ea. | 2B | 1577.50 | 0.00 | 1577.50 | |
| 57 | 082203 | | 2 | MALIS IRRGATN TUBING S | 2B | 329.32 | 0.00 | 329.32 | |
| 58 | 9/11-8/25/03 | | 4 | MASK AEROSOL @ 2.52 ea. | 2B | 10.08 | 0.00 | 10.08 | |
| 59 | 061303 | | 1 | MASK O2 ADULT DISP M | 2B | 29.03 | 0.00 | 29.03 | |
| 60 | 080703 | | 4 | OXYGEN | 2B1 | 398.32 | 0.00 | 398.32 | |
| 61 | 8/8-9/11/03 | | 23 | OXYGEN HOURLY 415.92 per 24 hrs. | 2B1 | 9566.16 | 0.00 | 9566.16 | |
| 62 | 082903 | | 1 | (24) OXYGEN HOURLY | 2B1 | 415.92 | 0.00 | 415.92 | |
| 63 | 082903 | | 1 | (24) OXYGEN HOURLY ( dup.) | 2B1/23 | 415.92 | 0.00 | 415.92 | |
| 64 | 8/8-8/28/03 | | 10 | PLATE BOVIE DISP @ 95.89 ea. | 2C/26C | 958.90 | 0.00 | 958.90 | |
| 65 | 090503 | | 1 | PLATE BOVIE DISP | 4C | 95.89 | 0.00 | 95.89 | |
| 66 | 8/7-8/18/03 | | 10 | PROXIMAL SPIKE PUMP SE @ 7.92 ea. | 2B | 237.60 | 0.00 | 237.60 | |
| 67 | 081503 | | 1 | PROXIMAL SPIKE PUMP SE | 4B1 | 7.92 | 0.00 | 7.92 | |
| 68 | 081903 | | 1 | SET 2C6537 ADM IV | 2B | 32.80 | 0.00 | 32.80 | |
| 69 | 081503 | | 1 | SET BLOOD GRAVITY FLOW | 4C | 49.54 | 0.00 | 49.54 | |
| 70 | 080803 | | 1 | SET IRR W/PJSTON SRG | 2B | 39.74 | 0.00 | 39.74 | |
| 71 | 8/7-8/18/03 | | 3 | SET SUCTION YANKAUER @ 59.93 ea. | 2B | 179.79 | 0.00 | 179.79 | |
| 72 | 081503 | | 3 | SOL BT 76L MALE 6IN. | 4B1 | 31.80 | 0.00 | 31.80 | |
| 73 | 8/19-8/22/03 | | 2 | STET ESO 18F W/TEMP @ 25.87 ea. | 2B | 51.74 | 0.00 | 51.74 | |
| 74 | 081903 | | 1 | STOPCOCK 3-WAY STERL | 2B | 19.57 | 0.00 | 19.57 | |
| 75 | 8/7-8/13/03 | | 3 | SUCTION DISPOSABLE VAL @ 28.96 ea. | 2B | 86.88 | 0.00 | 86.88 | |
| 76 | 081503 | | 1 | SUTURE J-495 | 4B1 | 54.88 | 0.00 | 54.88 | |
| 77 | 8/10-8/28/03 | | 6 | TIP YANKAUER @ 26.50 ea. | 2B | 159.00 | 0.00 | 159.00 | |
| 78 | 090503 | | 1 | TIP YANKAUER | 4B1 | 26.50 | 0.00 | 26.50 | |
| 79 | 082203 | | 3 | TISSEEL DUAL SPRAY TIP @ 89.58 ea. | 2B3 | 268.74 | 0.00 | 268.74 | |
| 80 | 081503 | | 1 | TISSEEL MIST APPLICATOR | 4B2 | 168.44 | 0.00 | 168.44 | |
| 81 | 082203 | | 1 | TISSEEL MIST APPLICATOR | 2B3 | 168.44 | 0.00 | 168.44 | |
| 82 | 081503 | | 1 | TISSEEL SPRAY TIP | 4B2 | 89.58 | 0.00 | 89.58 | |
| 83 | 8/19-8/28/03 | | 3 | TUBE ENDO MURPHY 7.5' @ 106.61 ea. | 2B | 319.83 | 0.00 | 319.83 | |
| 84 | 081503 | | 1 | TUBE ENDO MURPHY 8.0 | 4B1 | 106.61 | 0.00 | 106.61 | |
| 85 | 8/7-8/13/03 | | 3 | TUBING O2 @ 11.36 ea. | 2B | 34.08 | 0.00 | 34.08 | |
| 86 | | | | | | | | 20913.79 | |
| 87 | | | | | | | | | |
| 88 | | | | 272   STERILE SUPPLY | | | | | |
| 89 | 8/10-8/31/03 | | 18 | WATER IRRIG 1000 BOTTLE @ 68.56 ea. | 19D | 1234.08 | 0.00 | 1234.08 | |
| 90 | 9/3-9/8/03 | | 6 | CONTAINER IV BAG 4L | 2B | 550.86 | 0.00 | 550.86 | |
| 91 | | | | | | | | 1784.94 | |

535586696

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 92 | | | | | | | | | |
| 93 | | | | 305   LAB / HEMATOLOGY | | | | | |
| 94 | 082503 | 85014 | 1 | HEMATOCRIT   (unbundled from 85027) | 10D | 35.62 | 0.00 | 35.62 | |
| 95 | 082503 | 85018 | 1 | HEMOGLOBIN   (unbundled from 85027) | 10D | 62.06 | 0.00 | 62.06 | |
| 96 | | | | | | | | 97.68 | |
| 97 | | | | | | | | | |
| 98 | | | | 420   PHYSICAL THERAPY | | | | | |
| 99 | 081703 | 29125GP | 1 | APP SHT ARM SPL STATIC (unbundled from 97504) | 25F*/30B | 294.24 | 0.00 | 294.24 | |
| 100 | | | | | | | | 0.00 | |
| 101 | | | | | | | | | |
| 102 | | | | 430   OCCUPATION THERAPY | | | | | |
| 103 | 8/22-8/25/03 | 2951SGO | 1 | APP SHORT LEG SPLINT @ 139.61 ea. | 25F*/30B | 279.22 | 0.00 | 279.22 | |
| 104 | | | | | | | | 279.22 | |
| 105 | | | | | | | | | |
| 106 | | | | SUBTOTAL OF NON-BILLABLE ITEMS/SERVICES | | | | $   79,243.50 | |
| 107 | | | | | | | | | |
| 108 | | | | 360   OR SERVICES | | | | | |
| 109 | 080803 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 110 | 080803 | | 9 | OR CATEGORY ADDTNL 15MI | 25C/21 | 4173.12 | 0.00 | 4173.12 | |
| 111 | 081203 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 112 | 081203 | | 8 | OR CATEGORY ADDTNL 15MI | 25C/21 | 3708.44 | 0.00 | 3708.44 | |
| 113 | 081303 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 114 | 081303 | | 7 | OR CATEGORY ADDTNL 15MI | 25C/21 | 3245.76 | 0.00 | 3245.76 | |
| 115 | 081903 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 116 | 081903 | | 4 | OR CATEGORY ADDTNL 15MI | 25C/21 | 1854.72 | 0.00 | 1854.72 | |
| 117 | 082203 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 118 | 082203 | | 11 | OR CATEGORY ADDTNL 15MI | 25C/21 | 5100.48 | 0.00 | 5100.48 | |
| 119 | 082503 | | 1 | OR CATEGORY 1 1ST 30MI | 25C/21 | 4769.22 | 0.00 | 4769.22 | |
| 120 | 082503 | | 6 | OR CATEGORY ADDTNL 15MI | 25C/21 | 2782.08 | 0.00 | 2782.08 | |
| 121 | | | | | | | | 49480.92 | |
| 122 | | | | | | | | | |
| 123 | | | | 270   MED-SUR SUPPLIES | | | | | |
| 124 | 8/8-8/28/03 | | 4 | CIRCUIT ANESTH 60" @ 18.92 ea. | 25C/21 | 75.68 | 0.00 | 75.68 | |
| 125 | 8/12-8/28/03 | | 7 | OXYGEN R.R. CHARGE @ 123.94 ea. | 25C/21 | 867.58 | 0.00 | 867.58 | |
| 126 | 8/19-8/28/03 | | 2 | STYLET INTUBATG 14FR @ 32.18 ea. | 25C | 64.36 | 0.00 | 64.36 | |
| 127 | 8/7-9/9/03 | | 8 | BB IDENTIFICATION SYST @ 29.26 ea. | 25D | 234.08 | 0.00 | 234.08 | |
| 128 | | | | | | | | 1241.70 | |
| 129 | | | | | | | | | |
| 130 | | | | 710   RECOVERY ROOM | | | | | |
| 131 | 081203 | | 1 | PACU CLASS III | 25C/21 | 1117.27 | 0.00 | 1117.27 | |
| 132 | 081303 | | 1 | PACU CLASS IV | 25C/21 | 1279.74 | 0.00 | 1279.74 | |
| 133 | 081803 | | 1 | PACU CLASS III | 25C/21 | 1117.27 | 0.00 | 1117.27 | |
| 134 | 082203 | | 1 | PACU CLASS III | 25C/21 | 1117.27 | 0.00 | 1117.27 | |
| 135 | 082503 | | 1 | PACU CLASS III | 25C/21 | 1117.27 | 0.00 | 1117.27 | |

04/29/2004   14:19   6784217F                    PASA                    PAGE   09

539586846

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 136 | | | | | | | | 5748.82 | |
| 137 | | | | | | | | | |
| 138 | | | | 302   LAB / IMMUNOLOGY | | | | | |
| 139 | 8/10-9/9/03 | 86920 | 21 | CROSSMATCH IMM SPIN @ 138.72 ea. | 25C | 2913.12 | 0.00 | 2913.12 | |
| 140 | | | | | | | | 2913.12 | |
| 141 | | | | | | | | | |
| 142 | | | | 390   BLOOD/STOR-PROC | | | | | |
| 143 | 0811-0909 | P9021 | 14 | PRBC | 25C | 2491.02 | 0.00 | 2491.02 | |
| 144 | | | | | | | | 2491.02 | |
| 145 | | | | | | | | | |
| 146 | | | | 410   RESPIRATORY SCV | | | | | |
| 147 | 080703 | 94656 | 1 | VENT MGMT INITIAL DAY | 25C/2A | 1041.89 | 0.00 | 1041.89 | |
| 148 | 080703 | | 2 | VENT MANAGEMENT | 25C | 358.30 | 0.00 | 358.30 | |
| 149 | 080803 | 94657 | 1 | VENT MGMT SUBSEQUENT D | 25C/2A | 1072.82 | 0.00 | 1072.82 | |
| 150 | 080903 | 94657 | 1 | VENT MGMT SUBSEQUENT D | 25C/2A | 1072.82 | 0.00 | 1072.82 | |
| 151 | 081003 | 94657 | 1 | VENT MGMT SUBSEQUENT D | 25C/2A | 1072.82 | 0.00 | 1072.82 | |
| 152 | 081103 | 94657 | 1 | VENT MGMT SUBSEQUENT D | 25C/2A | 1072.82 | 0.00 | 1072.82 | |
| 153 | | | | | | | | 5691.47 | |
| 154 | | | | | | | | | |
| 155 | | | | 921   PERI VASCUL LAB | | | | | |
| 156 | 081103 | 93970 | 1 | DUP VEIN BIL | 24C/18A | 596.74 | 304.00 | 292.74 | |
| 157 | 081803 | 93970 | 1 | DUP VEIN BIL | 24C/18A | 596.74 | 304.00 | 292.74 | |
| 158 | | | | | | | | 585.48 | |
| 159 | | | | | | | | | |
| 160 | | | | 510   CLINIC | | | | | |
| 161 | | 99201 | 1 | INTL PATIENT HBO ASSME | 25B* | 218.34 | 0.00 | 218.34 | |
| 162 | 080703 | | | (what is POS?  Admitted as inpt @ 0700) | | | | 218.34 | |
| 163 | | | | | | | | | |
| 164 | | | | | | | | | |
| 165 | | | | SUBTOTAL OF ITEMS/SERVICES NOT ON UB-92 | | | | $   136,741.74 | |
| 166 | | | | | | | | | |
| 167 | | | | TOTAL NONBILLABLE AND UNDOCUMENTED | | | | $   108,279.35 | |
| 168 | | | | | | | | | |
| 169 | | | | | | | | | COST TO |
| 170 | | | | UCR / FAIR AND REASONABLE CHARGES | | Charge Per | Cost plus 30% | | CHARGE RATIO |
| 171 | | | 3 | SOD CHLOR 0.9% 500ML B | 99 | 71.85 | 4.76 | | 15.09 |
| 172 | 8/7-8/31/03 | | 1 | D5/NS 0.9% 1000ML BAG | 99 | 100.38 | 2.28 | | 44.03 |
| 173 | 080703 | | 6 | RL SOL 1000CC BAG | 99 | 104.62 | 3.64 | | 28.74 |
| 174 | 8/7-9/6/03 | | 21 | NACHL 0.9% 1000CC BAG | 99 | 71.85 | 2.44 | | 29.45 |
| 175 | 8/7-8/22/03 | | 42 | H2O STER INJ 1000CC BA | 99 | 34.97 | 2.56 | | 13.66 |
| 176 | 8/7-8/7/03 | | 4 | D5W 1000ML BAG | 99 | 87.61 | 1.88 | | 46.60 |
| 177 | 8/11-8/8/03 | | 9 | AMINO ACID 6.8% 750ML | 99 | 230.94 | 126.72 | | 1.84 |
| 178 | 8/31-8/8/03 | | 26 | XR CHEST 1 V      (CPT 71010) | 99 | 227.29 | 60.22 | | 3.77 |
| 179 | 8/7-8/12/03 | | 23 | CASPOFUNGIN 50MG INJ | 99 | 772.16 | 489.98 | | 1.58 |

539586846

04/29/2004   14:19   6784217   PASA   PAGE   11

| | A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|---|
| 180 | 8/14-9/4/03 | | 18 | ALBUMIN INF 25% 20ML | 99 | 701.44 | 46.80 | | 14.99 |
| 181 | 0826-0830 | | 97 | SPONGE LAP 18 X 18 | 99 | 126.81 | 4.36 | | 29.08 |
| 182 | 8/8-9/5/03 | 82803 | 26 | ABG WITH CALC O2 SAT | 99 | 195.19 | 116.83 | | 1.67 |
| 183 | 8/7-9/4/03 | 82040 | 3 | ALBUMIN SERUM | 99 | 79.57 | 25.06 | | 3.18 |
| 184 | 8/7-9/9/03 | 84075 | 45 | ALK PHOS (ALP) | 99 | 85.03 | 28.97 | | 2.94 |
| 185 | 8/7-9/10/03 | 84450 | 45 | AST (SGOT) | 99 | 108.65 | 31.96 | | 3.40 |
| 186 | 8/7-9/10/03 | 80048 | 2 | BASIC METABOLIC PANEL | 99 | 204.12 | 50.92 | | 4.01 |
| 187 | 8/28-9/7/03 | 82247 | 45 | BILIRUBIN TOT | 99 | 63.05 | 25.06 | | 2.52 |
| 188 | 8/7-9/10/03 | 84520 | 45 | BUN | 99 | 54.86 | 31.96 | | 1.72 |
| 189 | 8/7-9/10/03 | 82330 | 23 | CALCIUM IONIZED | 99 | 164.14 | 88.61 | | 1.85 |
| 190 | 8/7-9/6/03 | 82533 | 1 | CORTISOL TOTAL | 99 | 187.96 | 112.56 | | 1.67 |
| 191 | 090903 | 82550 | 47 | CREATINE KINASE (CK) | 99 | 93.35 | 31.13 | | 3.00 |
| 192 | 8/7-9/10/03 | 82565 | 41 | CREATININE BLD | 99 | 58.50 | 31.13 | | 1.88 |
| 193 | 8/7-9/10/03 | 80051 | 43 | ELECTROLYTE PANEL | 99 | 131.67 | 41.23 | | 3.19 |
| 194 | 8/7-9/4/03 | 82947 | 43 | GLUCOSE BLD QN | 99 | 44.84 | 29.72 | | 1.51 |
| 195 | 8/7-9/10/03 | 83605 | 18 | LACTIC ACID | 99 | 136.53 | 79.74 | | 1.71 |
| 196 | 8/8-9/9/03 | 83735 | 45 | MAGNESIUM BLD | 99 | 103.23 | 31.20 | | 3.31 |
| 197 | 8/7-9/10/03 | 84100 | 45 | PHOSPHORUS BLD | 99 | 81.05 | 28.97 | | 2.80 |
| 198 | 8/7-9/10/03 | 84439 | 2 | T4 FREE | 99 | 121.88 | 73.77 | | 1.65 |
| 199 | 8/7-9/18/03 | 84443 | 2 | TSH | 99 | 170.12 | 103.28 | | 1.65 |
| 200 | 8/7-9/10/03 | 85378 | 10 | D-DIMER SEMI | 99 | 91.85 | 61.73 | | 1.49 |
| 201 | 8/8-9/3/03 | 85384 | 18 | FIBRINOGEN ACTIVITY | 99 | 125.14 | 47.49 | | 2.64 |
| 202 | 8/8-9/9/03 | 85027 | 41 | HEMOGRAM W PLT NO DIFF | 99 | 99.80 | 37.85 | | 2.63 |
| 203 | 8/7-9/10/03 | 85610 | 17 | PROTIME | 99 | 63.60 | 33.25 | | 1.92 |
| 204 | 8-7-9/9/03 | 85730 | 17 | PTT | 99 | 85.73 | 40.36 | | 2.12 |
| 205 | 8/7-9/9/03 | | | | | 5079.78 | 1927.22 | | 283.27 |
| 206 | | | | | | | | | |

539586 846

|   | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | Patient: | Matt D. Stone | | | | | | |
| 2 | Hospital: | Doctors Hospital Augusta | | | | | | |
| 3 | Control #: | 539586846 | | | | | | |
| 4 | SS#: | 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 | | | | | | |
| 5 | Employer: | Carolina Beverage | | | | | | |
| 6 | Dates of Service: | 8/07/2003-09/12/2003 | | | | | | |
| 7 | TPA: | Employee Benefit Services | | | | | | |
| 8 | Rev Code | Description | Total Billed | Inappropriate or unsupported | Exceeds U&C | Total Invalid | Total Consideration | |
| 9 | 207 | ICU/Burn Care | 43,485.00 | 0.00 | 0.00 | 0.00 | 43,485.00 | |
| 10 | 207 | ICU/Burn Care | 43,485.00 | 0.00 | 0.00 | 0.00 | 43,485.00 | |
| 11 | 207 | ICU/Burn Care | 7,540.00 | 0.00 | 0.00 | 0.00 | 7,540.00 | |
| 12 | 207 | ICU/Burn Care | 4,020.00 | 0.00 | 0.00 | 0.00 | 4,020.00 | |
| 13 | 207 | ICU/Burn Care | 3,345.00 | 0.00 | 0.00 | 0.00 | 3,345.00 | |
| 14 | 207 | ICU/Burn Care | 1,885.00 | 0.00 | 0.00 | 0.00 | 1,885.00 | |
| 15 | 250 | Pharmacy | 137,977.31 | 5,253.17 | 48,292.06 | 53,545.23 | 84,432.08 | |
| 16 | 250 | IV Solutions | 18,049.68 | 11,285.44 | 6,317.39 | 17,602.83 | 446.85 | |
| 17 | 259 | Drugs/Other | 11,617.68 | 0.00 | 4,066.19 | 4,066.19 | 7,551.49 | |
| 18 | 270 | Med-Sur Supplies | 109,709.79 | 20,913.79 | 27,880.50 | 48,794.29 | 60,915.50 | |
| 19 | 272 | Sterile Supplie | 5,417.24 | 1,784.94 | 0.00 | 1,784.94 | 3,632.30 | |
| 20 | 274 | Prosth/Orth Dev | 618.94 | 0.00 | 0.00 | 0.00 | 618.94 | |
| 21 | 301 | Lab/Chemistry | 52,179.45 | 0.00 | 10,435.89 | 10,435.89 | 41,743.56 | |
| 22 | 302 | Lab/Immunology | 3,892.00 | 2,913.12 | 0.00 | 2,913.12 | 978.88 | |
| 23 | 305 | Lab/Hemotology | 10,557.10 | 97.66 | 2,111.41 | 2,209.10 | 8,348.00 | |
| 24 | 305 | Lab/Bact-Micro | 3,497.93 | 0.00 | 0.00 | 0.00 | 3,497.93 | |
| 25 | 307 | Lab/Urology | 44.71 | 0.00 | 0.00 | 0.00 | 44.71 | |
| 26 | 324 | DX X-ray/Chest | 5,909.54 | 0.00 | 0.00 | 0.00 | 5,909.54 | |
| 27 | 351 | CT Scan/Head | 1,753.76 | 0.00 | 0.00 | 0.00 | 1,753.76 | |
| 28 | 360 | OR Services | 71,207.46 | 49,480.92 | 54,241.49 | 63,722.41 | 7,485.05 | |
| 29 | 361 | OR/Minor | 3,444.44 | 0.00 | 0.00 | 0.00 | 3,444.44 | |
| 30 | 390 | Blood/Stor-Proc | 2,491.02 | 2,491.02 | 0.00 | 2,491.02 | 0.00 | |
| 31 | 410 | Respiratory Svc | 26,925.18 | 5,691.47 | 5,385.04 | 11,076.51 | 15,848.67 | |
| 32 | 413 | Hyper Baric 02 | 2,211.36 | 0.00 | 0.00 | 0.00 | 2,211.36 | |
| 33 | 420 | Physical Therapy | 1,245.93 | 294.24 | 0.00 | 294.24 | 951.68 | |
| 34 | 424 | Phsy therp/Eval | 103.55 | 0.00 | 0.00 | 0.00 | 103.55 | |
| 35 | 430 | Occupation Ther | 2,552.19 | 279.22 | 0.00 | 279.22 | 2,272.97 | |
| 36 | 434 | Occup Therp/Eval | 103.55 | 0.00 | 0.00 | 0.00 | 103.55 | |
| 37 | 510 | Clinic | 218.34 | 218.34 | 0.00 | 218.34 | 0.00 | |
| 38 | 636 | Drugs/Detail Code | 38,186.06 | 1,927.22 | 0.00 | 1,927.22 | 36,258.84 | |
| 39 | 710 | Recovery Room | 9,263.10 | 5,748.82 | 0.00 | 5,748.82 | 3,514.28 | |
| 40 | 730 | EKG /ECG | 251.70 | 0.00 | 0.00 | 0.00 | 251.70 | |

539586846

PAGE  13

PASA

6784217522

04/29/2004  14:19

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 41 | 750 | Gastr-inta Sys | 2,119.66 | 0.00 | 0.00 | 0.00 | 2,119.66 | |
| 42 | 921 | Peri Vascul Lab | 1,723.39 | 585.48 | 0.00 | 585.48 | 1,137.91 | |
| 43 | 991 | Cafeteria | 15.92 | 15.92 | 0.00 | 15.92 | 0.00 | |
| 44 | | | 627,047.88 | 108,980.79 | 118,729.98 | 227,710.77 | 399,337.11 | 399,337.11 |

# DANIEL & LOWE

### ATTORNEYS AT LAW

2907 PROFESSIONAL PARKWAY
AUGUSTA, GEORGIA 30907

N. KENNETH DANIEL, P.C.
ROBERT J. LOWE, JR.*

June 4, 2004

P.O. BOX 211790
AUGUSTA, GEORGIA 30917
(706) 860-3747
FAX 860-4757

*ALSO ADMITTED IN TN AND FL

CERTIFIED, RETURN RECEIPT

Carolina Beverage Corporation,
   Plan Administrator/Carolina Beverage
   Employee Medical Plan
P.O. Box 697
Salisbury, NC 28145-0697

CERTIFIED, RETURN RECEIPT

Employee Benefit Services, Inc.
Plan Supervisor/Carolina Beverage
   Employee Medical Plan
10 Woodlawn Green
4801 Chastain Avenue
Charlotte, NC 28217

      Re: Patient:     Matthew D. Stone
          Provider:    Doctors Hospital of Augusta

| Account No. | Total Charges | Amount Paid | Balance Due | Dates of Service |
|---|---|---|---|---|
| 539586846 | $626,896.22 | $399,337.11 | $227,710.77 | 08/07/03-09/12/03 |
| 539747658 | $ 73,688.69 | $ 54,874.08 | $ 34,781.06 | 09/15/03-10/06/03 |
| 539876409 | $117,174.99 | $ 85,322.19 | $ 25,123.28 | 10/17/03-11/02/03 |
| 540163689 | $     564.87 | $   -0- | $     564.87 | 02/04/04 |
| 540464586 | $ 31,821.53 | $ 21,304.88 | $ 10,516.65 | 03/08/04-03/15/04 |

Dear Sir or Madam:

     I represent Doctors Hospital of Augusta, the hospital housing the burn facility in Augusta, Georgia that provided the above referenced care and treatment to Matthew D. Stone. Doctors Hospital is also the designated authorized representative of Mr. Stone to pursue his claim for benefits due from the plan for the above referenced hospitalizations. A copy of the Appointment of Authorized Representative and Assignment of Benefits that Mr. Stone executed in favor of Doctors Hospital on March 5th was sent to you with my correspondence on March 26th and should be in your



EXHIBIT
E

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Two
June 4, 2004

records. Out of an abundance of caution, you will find another copy of the Appointment in tab 1 of the exhibits that accompany this letter.

    As an initial matter, I am renewing my request for your immediate production of a copy of the entire claims file with respect to this claim, all as initially set out in the last paragraph of my March 26th letter, a copy of which is included in the exhibits to these materials in tab 2. My March 26th letter was very specific in requesting, in accordance with the applicable provisions of ERISA, all documents which you have or will rely upon in accepting, rejecting, paying or partially paying this claim, as well as any and all other documents received or submitted by anyone with respect to this claim, whether or not you have relied on these documents in the making of the determinations and decisions that have been made with respect to this claim. We are specifically authorized to request, and you are specifically obligated to provide this information pursuant to the provisions of 29 C.F.R. Sec. 2560.503-1(m)(8). The time within which you could have timely produced this material has already expired and the hospital intends to seek the applicable penalties for your untimely production of these documents to the extent litigation hereafter results.

    This letter is also being submitted as an appeal of the payment decisions made with respect to the above referenced accounts. Four of the above referenced accounts have been partially paid while one account has not been paid at all. In the exhibits following this letter, please find in tab 3, a duplicate copy of the billing for account 540163689 which has not been paid at all. This letter should also specifically be considered as the initiation of an administrative appeal of the Plan's payment decisions that have been made. The hospital was notified of the Plan's payment decision by letter of April 27th, 2004 from Paula Mullinax at HBA/Hospital Bill Analysis. A copy of the HBA/Hospital Bill Analysis April 27th letter and the documentation that accompanied that letter is attached hereto in the supporting documentation as tab 4.

    While this letter should be considered as an appeal of the payment decisions that have been made, the letter should also be considered as a request that you specifically identify any and all additional materials needed to properly process this claim, which specification, according to applicable ERISA provisions, should have been provided with the payment decision contained in the April 27th letter of Hospital Bill Analysis. Specifically, there are a substantial number of charges in the above referenced accounts that were disallowed as being undocumented. The second paragraph of the April 27th letter from Hospital Bill Analysis specifically provides "additional documentation is required in order to support the charges billed". Unfortunately, there was very little

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Three
June 4, 2004

guidance provided as to exactly what additional documentation was required. The specific provisions of 29 C.F.R. 2560.503-1 require that when an adverse payment decision is made on the basis that additional documentation is necessary, "a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary" must be provided. No such explanation was given by Hospital Bill Analysis with respect to the documentation they sought. Notwithstanding the absence of such guidance, you will find in tab 5 of the supporting documentation attached, a revised UB-92 billing for Mr. Stone's inpatient stay between August 7th and September 12th, account number 539586846. This revised copy of the UB-92 billing contains a listing of all ICD-9 procedure codes reflecting the various procedures performed on Mr. Stone during this hospitalization. There is also enclosed with these materials a complete copy of Mr. Stone's entire medical record that supports all of the charges made for the services rendered during each of Mr. Stone's hospitalizations. To the extent the medical records and additional documentation provided in the attached exhibits does not provide you with all of the information needed to now process and pay the charges which were previously denied as undocumented or unsupported, please provide us immediately with a detailed description of the additional material or information necessary, and an explanation of why such material is necessary, so that the claim might be perfected.

In addition to the charges that have been denied as undocumented or unsupported, a number of charges have been repriced in manners that are inconsistent with the terms of the Plan. Specifically, the Plan's provisions provide as follows:

(a) The maximum hospital daily room and board covered expenses for burn units are to be allowed as charged as provided on page 13 of the Plan;

(b) Page 17 of the Plan provides that there should be no reduction in benefits for non-PPO providers when, due to emergency or the specialized nature of the treatment required (such as burn treatment), the patient could not utilize a PPO provider;

(c) The definition of Covered Expenses contained on page 33 specifically includes "miscellaneous hospital charges (charges billed by the hospital other than room and board); other hospital services required for medical, surgical care or treatment". Many charges that would qualify under this provision have been disallowed. In addition, paragraph 25 of the definitions of Covered Expenses includes charges for ambulance service, including air ambulance service. The definition

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Four
June 4, 2004


of Covered Medical Expenses set out on page 35 includes charges for medically necessary supplies and oxygen and rental of equipment for its administration. Many charges that would be included in these provisions have been disallowed;

(d) The Plan definition of Covered Medical Expenses on pages 33-36 and page 40 specifically includes charges for prescription drugs and those charges are not, pursuant to any provisions of the Plan, limited to levels of wholesale prices or a markup of any wholesale price levels;

(e) Page 40 of the Plan specifically defines Covered Expenses as "reasonable and customary expenses incurred, including hospital, surgical, medical and dental care expenses required for diagnosis and treatment of injury or illness". All of the admixtures or other materials disallowed entirely were required for this patient's treatment.

(f) Page 48 of the Plan specifically defines reasonable and customary as "the usual charge (not cost) made by a physician or supplier of services, medicines, or supplies which does not exceed the general level of charges made by others rendering or furnishing such services, medicines, or supplies within the area in which the charge is incurred for illness or injury comparable in severity and nature to the illness or injury being treated". As far as we have been able to determine, the HBA study did not use actual charges of any other hospital for comparison purposes in performing their study.

Many, if not most, of the repricing decisions and denials contained in the April 27th letter of Hospital Bill Analysis are specifically contrary to the Plan's defined obligations with respect to paying reasonable and customary Covered Expenses. Attached to the April 27th letter from Hospital Bill Analysis was a three page "Determination Code Explanation" that was referenced in the repricing study that was done. A number of the provisions in this Determination Code Explanation contradict the Plan's self-defined obligations with respect to reimbursement for medical bills. Specific examples of those contradictions are as follows:

(a) There is included on page 1 a reference to non-billable services which provides "CMS prohibits charging for non-billable services for both inpatients and outpatients. These are charges that Medicare considers as part of the cost of doing business as a hospital and, therefore, should be included in the room or procedure charge. They are also not billable to the beneficiary. Non-billable

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Five
June 4, 2004


services would include such things as billing for nursing time, gowns, call back, or equipment". Unfortunately, the Plan's definitions contain no such exclusions, nor do the Plan's definitions in any way limit the Plan's payment obligations to what Medicare or CMS would allow or pay.

(b) Again, on page 1 of the Determination Code Explanation, it is provided: "Routine Supplies - Routine supplies are defined as supplies found in the 'floor stock' and are available to all patients receiving supplies in that location. The supply items are included in the general cost of the room in which the services are delivered and are not separately billable". Again, there are no such exclusions listed in "Excluded Medical Expenses" as defined on pages 37-39 of the Plan and the Plan documents make it clear that the Plan is obligated to pay for all supplies which are medically necessary and for miscellaneous hospital charges which are charges billed by the hospital other than room and board.

(c) Paragraph 4 (C) of the Determination Code Explanations provides "that with respect to routine equipment or equipment commonly available to patients in a particular setting, such equipment will not be separately billable". Such equipment is defined by Hospital Bill Analysis as including "instruments, apparatuses, implements or such items for which depreciation and financing expenses are recoverable as depreciable assets". Again, there is no such exclusion within the Plan documents for charges related to equipment that is medically necessary and used to treat the patient. The Plan's provisions contain no support for these denials.

(d) Paragraph 19 of the Determination Code Explanations styled "Enfusions/Injections/IV Solutions" provides that in order to qualify for reimbursement, IV solutions must serve a therapeutic or diagnostic purpose. Admixtures are neither therapeutic nor diagnostic". The paragraph goes on to provide in subparagraph (E) that IV solutions are reimbursed using AWP (Average Wholesale Price) plus 30% markup. Again, this is completely contradictory to the Plan's self-imposed obligations. There are no exclusions in the Plan documents that would deny payment for IV admixtures. The "Excluded Medical Expenses" section of the Plan contains absolutely no authority for denying payment for these necessary medical supplies. Specifically, such admixtures are necessary in a burn setting and are required for treatment of the patient and, according to the Plan's definitions of Covered Medical Expenses and Covered Expenses, such admixtures qualify for reimbursement. In addition, there is absolutely no provision in the Plan which limits the Plan's reimbursement obligations to any level related to wholesale pricing. The Plan very specifically defines its payment obligation as being related to " . . . the usual charge made by a . . . supplier of

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Six
June 4, 2004

services, medicines or supplies which does not exceed the general level of <u>charges</u> made by others rendering or furnishing such services. . .". This provision specifically precludes any reimbursement decisions being made on the basis of wholesale pricing.

(e) Paragraph 24 of the Determination Code Explanations styled "UCR Range", subparagraph (c) styled "Allowed Amounts" provides that "Allowed Amounts are based upon percentiles from <u>national data bases</u>. The percentiles used are the 75th and 85th. This data is used in place of geographical conversion factors. The 75th percentile indicates that 25% of the charges are at that charge or higher, and 75% are at that point or lower". Again, as reflected in subparagraph (d) above, this method of reimbursement specifically contradicts the Plan's self-imposed obligations to pay "Reasonable and Customary" charges.

(f) Paragraph 99 styled "Fair and Reasonable Charges" provides that the repricing company has used "the Red Book 2003 Drug Topics, and the National Fee Analyzer, 2003, and 2004 published by Ingenix" in order to reprice these bills. As reflected in the two subparagraphs immediately preceding, this method of reimbursement contradicts the obligations imposed by the Plan itself.

(g) Paragraph 99 goes on to reflect that with respect to drug charges, "CMS reimburses 85% to 95% of the AWP listed in the Red Book. For purposes of non-CMS reimbursement, 'fair and reasonable' is calculated using the AWP (Average Wholesale Price) multiplied by 1.30, thus securing a 30% margin of profit for drugs supplied by the hospital". Again, this method of reimbursement contradicts the Plan's reimbursement obligations. The Plan itself very specifically provides that the prices of our hospital are to be compared with the prices charged by other suppliers of drugs such as other hospitals or pharmacies in our geographic area. There is no basis set out in the Plan that would permit the repricing of our drug charges with reference to a markup of average wholesale prices.

(h) As noted above, IV solutions have been repriced to a 30% markup from average wholesale price, a methodology which is unsupported by the Plan.

(i) Paragraph 99 specifically provides that with respect to ancillary supply prices "the amount allowed column figures are calculated from the purchase price of a single item, with no bulk discount and includes a 30% markup from that retail price". Again, the repricer attempts to use wholesale

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Seven
June 4, 2004

pricing to the supplier, not the price charged by the suppliers to the end user. This method is again completely contradictory to the Plan.

For all of the reasons set out above, the methodology used by Hospital Bill Analysis to reprice our bills is a methodology which is not only unsupported by, but completely contradictory to, the Plan's obligations as defined in the Plan documents. Accordingly, the hospital appeals the payment decisions and repricing decisions made by Hospital Bill Analysis as described above. I would note that the first page of the Hospital Bill Analysis' report of April 27th requests that the hospital provide in any appeal "invoices from suppliers for implants, medical supplies or devices disallowed. Please submit the physician's orders and the invoices for the pharmacy charges". As noted previously in this letter, an entire copy of the medical record is being submitted in support of the entirety of the charges made by Doctors Hospital. The Plan has no provisions that would authorize a repricing of the pharmacy, IV or supply charges based on wholesale prices or the hospital's invoice price. Accordingly, the hospital respectfully declines to produce such material.

Finally, the April 27th letter from HBA indicates that "the Plan member should not be balance billed". While the Plan may by its own terms limit its reimbursement obligations with respect to medical expenses incurred by a Plan participant such as Mr. Stone, the hospital has never agreed to accept as full and final settlement of Mr. Stone's account, the amounts paid by the Plan, particularly, when the Plan has refused to make payment in accordance with its own terms. At the present time, Mr. Stone has exposure on his hospital bill in an amount that exceeds $284,000.00 and the hospital would have a claim for such monies, as well as a lien upon any causes of action which Mr. Stone may have as against third parties whose actions necessitated the hospital care and treatment provided by Doctors Hospital.

Should you have any questions with respect to this appeal, please contact me on an immediate basis. Originals of this letter, together with supporting documentation, have been sent both to the Plan Administrator and the Plan Supervisor. Copies of the letter, without the supporting documentation, have been sent to Ms. Josephine H. Hicks, Attorney for the Plan, and to Paula Mullinax of Hospital Bill Analysis. Inasmuch as Mr. Stone has substantial exposure to the hospital as a result of the payment decisions that have been made to date by the Plan, we are also providing Mr. Stone's attorney, Raymond G. Chadwick, Jr., with a copy of this letter.

Carolina Beverage Corporation
  Plan Administrator/Carolina Beverage
  Employee Medical Plan

Employee Benefit Services, Inc.
  Plan Supervisor/Carolina Beverage
  Employee Medical Plan
Page Eight
June 4, 2004


        With kindest regards, I am

                        Yours very truly,

                        DANIEL & LOWE

                        N. Kenneth Daniel

NKD:dl

cc: Ms. Josephine H. Hicks w/o encls.
    Ms. Paula Mullinax w/o encls.
    Mr. Raymond G. Chadwick, Jr. w/o encls.

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

CHARLOTTE NC 282

| | |
|---|---|
| Postage | $ $15.30 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $19.35 |

0607
08   Postmark Here

06/04/2004

7002 2410 0004 4688 8563

Sent To Employee benefit Server
Street, Apt. No.; or PO Box No. 4801 Chastain Ave.
City, State, ZIP+4 Charollete NC 8217

PS Form 3800, June 2002          See Reverse for Instructions

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

SALISBURY NC 281 497

| | |
|---|---|
| Postage | $ $15.30 |
| Certified Fee | $2.30 |
| Return Receipt Fee (Endorsement Required) | $1.75 |
| Restricted Delivery Fee (Endorsement Required) | $0.00 |
| Total Postage & Fees | $ $19.35 |

0607
08   Postmark Here

06/04/2004

7002 2410 0004 4688 8570

Sent To Carolina Beverage Corp
Street, Apt. No.; or PO Box No. P.o. Box 697
City, State, ZIP+4 Salisbury NC 8145

PS Form 3800, June 2002          See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Employee benefit Services
INC
Plan

PO Box 1929
Fort Mill SC 29716

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)
Alice Harper

B. Date of Delivery

C. Signature
☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

JUN 16 2004
USPS - 29715

pt for Merchandise
☐ Yes

2.

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Carolina Beverage corporation
plan Administrator/Carolina
Beverage Employee Medical
Plan
P.O. Box 697
Salisbury, NC 28145-0697

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by (Please Print Clearly)

B. Date of Delivery
7-6-04

C. Signature
X   M.S. Buck
☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered   ☑ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number (Copy from service label)
7002 2410 0004 4688 8570

PS Form 3811, July 1999          Domestic Return Receipt          102595-99-M-1789

JUL-29-2004 THU 01:00 PM                    FAX NO.                              P. 01/02

# Law Office of Bryan B. Davenport PC

## Providing Recovery Services for the Self-Insurance Industry Since 1988

July 29, 2004

N. Kenneth Daniel
Daniel & Lowe                                    Via fax: 706-860-4757
Attorneys at Law                                 # of pages: 2
2907 Professional Parkway
P.O. Box 211790
Augusta, GA 30917

      In re: Plan Name: Carolina Beverage Corporation Employee Benefit Plan
             Plan Participant: Stone Matt
             Date of Injury: 8/7/03
             My File No.: K4-4-04
             **539586846**

Dear Mr. Daniel;

      Pursuant to our telephone conversation, I am responding to your June 4th, 2004 letter to Carolina Beverage Corporation's Plan Administrator relative to the adjustments that were made to the charges rendered by your client for care provided to Matthew D. Stone. This will be a partial response to your letter.

      I am in the process of gathering and copying the rather voluminous hospital file that you requested on page two of your letter. To the extent that you have requested information that should be in the hospital's possession, I will not copy these materials. Additionally there are some items that may be proprietary in nature. If necessary, I will attempt to obtain releases so that I can copy these materials and provide same to you. I would appreciate it if you would extend the time necessary for providing this information. I am willing to waive the charges for copying of this data. Additionally, I am hopeful that my complete response to this letter will make provision of all of the data unnecessary.

      My client recognizes that your response is intended to be a formal appeal of the determination of the plan. I am in the process of determining if there is additional information that my client's claims auditor requires in order to make further determinations on this matter. To the extent that such materials are necessary, I will communicate to you a sufficiently specific request so that you can adequately provide the information.

      In response to your paragraph noted by the (a), I have consulted with the claims auditor. They inform me that the hospital daily room and board charges were not reduced. If you contend that adjustments of this nature were made, please provide specific documentation that such an adjustment was made.

      In response to your paragraph noted by the (b), I have consulted with the claims auditor. The claims auditor informs me that they did not make a reduction in benefits due to any PPO issues. As such the fact that your client's facility was out of network did not result in claims reductions in this matter.

**EXHIBIT**
**F**
ALL-STATE LEGAL®

L a w    O f f i c e    o f    B r y a n    B    D a v e n p o r t    P C

In response to your paragraph noted by the "c" the auditor did make reductions due to the fact that some charges were not documented. Additionally, the auditor did make adjustments where the diagnosis code used did not support the charges made by the hospital. The auditor also made adjustments based upon reasonable and customary. The auditor did cover the air ambulance charges. Your client did not separately bill out oxygen.

In response to your paragraph noted by the (d), the auditor is in the process of reviewing the prescription drug charges.

In response to your paragraph noted by the (e), the auditor did adjust the pricing of admixtures due to the unreasonable price charged by your client. The auditor is reviewing our determination in this area to see if further allowances are possible.

Relative to your paragraph noted by the (f), you have correctly stated the definition for reasonable and customary under this plan. However, you are incorrect in your assertion that the auditor has not used actual charges of other hospitals for comparison purposes. A zip code specific, actual charge specific database was used for a substantial portion of the audit.

You next raise a series of issues (a) through (i) wherein you essentially raise issues regarding the auditor's methodology for reducing your client's billings. I have requested that the company that reviewed the bill review their methodology to determine if what they did is consistent with the terms of the plan. I expect that they will complete this review within one week.

I anticipate responding to the above referenced issues as well as the remainder of your letter within the next two weeks. If, in the mean time, you have any questions please feel free to contact my office. I look forward to working towards a resolution to this matter.

Very Truly Yours,

Law Office of Bryan B. Davenport, P.C.
Bryan B. Davenport, Attorney

BBD/sb

# DANIEL & LOWE

**ATTORNEYS AT LAW**

2907 PROFESSIONAL PARKWAY
AUGUSTA, GEORGIA 30907

N. KENNETH DANIEL, P.C.
ROBERT J. LOWE, JR.*

——————————
*ALSO ADMITTED IN TN AND FL

August 24, 2004

P.O. BOX 211790
AUGUSTA, GEORGIA 30917
(708) 860-3747
FAX 860-4757

<u>BY REGULAR MAIL AND</u>
<u>BY FACSIMILE - (317) 738-9310</u>

Mr. Bryan B. Davenport
160 Fairway Lakes Drive
Franklin, IN 46131

|  |  |
|---|---|
| Re: Plan Name: | Carolina Beverage Corporation Employee Benefit Plan |
| Plan Participant: | Matt Stone |
| Date of Injury: | 08/07/03 |
| Provider: | Doctors Hospital of Augusta |
| Patient Account Nos.: | 539586846, 539747658, 539876409, 540163689 and 540464586 |
| Your File No.: | K4-4-04 |

Dear Mr. Davenport:

This letter will follow up your correspondence of July 29th regarding the above referenced matter. Your July 29th correspondence indicated that you anticipated contacting me again within two weeks in order to respond to a number of issues that were not fully addressed in your initial letter. It has now been approximately four weeks since your last correspondence and we have yet to get any additional material with respect to this claim, including the claims file, which we have requested, or the revised calculations of the bill repricing that was done improperly.

When you and I last spoke regarding this claim, I inquired as to whether or not it would be necessary for us to go ahead and get a Complaint filed in the Federal District Court here in Augusta in order to assist in the resolution of these issues. During that conversation, you indicated that you thought you would have some substantive responses to me very soon and that we should be able to be in a position to evaluate whether litigation was necessary by the middle of August. Unfortunately, our deadlines continue to get pushed back and while I certainly always wish to explore every avenue of resolving claims like this before the filing of litigation, I hope you are being candid and would let me know whether the filing of such a claim will help us expedite conclusion of these issues. I would appreciate it if you could contact me upon receipt of this letter and let me know the status of your efforts that were referenced in your July 29th correspondence. I look forward to hearing from you at your earliest convenience.



EXHIBIT

G

Mr. Bryan B. Davenport
Page Two
August 24, 2004


With kindest regards, I am

Yours very truly,

DANIEL & LOWE

N. Kenneth Daniel

NKD;dl

## CERTIFICATE OF SERVICE

This is to certify that on this date I served the foregoing *"Notice of Removal"* by depositing a copy of the same in the United States mail, postage prepaid and addressed as follows:

> Robert L. Allgood
> N. Kenneth Daniel
> 2907 Professional Parkway
> Augusta, GA  30907

This the 3ᵈ day of December, 2004

*Amy R. Snell*
J. Arthur Davison Amy R. Snell